RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 West Main Ave, Suite 300
Spokane, WA 99201
Telephone: (509) 835-5211
ricke@cforjustice.org

DREW A. HARKER (*pro hac vice forthcoming*)
ALLYSON HIMELFARB (*pro hac vice forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Drew.Harker@arnoldporter.com
Allyson.Himelfarb@arnoldporter.com

(Additional Counsel Listed Below)

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
SPOKANE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER WASHINGTON AND NORTH IDAHO; PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS; and PLANNED PARENTHOOD OF THE HEARTLAND,<br><br>    Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES and ALEX MICHAEL AZAR II in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>    Defendants. | Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1.      Plaintiffs Planned Parenthood of Greater Washington and North Idaho ("PPGWNI"), Planned Parenthood of the Great Northwest and the Hawaiian Islands ("PPGNHI"), and Planned Parenthood of the Heartland ("PPH") are three of 76 recipients of federal grant funding under the congressionally appropriated Teen Pregnancy Prevention Program (the "TPP Program"), all of whom had their five-year grant agreements abruptly terminated by the U.S. Department of Health and Human Services ("HHS" or "the agency").  Plaintiffs bring this action to prevent and declare unlawful the agency's politically motivated decision to precipitously terminate Plaintiffs' grant agreements and end the TPP Program as a whole.

2.      Created by a congressional appropriations statute for Fiscal Year ("FY") 2010, the TPP Program provides federal grants for evidence-based teen pregnancy prevention programs, targeting communities with high rates of teen pregnancy and focusing on youth that are often underserved, including youth of color, youth in foster care, and youth in rural communities.

3.      The TPP Program has been heralded as one of the country's most promising evidence-based programs,[1] receiving bipartisan support as an example of how to administer a high quality evidence-based program.  For example, the September 2017 report from a bipartisan Commission on Evidence-Based Policymaking established by House Speaker Paul Ryan (R-WI) and Senator Patty Murray (D-WA) highlighted the TPP Program as an example of a federal program developing increasingly rigorous portfolios of evidence.[2]

---

[1] *See, e.g.*, Robert Gordon & Ron Haskins, *Trump Team Doesn't Understand Evidence-Based Policies Regarding Social Problems*, THE HILL, (July 26, 2017), http://thehill.com/blogs/pundits-blog/the-administration/343908-trump-team-doesnt-understand-evidence-based-policies.

[2] COMM'N ON EVIDENCE-BASED POLICYMAKING, THE PROMISE OF EVIDENCE-BASED (footnote continued)

4.     Through 84 grants, HHS currently funds 76 TPP Program grantees broadly consisting of states, non-profit organizations, school districts, universities, and others.

5.     As of September 2016, it was estimated that the TPP Program was on track to serve an estimated 1.2 million youths across the United States.[3]

6.     Since the TPP Program's inception in 2010, the teen birth rate has declined 41% from 2010 to 2016—a drop that is more than twice as large as the decline in any other six-year period.[4]

7.     Just recently, on January 5, 2018, the Centers for Disease Control and Prevention ("CDC") released results of its research on sexual intercourse among high school students from 2005–2015 finding significant decreases in the proportion of high school students nationwide who had ever had sexual intercourse.[5]  The CDC noted that "innovations in and federal resources for . . . teen pregnancy prevention" is one of the influences that may have contributed to the decline.[6]

---

POLICYMAKING 94 (Sept. 2017).

[3] Evelyn Kappeler, *Building the Evidence to Prevent Adolescent Pregnancy*, 106 AM. J. PUB. HEALTH S1, S5 (2016).

[4] Valerie Strauss, *Trump Administration Cuts Funding for Teen Pregnancy Prevention Programs. Here Are the Serious Consequences*, WASH. POST (Sept. 7, 2017), https://www.washingtonpost.com/news/answer-sheet/wp/2017/09/07/trump-administration-cuts-funding-for-teen-pregnancy-prevention-programs-here-are-the-serious-consequences/?utm_term=.46e240f75cdb.

[5] In addition to overall decreases seen during this period, decreases were also seen among 9th and 10th grade students, among African American students across all grades, and among Hispanic students in three grades.  Kathleen A. Ethier, Laura Kann & Timony McManus, Ctrs. for Disease Control & Prevention, *Sexual Intercourse Among High School Students—29 States and United States Overall, 2005–2015*, 66 Morbidity & Mortality Weekly Report 1393, 1395 (Jan. 5, 2018), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm665152a1-H.pdf.

[6] *Id.* at 1396.

8.    HHS has also stated that the TPP Program has "significantly contributed" to the research on effective programs to prevent teen pregnancy.[7]

9.    Despite these commendations, on July 3, 2017, HHS abruptly informed recipients of 81 TPP Program grants that HHS would be terminating their grant agreements two years early.[8]  Specifically, HHS informed these TPP grantees, including Plaintiffs, that their TPP projects would end on June 30, 2018, rather than on June 30, 2020 as originally designed, awarded, and implemented.

10.    HHS's sudden decision to terminate Plaintiffs' TPP grant agreements and the TPP Program as a whole cannot be reconciled with HHS's prior statements regarding the Program's effectiveness or Plaintiffs' individual performance under it.

11.    Rather, it is part and parcel of the Trump–Pence Administration's broader political agenda against sexual and reproductive health and evidence-based and science-based programs.

12.    The early termination of the TPP Program will lead to, and already has had the effect of causing, irreparable harm to Plaintiffs and the high-need communities they serve.  Plaintiffs were expecting that the TPP Program would enable them to continue their work in years four and five of their projects, and its early termination equals a loss of more than $200 million in funding program-wide and a loss of over $5.5 million in annual funding among Plaintiffs.  This means an end to critical education for the 1.2 million youths being served nationwide and the 40,000 youths to be served by Plaintiffs' TPP Program projects specifically.

13.    Consequently, by terminating the TPP Program, hundreds of thousands

---

[7] HHS, Office of Adolescent Health, *About the Teen Pregnancy Prevention (TPP) Program*, https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-program-tpp/about/index.html (last visited Feb. 13, 2018).

[8] The remaining three grants were terminated in September 2017.

of young people will be deprived of the high-quality information and education that have demonstrated effectiveness in helping young people make healthy decisions about their health and their futures.

14.     In addition, terminating the TPP Program mid-stream means that the federal government and researchers will be deprived of completing current research on whether programs models that have demonstrated effectiveness work with additional populations and on new evidence-informed programs that are needed to maintain the important gains that have been made in helping adolescents avoid unintended pregnancy. This amounts to a waste of millions of dollars in resources.

15.     In addition, the termination will cause, and in some cases, has aleady caused, Plaintiffs and/or their sub-grantees to lay off employees who have as their sole responsibility implementation of the TPP Program in the communities they serve, resulting in fewer trained educators.  The termination has also imposed additional hurdles on Plaintiffs to making effective partnerships in the communities they serve and has caused reputational harm.

16.     Plaintiffs bring this action and seek preliminary and permanent injunctive relief to prevent irreparable harms caused by Defendants' unlawful termination of their grants.

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiffs' claims arising under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the First and Fifth Amendments to the United States Constitution.

18.     Venue is proper in the Eastern District of Washington under 28 U.S.C. § 1391(e) because Plaintiff PPGWNI is headquartered in this district and a substantial part of the events giving rise to the claims occurred and continues to occur in this district.  PPGNHI and PPH are properly joined as plaintiffs pursuant to Rule 20(a) of the Federal Rules of Civil Procedure as they assert rights to relief

arising out of the same transaction and occurrence as PPGWNI, and common questions of law and fact will arise in this action with respect to all parties.

**PARTIES**

19.    **Plaintiff PPGWNI** is a not-for-profit corporation organized under the laws of Washington.  For over 50 years, PPGWNI has been helping women, men, and teens make responsible decisions about their sexual health and is dedicated to delivering the highest quality reproductive health care services at eleven health centers throughout eastern Washington as well as providing evidence-based sexuality education and teen pregnancy prevention. PPGWNI's grant agreement to provide teen pregnancy prevention services through the TPP Program has been terminated by Defendants.

20.    **Plaintiff PPGNHI** is a not-for-profit corporation organized under the laws of Washington.  PPGNHI provides high-quality, affordable reproductive health care through twenty-eight health centers in Alaska, Hawaii, Idaho, and western Washington.  PPGNHI's mission includes providing evidence-based teen pregnancy prevention programs in the communities it serves. PPGNHI's four grant agreements to provide teen pregnancy prevention services through the TPP Program have been terminated by Defendants.

21.    **Plaintiff PPH** is a not-for-profit corporation organized under the laws of Iowa.  PPH delivers clinical, educational, and counseling services at ten health centers in Iowa and Nebraska, and evidence-based sex education and teen pregnancy prevention programs. PPH's grant agreements to provide teen pregnancy prevention services through the TPP Program have been terminated by Defendants.

22.    **Defendant HHS** is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1).  HHS is the federal agency responsible for awarding and administrating funds under the TPP Program.

23.    **Defendant Alex Azar** is Secretary of HHS and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Congress Creates the TPP Program to Fund Evidence-Based Teen Pregnancy Prevention Programs

24.    The TPP Program is a creature of congressional appropriations.

25.    The TPP Program grew out of efforts "to create evidence-based social policy initiatives to improve policymaking and program outcomes" by "designing new initiatives to build rigorous data, rather than treating evaluation as an afterthought, and using the evidence that emerges for action."[9]

26.    Thus, when Congress initially appropriated $110 million in funds to create the TPP Program in FY 2010, it directed that such funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants."  Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

27.    Of the $110 million originally appropriated, Congress directed that not less than $75 million shall be for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."  *Id.*  These "replication" grants are referred to as "Tier 1."

28.    In addition, Congress directed that not less than $25 million of the

---

[9] Evelyn M. Kappeler & Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. ADOLESCENT HEALTH S3, S3 (2014).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

appropriated funds shall be "available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.* These "evaluation" grants are referred to as Tier 2.[10]

29.    When HHS originally sought the 2010 appropriations that would fund the TPP Program, HHS stated that "utilizing evidence-based models and promising practices" were "necessary to permit teen pregnancy prevention funds to be targeted more effectively."[11]

30.    HHS's Office of Adolescent Health (OAH) is responsible for implementing and administering the TPP Program.

31.    Since the inception of the TPP Program in 2010 through the most recent appropriations for Fiscal Year 2017, overall annual funding under the TPP Program has remained nearly constant, with Congress appropriating approximately $100 million in funding each year.

32.    This funding supports grants in the form of competitively-awarded funding agreements with five-year periods of performance to a variety of eligible organizations, including school districts, community-based organizations, universities, and health departments.

33.    Because no appropriations bill for Fiscal Year 2018 (October 1, 2017, through September 30, 2018) has yet been signed into law, HHS, like the rest of the federal government, currently operates under a continuing budget resolution, a series of which have been in effect since September 8, 2017 (and will remain in effect until

[10] *See* CARMEN SOLOMON-FEARS, CONG. RESEARCH SERV., *Teenage Pregnancy Prevention: Statistics and Programs* 12 (2016), https://fas.org/sgp/crs/misc/RS20301.pdf; Consolidated Appropriations Act, 2017, Pub. L. 115-31, 131 Stat. 135 (2016).

[11] HHS FY 2010, Justification for Estimates for Appropriations Committees 11.

a FY 2018 appropriation law is passed).[12]  By operation of those continuing

resolutions, Congress has maintained current FY 2018 funding for the TPP Program

consistent with funding levels for FY 2017.

**HHS Issues Five-Year TPP Project Grants for 2015-2020**

34.     After an initial round of TPP funding that took place from 2010

through 2015, HHS solicited applications for another round of five-year funding.

Specifically, in April 2015, HHS issued Funding Opportunity Announcements

(FOAs) for Tier 1 and Tier 2 funds, which expressly stated that "[a]wards will be in

the form of a five-year cooperative agreement with the grantee."[13]

35.     Before announcing grant opportunities for the TPP Program, HHS

sponsored an independent review of the available evidence on teen pregnancy

prevention that identified a list of approved evidence-based models.[14]

36.     This "Evidence Review" is what determines whether programs have

been "proven effective through rigorous evaluation to reduce teenage pregnancy,

behavioral risk factors underlying teenage pregnancy, or other associated risk

factors" as Congress directed in creating the TPP Program.  Consolidated

Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. at 3253.

---

[12] Pub. L. 115-56 ("2017 Continuing Resolution"); Pub. L. 115-90; Pub. L. 115-96.

[13] *See, e.g.*, April 2015 Tier 1A Funding Opportunity Announcement,
https://www.hhs.gov/ash/oah/sites/default/files/tier1a-foafile.pdf (last visited
February 12, 2018).

[14] This independent review was sponsored through HHS's Office of the Assistant
Secretary for Planning and Evaluation (ASPE), the Office of Adolescent Health
(OAH) within the Office of the Assistant Secretary for Health, and the Family and
Youth Services Bureau (FYSB) within the Administration for Children and Families
(ACF).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

37.     The Evidence Review has been conducted and updated periodically since 2009, and the most recent results were published in 2016 reflecting studies through August 2015.

38.     Tier 1 (replication) grantees selected an existing evidence-based model from this Evidence Review when applying for grants funded through the TPP Program.  Thus, the models utilized by Plaintiffs in applying for TPP Program grants and were approved as evidence-based.  Tier 2 (evaluation) grants are new or innovative evidence-informed programs that help to fill gaps in existing interventions for underserved youth by expanding the number of programs available to help reduce teen pregnancy.

39.     As of July 2016, there were 44 evidence-based program models approved for use in Tier 1 funded programs.[15]  To meet the criteria for inclusion on HHS's list, the program must have evidence of at least one favorable, statistically significant impact on at least one sexual risk behavior or reproductive health outcome of interest (sexual activity, number of sexual partners, contraceptive use, STIs, or pregnancy).[16]  Upon information and belief, researchers submitted additional evaluations of TPP Program models in November 2016, but despite over a year having gone by, HHS has not published the results of that updated review.[17]

---

[15] HHS, Office of Adolescent Health, *Evidence-Based TPP Programs*, https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-program-tpp/evidence-based-programs/index.html; *see also* JULIETA LUGO-GIL ET AL., UPDATED FINDINGS FROM THE HHS TEEN PREGNANCY PREVENTION EVIDENCE REVIEW: JULY 2014 THROUGH AUGUST 2015 at 1 (June 2016), https://tppevidencereview.aspe.hhs.gov/pdfs/Summary_of_findings_2015.pdf.
[16] *Id.*
[17] *See HHS Teen Pregnancy Prevention (TPP) Evidence Review, Call for Studies*, https://tppevidencereview.aspe.hhs.gov/pdfs/2016_Call_for_Studies.pdf.

40.     Following a highly competitive grant application process, in July 2015, HHS awarded 84 new five-year TPP Program grants.

41.     In each of the governing cooperative agreements with Plaintiffs, HHS specified that the TPP Program project period would run for five years—from July 1, 2015 through June 30, 2020.

42.     Each FOA required that applicants submit a detailed work plan for the "five-year project period."

43.     In setting up the grants to run for five years, HHS intended that the first year would be for planning whereas years two through five were for implementation of the projects.  HHS required that grantees' applications and work plans demonstrate staffing, budget, goals, and milestones over the course of the five-year project period.

44.     Plaintiffs PPGWNI, PPH, and PPGNHI are three of the current TPP Program grantees, receiving six TPP Program grants among them.

45.     Specifically, Plaintiff PPGWNI was awarded a five-year Tier 1 grant to implement a project titled Inland Northwest Healthy Youth Initiative (hereinafter the "Healthy Youth Initiative").

46.     Plaintiff PPH was awarded a five-year Tier 1 grant to implement a project called Education & Prevention, Information & Conversation ("EPIC").

47.     Plaintiff PPGNHI currently receives four TPP Program grants:  two with Tier 1 (replication) funding and two with Tier 2 (evaluation) funding.

48.     Consistent with the terms of FOAs and their  funding agreements, Plaintiffs have each been operating their respective TPP Program projects with this anticipated five-year project period in mind, and have been making vital contributions to reducing teen pregnancy in the high-need communities they serve.

49.     For example, since 2015, Plaintiff PPGWNI has been working with more than 40 formal partners through its Healthy Youth Initiative to implement

evidence-based teen pregnancy prevention programs in four Washington communities with some of the highest live birth rates for women ages 15 to 19 years in the state.  All four target communities have higher than national average rates of children under eighteen living in households below the federal poverty level and receiving public assistance.  One example of a successful Healthy Youth Initiative partnership is with Domestic Violence Services of Benton & Franklin Counties ("DVS").  That organization has been so impressed by the programming that it has requested PPGWNI training for the majority of the DVS staff in order to continue the program's beneficial impact on local teens who have experienced domestic violence.  The Healthy Youth Initiative project was structured to serve 2,000 young people per year in years two through five of the TPP Program grant project, amounting to a total of 8,000 youth served in the five-year grant period.

50.    Plaintiff PPH is using its Tier 1 funding to reduce unintended pregnancy rates among high risk, vulnerable, and underserved youth populations in three high-need communities in Iowa and Nebraska.  Each of the targeted communities has teen birth rates above the state and national averages and, within those elevated rates, African American and Latina youth are disproportionately represented.  With its TPP Program grant agreement, Plaintiff PPH had aimed to reach more than 13,875 young people during the five-year grant period.

51.    Plaintiff PPGNHI is using its Tier 1 funding to implement a program called "Stronger Together: The Northwest Coalition for Adolescent Health Capacity Building Project."  Through this grant, PPGNHI helps other non-profit organizations learn how to deliver education previously determined to be effective at reducing teen pregnancy with a particular focus on programs that target vulnerable young people, including young people in foster care and young people experiencing homelessness in Oregon and Washington.  For instance, though this grant, PPGNHI works with a homelessness organization called YouthCare in Seattle Washington to

train their staff to teach youth about sexual and reproductive health.  Through the Stronger Together program, Plaintiff PPGNHI had aimed to reach more than 3,500 young people during the five-year grant period.

52.     Plaintiff PPGNHI also implements a Tier 1 grant program called "Improving the Lives of Teens."  This programs aims to replicate evidence-based teen pregnancy prevention programs in seven communities with disproportionately high teen pregnancy rates in Alaska, Hawaii, Idaho, and Washington.  In each community, there are three distinct implementation settings ranging from faith-based institutions, to foster care youth programs, to high-school settings and school-based health centers.  Through the Improving the Lives of Teens program, PPGNHI had aimed to serve 2,275 people per year for a total of 9,100 youth in years two through five of the program.

53.     Plaintiff PPGNHI is using its Tier 2 funding to evaluate the effectiveness of a program called "Linking Families and Teens," which includes sessions for parents-caregivers and their children, as well as a joint community service component.  The program targets young people in grades 9–12 and their parent/caregiver(s) living in rural communities in Alaska, Hawaii, Idaho, Oregon, Utah, and Washington.  The goal of the program is to "reduce teen pregnancy rates, increase the use of contraceptives, and delay initiation of sexual activity by increasing parent/caregiver-youth connectedness, and increasing youth's self-efficacy, knowledge, and skill related to sexual health and pregnancy prevention."[18] Plaintiff PPGNHI planned to evaluate the program's effectiveness through a randomized control trial, the most rigorous form of program research, measuring the program's impact by evaluating changes in knowledge, communication and self-

efficacy, sexual initiation, contraceptive use, and pregnancy. PPGNHI planned to reach 500 young people per year with this intervention.

54.     Plaintiff PPGNHI's other Tier 2 funding is used to evaluate the effectiveness of a program called "IN-clued: Inclusive Healthcare—Youth and Providers Empowered," which is a teen pregnancy intervention designed specifically for lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ") young people who experience higher rates of unintended teen pregnancy than their heterosexual peers. Young people who receive the IN-clued programming are from urban communities in Alaska, Massachusetts, Minnesota, Oregon, Utah, and Washington. The intervention includes a three-hour workshop for health-care staff and providers that addresses best practices with LGBTQ young people and a three-hour interactive workshop for LGBTQ young persons that includes education related to sexual risk prevention and healthy relationships, and information about how to access sexual health services, delivered by trained peer health educators. To evaluate the effectiveness of this intervention, PPGNHI planned to conduct a randomized control trial with 1,500 LGBTQ young persons over three years, measuring its impact through receipt of reproductive health services and use of birth control.

55.     Over the first three years of the latest round of TPP Program funding, HHS has consistently commended all three Plaintiffs for their implementation of their respective TPP Program projects.

56.     For example, PPGWNI has consistently received praise from HHS for its implementation of the Healthy Youth Initiative. On February 22, 2016, HHS provided PPGWNI with its progress report on the first six months of the project, in which HHS commended PPGWNI's "selecting and reviewing evidence-based programs (EBPs) for each intervention site" and its "focus on recruiting Hispanic and Native populations," among other things. In this progress report, HHS stated

that "[t]he grantee is working hard to meet the milestones for the project and is solidifying the project in the intervention communities."

57.    On September 1, 2016, an HHS medical education specialist and OAH Project Officer sent PPGWNI a letter in response to PPGWNI's annual progress report submission for Year 1.  In it, HHS wrote "[c]ongratulations on successfully completing year one of the OAH TPP grant" and stated that PPGWNI "accomplished a lot."  HHS further acknowledged that PPGWNI "successfully completed [its] planning year milestones."  In closing, HHS noted that it was "a pleasure to work with [PPGWNI] and [its] program;" that HHS "look[ed] forward to the continuing progress in the coming years;" and remarked, "[c]ongratulations on a job well done, on your Year 1 achievements, and thank you for all that you and your team do each and every day to improve the lives of adolescents!"

58.    PPGWNI again received several commendations from HHS in its Year 2 review.  HHS commended PPGWNI for "provid[ing] goals and objectives for Year 3 that were specific and measurable and aligned with OAH expectations such as implementing evidence based programs in 5 counties across Washington State."  In its review HHS also commended PPGWNI's plans "to expand programming to include at least three new middle, high, or alternative schools in each community they are working in by the end of year 3."

59.    Similarly, HHS has repeatedly commended Plaintiff PPH's grant performance throughout the duration of the TPP Program.  For example, PPH was featured in OAH's Technical Review of Year 1 Annual Progress Report (10/17/16). The Program Officer wrote: "I look forward to the continued progress in the coming years.  Congratulations on a job well done, on your Year 1 achievements, and thank you for all that you and your team do each and every day to improve the lives of adolescents!"

60.    The same is true for Plaintiff PPGNHI.  Not only has HHS lauded

PPGNHI as a "success story" for its implementation of TPP programs during the previous round of funding from 2010–2015, but HHS has also consistently praised PPGNHI for its performance during the second, current round of funding, always indicating that PPGNHI is meeting or exceeding expectations and milestones.

61.    For example, in connection with its Tier 1 funding for Improving the Lives of Teens, HHS commended PPGNHI for "exhibit[ing] strong organizational skills during the first six months of this project, meeting appropriate milestones, [and] engaging multiple partners to establish a strong structure for the coming years."

62.    After PPGNHI's first full year of performance, HHS stated that PPGNHI "successfully completed [its] planning year milestones," and an OAH employee stated that she "looked forward to the continued progress in the coming years"; congratulated PPGNHI for "a job well done"; and thanked PPGNHI for its "achievements" and all it does "each and every day to improve the lives of adolescents."

### The Trump–Pence Administration Takes Office

63.    The Trump–Pence Administration has a demonstrated aversion to evidence and science, where even the terms "evidence-based" and "science-based" are discouraged.  For example, in December 2017, senior officials at the CDC informed policy analysts that certain words were forbidden from budget documents, including "evidence-based," "science-based," and "diversity."[19]

64.    This is also not the only time the Administration has rejected evidence-

---

[19] Lena H. Sun & Juliet Eilperin, *CDC Gets List of Forbidden Words: Fetus, Transgender, Diversity*, Wash. Post (Dec. 15, 2017), https://www.washingtonpost.com/national/health-science/cdc-gets-list-of-forbidden-words-fetus-transgender-diversity/2017/12/15/f503837a-e1cf-11e7-89e8-edec16379010_story.html.

based programs.  On December 28, 2017, the Substance Abuse and Mental Health Services Administration, a part of HHS, unexpectedly terminated its contract for the highly successful National Registry of Evidence-Based Programs and Practices, which was started in 1997 and lists 453 behavioral health programs that have been proven to be effective.

65.    Outside of HHS, other federal agencies have also attempted to remove science from policymaking.

66.    For example, in December 2017, the Department of the Interior implemented a new grant review policy that gives a single political appointee the authority to screen research grants to ensure that they "better align with the Secretary's priorities."[20]  This action prompted criticism from the scientific community, including a joint statement issued by the National Academies of Science, Engineering, and Medicine that they "view any political review of scientific proposals as inappropriate."[21]

67.    In May 2017, President Trump's proposed budget for FY 2018 called for eliminating the TPP Program[22] and sought a $277 million investment in

---

[20] U.S. DEP'T OF THE INTERIOR, GUIDANCE FOR FINANCIAL ASSISTANCE ACTIONS EFFECTIVE IN FISCAL YEAR 2018 (Dec. 28, 2017), https://assets.documentcloud.org/documents/4344915/Interior-guidance-for-fiscal-2018-grants.pdf.

[21] Press Release, The National Academies of Sciences, Engineering, and Medicine, Statement by NAS, NAE, and NAM Presidents on the Political Review of Scientific Proposals (Jan. 16, 2018) http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=1162018.

[22] U.S. HEALTH AND HUMAN SERVS., GENERAL DEPARTMENTAL MANAGEMENT BUDGET at 91, https://www.hhs.gov/sites/default/files/combined-general-department-management.pdf ("The teenage pregnancy rate has declined significantly over recent years, but it does not appear this program has been a major driver in that reduction.")

extending abstinence education.[23]

68.     Generally, abstinence education programs teach that abstinence from sexual activity is the only certain way to avoid out-of-wedlock pregnancy, sexually transmitted diseases, and other associated health problems.  Abstinence only programs have been proven ineffective in delaying initiation of sexual intercourse or changing other sexual risk behaviors, and moreover, may provide medically inaccurate and stigmatizing information, as well as withhold important information about sexuality that young people need to make healthy decisions.[24]

69.     Significantly, on June 5, 2017, President Trump appointed Valerie Huber as Chief of Staff for the Office of the Assistant Secretary of Health,[25] the office at HHS under which OAH falls.[26]

70.     Prior to serving at HHS, Ms. Huber served as the abstinence education coordinator for her home state of Ohio's Department of Health from 2004 to 2007. A report on abstinence-only-until-marriage programs in Ohio issued in 2005 during Huber's tenure found that Ohio's abstinence only curriculum "misrepresent[ed] religious convictions as scientific fact."[27]  It further found that "the content of

---

[23] BUDGET OF THE U.S. GOVERNMENT, FISCAL YEAR 2018, at Table S-6, https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/budget.pdf; Lisa Ryan, *Trump's Proposed Budget Would Invest $277 Million in Abstinence-Only Education*, THE CUT (May 24, 2017), https://www.thecut.com/2017/05/trump-budget-abstinence-only-sex-ed.html.

[24] John S. Santelli et al., *Abstinence-Only-Until-Marriage: An Updated Review of U.S. Policies and Programs and Their Impact*, 61 J. Adolescent Health 273 (2017).

[25] *See* HHS, Office of the Assistant Sec'y for Health, *Valerie Huber*, https://www.hhs.gov/ash/about-ash/leadership/valerie-huber/index.html.

[26] HHS, Office of the Assistant Sec'y for Health, *Organizational Chart*, https://www.hhs.gov/ash/about-ash/organizational-chart/index.html.

[27] Scott H. Frank, *Report on Abstinence-Only-Until-Marriage Programs in Ohio*, 3, 17–18 (June 2005),

(footnote continued)

abstinence-only-until-marriage curriculum [has] raised concerns regarding the likelihood of stigma and disenfranchisement of students who do not share the religious, cultural, and ideologically narrow message proffered by these programs."[28]

71.    For example, popular abstinence-only program *True Love Waits* was promoted in Ohio by Valerie Huber.  *True Love Waits* had students take the following pledge: "Believing that true love waits, I make the commitment to God, myself, my family, my friends, my future mate, and my future children to a lifetime of purity including sexual abstinence from this day until the day I enter a biblical marriage relationship."[29]

72.    Ms. Huber officially resigned from Ohio's Department of Health in January of 2007, and then formed the National Abstinence Educators Association—a lobbying arm of the abstinence education industry, later known as Ascend.  She is also responsible for attempting to rebrand abstinence education as "sexual risk avoidance."

73.    Soon before her appointment to HHS, Ms. Huber penned an op-ed promoting abstinence-only education and complaining of the lack of funding for it, stating that "[o]nly ten cents out of every federal sex education dollar is devoted to Sexual Risk Avoidance (SRA) education." [30]  In the same op-ed, Ms. Huber

---

https://www.researchgate.net/publication/266456924_Report_on_Abstinence-Only-Until-Marriage_Programs_in_Ohio.

[28] *Id.* at 4.

[29] Scott H. Frank, Report on Abstinence-Only-Until-Marriage Programs in Ohio, 3, 17-18 (June 2005); *see also* LifeWay, True Love Waits, https://www.lifeway.com/en/product-family/true-love-waits (describing the program as "a tremendous movement, orchestrated by God, to further spread the biblical message of sex and purity to a younger generation").

[30] Valerie Huber, *Sexual Risk Avoidance Education: Common sense, science and health are winning the day*, THEHILL.COM (Mar. 12, 2017),

(footnote continued)

maligned the TPP Program, referring to it as "so-called comprehensive sex education" and claiming that it "normalizes teen sex." She also attacked the effectiveness of the TPP Program, stating inaccurately that "more than 80 percent of teens in the [TPP] program fared either worse or no better than their peers who were not a part of the program."

74.    Huber has claimed that peer-reviewed scientific studies concerning the effectiveness of contraceptives in preventing teen pregnancy are biased.[31]

75.    Less than a month after her appointment to her position as Chief of Staff for the office that administers the TPP Program, HHS terminated all TPP Program grants.

**HHS Abruptly Terminates All TPP Program Grants**

76.    Despite the consistent commendations that Plaintiffs received from HHS, in July 2017, HHS notified the recipients of 81 TPP Program grants, including Plaintiffs, that their TPP program grants would be terminated as of June 30, 2018, two full years before their respective projects were set to end.

77.    Specifically, without warning, HHS notified Plaintiffs PPGNHI, PPGWNI, and PPH via a Notice of Award for year three of their grants that "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year."

78.    HHS neither provided an explanation for that decision nor did it give Plaintiffs or any of the other grantees any ability to challenge that decision.

_____

http://thehill.com/blogs/pundits-blog/healthcare/323590-sexual-risk-avoidance-education-common-sense-science-and-health.

[31] Julie Rovner Kaiser, *Drop in Pregnancies Is Due to More Contraceptives, Not Less Sex*, PBS Newshour (Sept. 2, 2016), https://www.pbs.org/newshour/health/teen-pregnancies-contraceptives-less-sex.

79.     On August 1, 2017, Plaintiffs each separately wrote to HHS challenging the termination of their grants mid-stream, particularly in light of the commendations that Plaintiffs had each received from HHS since 2015.

80.     As of the date of this filing, HHS still has not responded, let alone given Plaintiffs any explanation for the abrupt termination.

81.     Nor was there any indication in Plaintiffs' annual evaluations that there were any issues that could result in termination or that termination was likely.

**HHS Gives Contradictory Explanations for Terminating TPP**

82.     Although HHS has yet to provide any explanation for the termination to Plaintiffs themselves, HHS has provided various statements to the media or Congress in an attempt to justify the termination.

83.     In mid-July 2017, HHS explained in a media statement that the termination decision was made because "the President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout,"[32] even though Congress had not enacted an FY 2018 budget or otherwise indicated it was concluding the TPP Program.

84.     One month later, HHS changed course, claiming in another media statement it believed there was "weak evidence of positive impacts," that the TPP Program was "a poor use of more than $800 million in taxpayer dollars" and that "HHS hit the pause button on it."[33]  Hitting the "pause button" on the congressional

---

[32] Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding*, WIRED.COM (July 19, 2017), https://www.wired.com/story/teen-pregnancy-researchers-regroup-after-trumps-hhs-pulls-funding/.

[33] Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN.COM (Aug. 17, 2017),

(footnote continued)

mandated program, HHS said, was meant to "give[] the Department time to continue its review of the program and the evidence, to ensure that should Congress continue it, the program provides positive reinforcement of the healthy decisions being made by a growing majority of teens."[34]

85.     In late November 2017, HHS responded to inquiries by several U.S. Senators and Representatives by repeating its conclusory assertions that continuing the TPP Program was "not a reasonable option" due to "strong evidence of negative impact or no impact"; that the TPP Program had "failed to deliver" on its promises and "jeopardize[ed] the youth who were served"; and that the program was "a poor use" of taxpayer dollars.[35]

86.     But even taking these post-hoc justifications at face value, they cannot be reconciled with HHS's own statements about the success of Plaintiffs' implementation of their individual programs and the positive impacts of the TPP Program as a whole.

87.     Indeed, even after the abrupt termination of the TPP Program grants, HHS has continued to praise Plaintiffs' individual performance under them.

88.     Specifically, on October 18, 2017, HHS issued a report commending Plaintiff PPGWNI for, among other things, "prepar[ing] their educators to be Trainers of Trainers," "focusing on ways to make teaching and learning practices more inclusive for all ethnicities and genders," and "developing a comprehensive

---

http://www.cnn.com/2017/08/17/health/teen-pregnancy-prevention-programs-funding/index.html.

[34] *Id.*

[35] Letter from Barbara Clark, Acting Assistant Sec'y for Legislation, Dep't of Health and Hum. Servs., to U.S. Senator Patty Murray (Nov. 22, 2017); Letter from Barbara Clark, Acting Assistant Sec'y for Legislation, Dep't of Health and Hum. Servs., to U.S. Representative Barbara Lee (Nov. 28, 2017).

and community-specific referral guide that has up-to-date information for local youth friendly services."

89.    HHS's newfound criticism of the TPP Program also is inconsistent with the agency's own data.  According to HHS materials, out of 41 evaluations, 12 programs (or 29%) "were found effective at changing the behavior of program participants,"[36] including 4 programs funded through Tier 1 and 8 programs funded through Tier 2. In research fields, a finding that 29% of programs had statistically significant positive behavioral outcomes is significantly higher than expected, particularly when compared to replication efforts from other fields.

90.    The fact that HHS is terminating *all* TPP Program grants, including Tier 2 evaluation programs, further undercuts HHS's argument that its decision to terminate is based on effectiveness of the program.  By congressional definition, Tier 2 programs utilize funding for the express purpose of testing new and innovative approaches to determine whether such programs are in fact effective. Thus, to terminate Tier 2 programs based on the notion that they are presently ineffective is not only premature, but illogical.

91.    HHS, driven by ideology and a disregard for evidence-based policymaking, has disseminated its misleading and skewed interpretation of the TPP Program's evaluation results.  For example, HHS recently issued a press release condemning the TPP program, even going so far as to say the TPP Program is a

_____

[36] HHS, Office of Adolescent Health, *Summary of Evaluated Programs Effective at Changing Behavior*, https://www.hhs.gov/ash/oah/evaluation-and-research/grantee-led-evaluation/evaluated-programs-effective-at-changing-behavior/index.html; *see also* Amy Feldman Farb & Amy L. Margolis, The Teen Pregnancy Prevention Program (2010-2015): Synthesis of Impact Findings, 106 AM. J. PUB. HEALTH S1, S9 (2016).

1  "waste of taxpayer money."[37]  But Congress has already determined otherwise,

2  funding TPP at consistent levels since its inception in 2010 through the most recent

3  appropriations for FY 2018, and has specifically directed HHS to utilize the

4  appropriated funds for evidence-based programs.  The release even criticizes

5  Congress for "prematurely ending and then eliminating more than 150 Community-

6  Based Abstinence Education (CBAE) Program grants and repurposing the monies"

7  to the TPP Program in 2010, and suggesting that Congress's "unprecedented"

8  decision to "hastily end[]" the CBAE Program is precedent allowing HHS to end the

9  TPP Program.

10         92.    The effort to end this highly regarded program, because it does not

11  conveniently fit into the Administration's agenda, goes against Congress's mandate

12  that HHS fund "medically accurate and age appropriate programs that reduce teen

13  pregnancy and for the Federal costs associated with administering and evaluating

14  such contracts and grants."  Consolidated Appropriations Act, 2017, Pub. L. No.

15  115-31, 131 Stat. 135, 536 (May 5, 2017).

16         93.    While HHS has not identified what it plans to replace the TPP Program

17  with, the President's 2018 Budget, proposed in January of last year, proposed to

18  spend $277 million on abstinence-only education.[38]  The President's 2019 Budget,

19  proposed just this month, proposes to spend "$75 million for the Health and Human

20  Services Department to fund abstinence-only 'and personal responsibility' sex-

_____

22  [37] Press Release, U.S. Dep't of Health & Human Servs., Teen Pregnancy Prevention
23  Program Facts: False Claims vs. The Facts (Aug. 28, 2017),
    https://www.hhs.gov/ash/about-ash/news/2017/teen-pregnancy-prevention-program-
24  facts.html.

25  [38] Lisa Ryan, *Trump's Proposed Budget Would Invest $277 Million in Abstinence-*
    *Only Education*, The Cut (May 24, 2017), https://www.thecut.com/2017/05/trump-
26  budget-abstinence-only-sex-ed.html.

education program," while zeroing out funding for more comprehensive sex-education programs, including the TPP Program.[39]

94.    As the Washington Post reported, "[m]any speculate that HHS's real motivation [in withdrawing all TPP Program funding] is antipathy to anything connected to comprehensive sex education. [Former HHS Secretary Tom] Price is a strong proponent of abstinence-only education, and Valerie Huber, the new chief of staff to the department's assistant secretary for health, was until recently president of a national abstinence education organization."[40]

95.    As a writer for Tonic recently explained, "[t]he scariest thing to witness [in the first year of the Trump administration] was the way the administration cozied up to advocates of abstinence-only sex education, while freezing out supporters of evidence-based approaches to sexual health promotion. Nowhere was this more evident than in the federal budget proposal released in the spring, which recommended retaining millions of dollars in funding for the government's 'Abstinence Education and Personal Responsibility Education Program,' an initiative the Obama administration sought to eliminate completely from the budget the year prior."[41]

---

[39] Emily Richmond, *Does Trump's Education Budget Even Matter?*, The Atlantic (Feb. 13, 2018), https://www.theatlantic.com/education/archive/2018/02/does-trumps-education-budget-even-matter/553271/.

[40] Jessica Lander & Carolyn Smith-Lin, *Trump administration cuts funding for teen pregnancy prevention programs. Here are the serious consequences.*, Washington Post (Sept. 7, 2017), https://www.washingtonpost.com/news/answer-sheet/wp/2017/09/07/trump-administration-cuts-funding-for-teen-pregnancy-prevention-programs-here-are-the-serious-consequences/?utm_term=.32bb7fcc3937.

[41] Justin Lehmiller, *Trump's Embrace of Abstinence-Only Sex Ed Is a Threat to Your Health*, Tonic (Jan. 18, 2018), https://tonic.vice.com/en_us/article/bjyb8v/trumps-embrace-of-abstinence-only-sex-ed-is-a-threat-to-your-health.

96.    HHS is not at liberty to ignore the clear statutory mandate in favor of programs that are more in line with its ideological objectives.  Nor may it make religiously-motivated and coercive spending decisions.

**Terminating TPP Program Impacts Plaintiffs and the Communities They Serve**

97.    By terminating Plaintiffs' TPP Program projects, HHS has deprived Plaintiffs of the opportunity to continue providing these important teen pregnancy prevention services to the communities they serve during the final two years of their five-year grant agreements.  The early termination requires immediate action to wind up operations.  As part of that wind-up, Plaintiffs will have to lay off full-time employees; indeed, some of Plaintiffs' employees have already left.  Plaintiffs have also had to spend time on contingency planning.  Plaintiffs also will not have the resources necessary to devote to increasing participation rates, engaging new partners, or completing their research on program effectiveness.  Plaintiffs will suffer injury to their ability to fulfill their missions of providing evidence-based teen pregnancy prevention programs in their communities.

98.    In addition, and most significantly, terminating the TPP Program is likely to harm some of the country's most vulnerable youth by denying them high-quality information and education that will help them make healthy decisions about their futures. TPP Program grantees served half a million youth from FY 2010 to FY 2014, and were well on their way to serving an additional 1.2 million youth in 39 states and the Marshall Islands during the current five-year project period.[42]  It is these youth who will suffer from the termination of the final two years of the program.

---

[42] HHS, Office of Adolescent Health, *Results from the OAH Teen Pregnancy Prevention Program*, https://www.hhs.gov/ash/oah/sites/default/files/tpp-cohort-1/tpp-results-factsheet.pdf (last visited February 12, 2018).

99.    Finally, cutting off research midstream is not only disruptive and wasteful, but it denies the public the benefit from advancements in learning about what currently works to prevent teen pregnancy.

## FIRST CLAIM FOR RELIEF
### Administrative Procedure Act—Arbitrary and Capricious

100.    Plaintiffs incorporate Paragraphs 1 through 99 above.

101.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes this court to set aside agency action that is arbitrary and capricious, including when an agency adopts a course of action that is contrary to its own regulations.

102.    HHS's decision to terminate the previously awarded competitive grants is contrary to HHS's own regulations.

103.    In awarding federal grants under the TPP Program, HHS is bound by its general grant regulations at 45 C.F.R. Part 75.  These regulations are referenced in each of Plaintiffs' TPP Program grant agreements.

104.    Under those regulations, a "termination" is defined as "any ending of a Federal award, in whole or in part, at any time prior to the planned end of a period of performance."  *See* 45 C.F.R. § 75.2.  Here, by unilaterally shortening Plaintiffs' period of performance under the TPP Program grants from five years to three, HHS's actions constitute the "ending of a Federal award, in whole or in part, at any time prior to the planned end of a period of performance" and thus amount to a "termination."  *See* 45 C.F.R. § 75.2; 2 C.F.R. § 200.95.

105.    But HHS did not have authority to terminate Plaintiffs' grants.  There are only three circumstances under which a federal agency may effect a "termination": (1) where the grantee "fails to comply with the terms and conditions of

the award;" (2) "for cause;" or (3) with consent.  45 C.F.R. § 75.372(a)(1)–(3).[43]

106.    None of these three circumstances exists here.  First, HHS cannot justify the termination based on a failure to comply with the terms of the conditions of the award (and any attempt to do so would be in stark contrast to HHS's own prior statements about Plaintiffs' successful performance under the grants); second, HHS has not demonstrated that the termination was "for cause," nor is there any such "cause"; and third, Plaintiffs did not consent to the termination.

107.    Moreover, HHS's rationale for terminating the TPP Program is inconsistent with HHS's own data and its frequent commendations of Plaintiffs' implementation of their TPP Program grants, is based on an irrational and incomplete reading of the HHS's own evidence relating to the impact of TPP Program models, and reflects a misunderstanding of the very purpose of Tier 2 funded programs, which is to determine which TPP Program models are in fact effective.

108.    Accordingly, HHS's termination of Plaintiffs' grants under the TPP Program is arbitrary and capricious, contrary to its own regulations, and must be set aside.

109.    As a result of HHS's conduct, Plaintiffs have suffered and will continue to suffer irreparable injury.

## SECOND CLAIM FOR RELIEF
### Administrative Procedure Act—Contrary to Law

110.    Plaintiffs incorporate Paragraphs 1 through 99 above.

111.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes federal courts to set aside agency action that is contrary to law.

---

[43] The fourth circumstance applies to termination by the *grantee* and thus is not applicable here.  *See* 45 C.F.R. § 75.372(a)(4).

112.    HHS's unilateral decision to terminate all TPP Program grant agreements and its refusal to continue the TPP Program is directly contrary to the statutory requirement and congressional mandate that HHS "mak[e] competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." As such, HHS's conduct is contrary to law and must be set aside.

113.    As a result of HHS's conduct, Plaintiffs have suffered and will continue to suffer irreparable injury.

### THIRD CLAIM FOR RELIEF
### Establishment Clause

114.    Plaintiffs hereby incorporate Paragraphs 1 through 99 above.

115.    The Establishment Clause of the First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion."

116.    HHS has violated, and will continue to violate, Plaintiffs' rights under the Establishment Clause, including in the following ways:

117.    HHS's conduct has and will continue to have the primary purpose of promoting and advancing religion.

118.    HHS's conduct has and will continue to have the effect of endorsing and advancing religion.

119.    HHS's conduct excessively entangles the government with religion.

120.    HHS's conduct constitutes governmental endorsement of religion because a reasonable observer would believe that HHS has endorsed a particular religious view.

121.    HHS's conduct impermissibly coerces grantees into adopting Christian views by withdrawing access to funding for pregnancy prevention programs unless grantees espouse a Christian viewpoint in administering those programs.

122.   Absent declaratory and injunctive relief, HHS's violations will cause ongoing harm to Plaintiffs.

## FOURTH CLAIM FOR RELIEF
### Due Process Clause

123.   Plaintiffs hereby incorporate Paragraphs 1 through 99 above.

124.   Under the Due Process Clause of the Fifth Amendment, the government may not deprive a person or entity of a protected property interest without due process of the law.

125.   In April 2015, to solicit applications for Tier 1 and Tier 2 funds, HHS issued Funding Opportunity Announcements (FOAs), which expressly stated that "[a]wards will be in the form of a five-year cooperative agreement with the grantee."[44]

126.   Each FOA required that applicants submit a detailed work plan for the "five-year project period."

127.   In each of the governing cooperating agreements with Plaintiffs, HHS specified that the TPP Program project period would run for five years—from July 1, 2015, through June 30, 2020.

128.   Accordingly, based on these statements and documents, Plaintiffs had protected property interests in the final two years of their five-year federal grant agreements with HHS.

129.   HHS unconstitutionally deprived Plaintiffs of these property interests when it abruptly terminated these grants two years early without adequate process.

130.   HHS did not provide Plaintiffs with sufficient notice or opportunity for

---

[44] *See, e.g.*, April 2015 Tier 1A Funding Opportunity Announcement, https://www.hhs.gov/ash/oah/sites/default/files/tier1a-foafile.pdf (last visited February 12, 2018).

pre-termination hearings, therefore denying the Plaintiffs of adequate procedural protections in violation of the Plaintiffs' Fifth Amendment rights.

131.   As a result of HHS's conduct, Plaintiffs have suffered and will continue to suffer irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.      Declare that Defendants' decision to terminate the Plaintiffs' TPP Program grant agreements was arbitrary, capricious, not in accordance with the law, in violation of the Establishment Clause, and in violation of Plaintiffs' right to due process of law.

2.      Declare that Defendants' decision to terminate the TPP Program as a whole was arbitrary, capricious, and not in accordance with the law.

3.      Enter a preliminary, followed by permanent, injunction barring Defendants, and their successors and agents, from terminating Plaintiffs' cooperative agreements or the TPP Program as a whole except as allowed by federal law and consistent with due process.

4.      Such other and further relief as this Court may deem just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DATED: February 15, 2018          Respectfully submitted,

By:    */s/* Rick Eichstaedt_____

RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 West Main Ave, Suite 300
Spokane, WA 99201
Telephone: (509) 835-5211
ricke@cforjustice.org

DREW A. HARKER (*pro hac vice forthcoming*)
ALLYSON HIMELFARB (*pro hac vice forthcoming*)
NATHANIEL CASTELLANO (*pro hac vice forthcoming*)
ALICE C.C. HULING (*pro hac vice forthcoming*)
ANDREW TUTT (*pro hac vice forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Drew.Harker@arnoldporter.com
Allyson.Himelfarb@arnoldporter.com
Nathaniel.Castellano@arnoldporter.com
Alice.Huling@arnoldporter.com
Andrew.Tutt@arnoldporter.com

CARRIE Y. FLAXMAN (*pro hac vice forthcoming*)
RICHARD MUNIZ (*pro hac vice forthcoming*)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave, NW, Suite 300
Washington, DC 20005
Telephone: 202.973.4800
Facsimile: 202.296.3480
Carrie.Flaxman@ppfa.org
Richard.Muniz@ppfa.org
*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF