RICK EICHSTAEDT (WSB # 36487)
CENTER FOR JUSTICE
35 West Main Ave, Suite 300
Spokane, WA 99201
Telephone: (509) 835-5211
ricke@cforjustice.org

DREW A. HARKER (*pro hac vice*)
ALLYSON HIMELFARB (*pro hac vice*)
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.942.5000
Facsimile: 202.942.5999
Drew.Harker@arnoldporter.com
Allyson.Himelfarb@arnoldporter.com

(Additional Counsel Listed Below)

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
SPOKANE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER WASHINGTON AND NORTH IDAHO; PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS; and PLANNED PARENTHOOD OF THE HEARTLAND, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES and ALEX MICHAEL AZAR II in his official capacity as Secretary of the U.S. Department of Health and Human Services, <br><br> Defendants. | Case No. 2:18-cv-00055-TOR <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF |

1
2

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ............................................................................... 1

II.   STATEMENT OF FACTS ................................................................ 3

    A.   History of the Teen Pregnancy Prevention Program ................................ 3

        1.   Congressional Creation & Funding ................................ 3
        2.   HHS Implementation of the TPP Program .................... 4

    B.   Plaintiffs Are Successfully Performing Under the TPP Program............. 6

    C.   HHS's Termination of Plaintiffs' TPP Awards and the TPP Program..... 9

III.   ARGUMENT........................................................................................ 9

    A.   Plaintiffs Are Likely To Succeed on the Merits. ................................... 10

        1.   HHS's Actions Must Be Set Aside Under the APA.................... 10
        2.   HHS's Actions Violate Plaintiffs' Due Process Rights............... 19

    B.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.......... 23

    C.   Preliminary Relief Will Not Cause Harm to HHS................................. 26

    D.   A Preliminary Injunction Is In The Public Interest................................ 26

IV.   CONCLUSION & RELIEF REQUESTED ..................................................... 28

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*2Die4Kourt v. Hillair Capital Mgmt., LLC*,
    692 F. App'x 366 (9th Cir. 2017) .................................................................. 28

*Arc of California v. Douglas*,
    757 F.3d 975 (9th Cir. 2014) ...................................................................... 9

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ................................................................... 23

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972) ................................................................................. 20

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,
    149 F.3d 971 (9th Cir. 1998) ............................................................... 21, 22

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985) ................................................................................. 22

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*,
    448 F.3d 1118 (9th Cir. 2006) ............................................................. 27, 28

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ...................................................................... 9

*Doe v. Trump*,
    2017 WL 6551491 (W.D. Wa. 2017) ......................................................... 23

*Exodus Refugee Immigration, Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir.
    2016) ...................................................................................................... 25

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................... 13, 19

*Harris v. Board of Supervisors, Los Angeles County*,
    366 F.3d 754 (9th Cir. 2004) ...................................................................... 9

*Healthy Teen Network v. Azar et al.*,
    Civ. No. 1:18-cv-468 (D. Md.) .................................................................... 1

- ii -

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

*Jicarilla Apache Nation v. U.S. Dept. of Interior*,
  613 F.3d 1112 (D.C. Cir. 2010) ................................................................ 13

*King County v. Azar et al.*,
  No. 2:18-cv-00242-JCC (W.D. Wa.) ......................................................... 1

*Local 2677, Am. Fed'n of Gov't Emp. v. Phillips*,
  358 F. Supp. 60 (D.D.C. 1973) ................................................................ 13

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................................ 21

*McQuillion v. Duncan*,
  306 F.3d 895 (9th Cir. 2002) .................................................................. 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .................................................................................. 13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................ 15

*People of the State of Cal. ex rel. Van de Kamp v. Tahoe Reg. Planning Agency*,
  766 F.2d 1319 (9th Cir. 1985) ................................................................ 28

*Perez v. Mortgage Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ...................................................................... 13, 19

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ................................................................................ 20

*Planned Parenthood Assoc. of Utah v. Herbert*,
  828 F.3d 1245 (10th Cir. 2016) .......................................................... 23, 26

*Planned Parenthood of Central N.C. v. Cansler*,
  804 F. Supp. 2d 482 (M.D.N.C. 2011) ................................................... 25

*Planned Parenthood Greater Memphis Region v. Drehyzehner*,
  853 F. Supp. 2d 724 (M.D. Tenn. 2012) ................................................ 25

*Planned Parenthood of Greater Ohio v. Hodges*,
  188 F. Supp. 3d 684 (S.D. Ohio 2016) ................................................... 25

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

*Planned Parenthood of Greater Texas Family Planning & Preventative*
  *Health Servs., Inc. v. Smith*,
  236 F. Supp. 3d 974 (W.D. Tex. 2017) ................................................. 28

*Policy and Research, LLC v. U.S. Department of Health and Human*
  *Services et al.*,
  1:18-cv-00346 (D.D.C.) ......................................................................... 1

*Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir.1991) ................................................................ 23

*Salehpour v. INS*,
  761 F.2d 1442 (9th Cir. 1985) ............................................................ 10

*Santa Rosa Mem. Hosp. v. Maxwell-Jolly*,
  380 F. App'x 656 (9th Cir. 2010), *vacated and remanded on other*
  *grounds by Douglas*, 565 U.S. 606 ..................................................... 28

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ............................................................ 28

*State v. U.S. Bureau of Land Mgmt.*,
  277F.Supp.3d. 1106, 1123(N.D. Cal. 2017) ........................................ 19

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001) .............................................................. 23

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................................... 9

**Statutes**

5 U.S.C. § 705 ............................................................................................. 9

5 U.S.C. § 706 ...................................................................................... 10, 12

Bipartisan Budget Act of 2018, Pub. L. No. 115-123, Feb. 9, 2018, 132
  Stat. 64, 119 ........................................................................... 4, 12, 14

Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017,
  131 Stat. 135, 536 .................................................................. 4, 12, 14

Continuing Appropriations Act, 2018 and Supplemental Appropriations
  for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, 131
  Stat. 1129 .................................................................................. 4, 12

TPP Program. Consolidated Appropriations Act, 2010, Pub. L. No. 111-117. .......................................................................................................... 3, 5

**Rules**

Federal Rule of Civil Procedure 65 .......................................................... 1, 28

**Other Authorities**

2 C.F.R. Part 200......................................................................................... 10

2 C.F.R. § 200.95 ........................................................................................ 10

45 C.F.R. § 75.2 .................................................................................... 10, 11

45 C.F.R. § 75.372(a) ......................................................................... *passim*

45 C.F.R. § 75.374 ............................................................................... 11, 22

78 Fed. Reg. 78590, 78599 (Dec. 26, 2013)...................................... 10, 12

Adolescent Health, *Evidence-Based TPP Programs*
    https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-
    prevention-program-tpp/evidence-based-programs/index.html ............................... 6

Adolescent Health, *Results from the OAH Teen Pregnancy Prevention
    Program*
    https://www.hhs.gov/ash/oah/sites/default/files/tpp-cohort-1/tpp-
    results-factsheet.pdf ..................................................................... 15

Adolescent Health, *Summary of Evaluated Programs Effective at
    Changing Behavior*
    https://www.hhs.gov/ash/oah/evaluation-and-research/grantee-led-
    evaluation/evaluated-programs-effective-at-changing-
    behavior/index.html ..................................................................... 17

Evidence-Based Policymaking, *The Promise of Evidence-Based
    Policymaking* 94 (Sept. 2017)
    https://www.cep.gov/cep-final-report.html ............................................. 1

Gordon & Haskins, *Trump Team Doesn't Understand Evidence-Based
    Policies Regarding Social Problems*
    http://thehill.com/blogs/pundits-blog/the-administration/343908-
    trump-team-doesnt-understand-evidence-based-policies .................................. 1, 17

Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN.com (Aug. 17, 2017) http://www.cnn.com/2017/08/17/health/teen-pregnancy-prevention-programs-funding/index.html ................................................................. 14

John S. Santelli et al., *Abstinence-Only-Until-Marriage: An Updated Review of U.S. Policies and Programs and Their Impact* http://www.jahonline.org/article/S1054-139X(17)30260-4/fulltext ..................... 16

Julie Rovner Kaiser, *Drop in Pregnancies Is Due to More Contraceptives, Not Less Sex* https://www.pbs.org/newshour/health/teen-pregnancies-contraceptives-less-sex ........................................................................ 16

Julieta Lugo-Gil et al., *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review: July 2014 through August 2015* (June 2016) https://tppevidencereview.aspe.hhs.gov/pdfs/Summary_of_findings_2015.pdf ........................................................................................ 5, 17

Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding* (July 19, 2017) https://www.wired.com/story/teen-pregnancy-researchers-regroup-after-trumps-hhs-pulls-funding/ ............................................................ 14

Robert S. Catz, *Due Process and Federal Grant Termination: Challenging Agency Discretion Through a Reasons Requirement*, 59 Wash. U. L.Q. 1067, 1090 (1982) https://openscholarship.wustl.edu/law_lawreview/vol59/iss4/1/ .......................... 20

Statement of Haywood L. Brown, President, Am. Congress for Obstetricians & Gynecologists, Unintended Pregnancy Prevention Is Essential to Women's Health (July 17, 2017) https://www.acog.org/About-ACOG/News-Room/Statements/2017/Unintended-Pregnancy-Prevention-is-Essential-to-Womens-Health ................................................................. 27

Valerie Huber, *Sexual Risk Avoidance Education: Common sense, science and health are winning the day* (Mar. 12, 2017) http://thehill.com/blogs/pundits-blog/healthcare/323590-sexual-risk-avoidance-education-common-sense-science-and-health ...................................... 16

## I.    INTRODUCTION

Plaintiffs—Planned Parenthood of Greater Washington and North Idaho (PPGWNI), Planned Parenthood of the Great Northwest and the Hawaiian Islands (PPGNHI), and Planned Parenthood of the Heartland (PPH)—hereby move, pursuant to Section 705 of the Administrative Procedure Act (APA) and Federal Rule of Civil Procedure 65, for preliminary injunctive relief enjoining the U.S. Department of Health and Human Services and Alex Michael Azar II, in his official capacity as Secretary of HHS (collectively, "HHS" or "the agency"), from terminating without cause Plaintiffs' five-year cooperative agreements under the Teen Pregnancy Prevention ("TPP") Program.[1]

The TPP Program supports evidence-based teen pregnancy prevention programs, targeting communities with high rates of teen pregnancy and focusing on youth that are often underserved.  The TPP Program has been heralded as one of the country's most  successful evidence-based programs,[2] receiving bipartisan support as an example of how to administer a high quality evidence-based program.  For example, the September 2017 report from a bipartisan Commission on Evidence-Based Policymaking established by House Speaker Paul Ryan (R-WI) and Senator Patty Murray (D-WA) highlighted the TPP Program as an example of a federal program developing increasingly rigorous portfolios of evidence.[3]

---

[1] Three other cases involving termination of five-year cooperative agreements under the TPP Program, and involving the same defendants, have been filed and are pending in other jurisdictions.  *King County v. Azar et al.*, No. 2:18-cv-00242-JCC (W.D. Wa.); *Healthy Teen Network v. Azar et al.*, Civ. No. 1:18-cv-468 (D. Md.); *Policy and Research, LLC  v. U.S. Department of Health and Human Services et al.,* 1:18-cv-00346 (D.D.C.).

[2] *See, e.g.*, Robert Gordon & Ron Haskins, *Trump Team Doesn't Understand Evidence-Based Policies Regarding Social Problems*, The Hill, (July 26, 2017) (Harker Decl., Ex. A).  For the Court's convenience, URLs for exhibits available online are included in the table of authorities, as well as in the Harker Declaration.

[3] Commission on Evidence-Based Policymaking, *The Promise of Evidence-Based Policymaking* 94 (Sept. 2017) (Harker Decl., Ex. B).

1    In July 2017, without explanation, HHS notified Plaintiffs along with 75 other

2    recipients[4] of TPP funding that the agency was terminating their cooperative

3    agreements on June 30, 2018, rather than on June 30, 2020 as originally provided.  In

4    doing so, HHS effectively terminated the TPP Program as a whole.  Without any

5    legal or rational justification, HHS's actions here serve as yet another example of the

6    current Administration's broader political agenda against sexual and reproductive

7    health and evidence-based and science-based programs.  Plaintiffs are likely to

8    prevail on their claims that the agency's actions are contrary to law and arbitrary and

9    capricious.  Plaintiffs are also likely to prevail on their claims that the agency's

10   action violates the Due Process Clause of the Fifth Amendment of the U.S.

11   Constitution.

12       Termination of Plaintiffs' cooperative agreements prior to completion of their

13   five-year project periods will cause (and is causing) significant and irreparable harm

14   to Plaintiffs and the communities they serve.  No harm will result to the agency by

15   allowing Plaintiffs to carry out the terms of their cooperative agreements—which

16   they have been performing in exemplary fashion for years—and fulfill Congress's

17   mandate to implement evidence-based programs that have proven effective at

18   reducing teenage pregnancy as well as pursuing innovative new strategies.  The

19   public interest will also be served by the preservation of the status quo during the

20   pendency of the litigation by allowing the relevant communities to continue to

21   receive much-needed programs, and allowing the public as a whole to benefit from

22   the vital research generated by Plaintiffs through the TPP Program.

23

24

25   ---

[4] Other recipients include Illinois Department of Human Services; North Carolina
26   Department of Health and Human Services;  King County, Washington; Maricopa
     County, Arizona; City of Rochester, New York; City of Hartford, Connecticut;
27   University of Southern California; The University of Texas Health Science Center at San
     Antonio; New York University; and the Regents of the University of California, San
28   Francisco.

## II.   STATEMENT OF FACTS

### A.   History of the Teen Pregnancy Prevention Program

#### 1.   Congressional Creation & Funding

In 2010, recognizing the importance of developing evidence-based approaches to reduce teen pregnancy, Congress established the TPP Program through the Congressional Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).  When HHS sought the 2010 appropriations that would initially fund the TPP Program, HHS stated that "utilizing evidence-based models and promising practices" were "necessary to permit teen pregnancy prevention funds to be targeted more effectively."[5]

Thus, when Congress initially appropriated $110 million in funds to create the TPP Program for FY 2010, it expressly directed that such funds "shall be for making competitive cooperative agreements and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy."  *Id*. Out of the total appropriated funds for the program, at least $75 million was to be used for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."  *Id*.  These programs are referred to as "Tier 1" programs.

Congress further provided that at least $25 million was to be made available for "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."  *Id*. These programs are referred to as "Tier 2" programs.  Tier 2 (evaluation) awardees pursue new or innovative evidence-informed programs that help to fill gaps in existing interventions for underserved youth by expanding the number of programs

---

[5] U.S. Dep't of Health and Human Services, Justification for Estimates for Appropriations Committees, FY 2010, at 11 (Harker Decl., Ex. C).

- 3 -

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

available to help reduce teen pregnancy.[6]

Since 2010, Congress has appropriated funds for the TPP Program at nearly constant levels, appropriating approximately $100 million annually.[7]  Because no appropriations bill for Fiscal Year (FY) 2018 (October 1, 2017 through September 30, 2018) has yet been signed into law, HHS, like the rest of the federal government, currently operates under a continuing appropriations resolution.  By operation of those continuing resolutions, Congress has maintained current FY 2018 funding for the TPP Program consistent with funding levels for FY 2017.[8]

### 2.    HHS Implementation of the TPP Program

HHS's Office of Adolescent Health (OAH) is responsible for implementing and administering the TPP Program.  In April 2015, after an initial round of TPP Program funding from 2010 through 2015, OAH issued new Funding Opportunity Announcements (FOAs) to solicit applications for another round of five-year funding for both Tier 1 and Tier 2 funds.  (PPGNHI Decl. ¶¶ 6-11).  Each FOA required that applicants submit a detailed work plan for the "five-year project period."  (*Id.*).  In specifying a five-year term, OAH intended that the first year would be for planning whereas years two through five were for implementation of the projects.  (*Id.*).  OAH required that grantees' applications and work plans demonstrate staffing, budget, goals, and milestones over the course of the five-year project period.  (*Id.*).

In July 2015, following a highly competitive application process, HHS awarded 81 new five-year TPP Program cooperative agreements.  (*Id.* ¶ 12).  In the cooperative agreements with Plaintiffs, HHS specified that the TPP Program project

---

[6] *See generally* Carmen Solomon-Fears, Cong. Research Serv., RS20301, *Teenage Pregnancy Prevention: Statistics and Programs* 12 (2016) (Harker Decl., Ex. D).

[7] *See* Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017, 131 Stat. 135, 536.

[8] *See* Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, 131 Stat. 1129, 1139-40. Subsequent acts have extended funding at existing levels through March 23, 2018.  *See* Bipartisan Budget Act of 2018 § 20402, Pub. L. No. 115-123, Feb. 9, 2018, 132 Stat. 64, 119.

period would run for five years—from July 1, 2015 through June 30, 2020.  (*Id.* ¶ 14; PPGWNI Decl. ¶¶ 11-12; PPH Decl. ¶ 8).

In applying for a grant under the TPP Program in 2015, like in 2010, Tier 1 (replication) grantees selected an existing evidence-based model from HHS's Evidence Review.  (*See* PPGNHI Decl. ¶¶ 23-26).  That independent and comprehensive review of the available evidence on teen pregnancy prevention identifies a list of approved evidence-based models that have previously proven effective.  (*Id.*).  To meet the criteria for inclusion on HHS's list, the program must have evidence of at least one favorable, statistically significant impact on at least one sexual risk behavior or reproductive health outcome of interest (sexual activity, number of sexual partners, contraceptive use, STIs, or pregnancy).[9]

The Evidence Review is what determines whether programs have been "proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors" as Congress directed in creating the TPP Program.  Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. at 3253.  As new research is conducted, new program models have been added to the Evidence Review; similarly, program models have been removed from the Evidence Review if new studies demonstrate that certain programs are not as effective.[10]  Because of the nature of the Evidence Review, each application cycle has had a more refined and effective menu of program options, as more program models are evaluated and the evidence base evolves.[11]  Thus, the models utilized by Plaintiffs in applying for the Tier 1TPP awards were specifically proven to be effective at preventing teen pregnancy or related risk factors.

---

[9] Julieta Lugo-Gil et al., *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review: July 2014 through August 2015* at 1, 12 (June 2016) (Harker Decl., Ex. E).
[10] *See id.*
[11] *See id.*

The Evidence Review has been conducted and updated periodically since 2009, and the most recent results were published in 2016 reflecting studies through August 2015.[12]   As of July 2016, there were forty-four evidence-based program models approved for use in Tier 1 funded programs.[13]   The program models include a range of approaches including youth development, comprehensive sex education, abstinence education and clinic-based models.[14]

### B.    Plaintiffs Are Successfully Performing Under the TPP Program

Plaintiffs are three of the current TPP Program grantees, receiving six TPP Program cooperative agreements among them.  As explained in greater detail in the accompanying declarations, over the first three years of the latest round of TPP Program funding, HHS has consistently commended all three Plaintiffs for implementation of their respective TPP Program projects.

**Plaintiff PPGWNI** works with more than forty community partners through its Healthy Youth Initiative to implement evidence-based teen pregnancy prevention programs in four Washington communities— Yakima County, Franklin County, Okanogan County, and the City of Spokane—with some of the highest birth rates for teen women in the state.  (*See* PPGWNI Decl. ¶¶ 10, 16).  These communities have higher than national average rates of children under eighteen living in households below the federal poverty level and receiving public assistance.  (*Id.*)

PPGWNI has consistently received praise from HHS for its implementation of the Healthy Youth Initiative.  (*Id.* ¶¶ 24-26, 34).  For example, on September 1, 2016, HHS sent PPGWNI a letter in response to PPGWNI's annual progress report submission.  (*Id.*, Ex. D.).  In it, HHS wrote "[c]ongratulations on successfully

---

[12] HHS, Office of Adolescent Health, *Evidence-Based TPP Programs* (Harker Decl., Ex. F).

[13] *Id.*

[14] *Id.*; *see generally* Identifying Programs That Impact Teen Pregnancy, Sexually Transmitted Infections, and Associated Sexual Risk Behaviors: Review Protocol 5.0 (April 2016) (Harker Decl., Ex. G).

completing year one of the OAH TPP grant" and stated that PPGWNI "accomplished a lot." (*Id.*).  HHS further acknowledged that PPGWNI "successfully completed [its] planning year milestones." (*Id.*).  In closing, HHS noted that it was "a pleasure to work with [PPGWNI] and [its] program"; that HHS "look[ed] forward to the continuing progress in the coming years"; and remarked, "[c]ongratulations on a job well done, on your Year 1 achievements, and thank you for all that you and your team do each and every day to improve the lives of adolescents!" (*Id.*).

**Plaintiff PPH** is using its Tier 1 funding to implement a project called Education & Prevention, Information & Conversation ("EPIC").  (PPH Decl. ¶ 7).  EPIC is aimed at reducing unintended pregnancy rates among high risk, vulnerable, and underserved youth populations in three high-need communities: (i) Woodbury County, Iowa and Dakota County, Nebraska; (ii) Pottawattamie County, Iowa and Douglas County, Nebraska; and (iii) Mills County, Iowa.  (*Id.*).  Each of the targeted communities has teen birth rates above the state and national averages and, within those elevated rates, African American and Latina youth are disproportionately represented. (*Id.*).

HHS has repeatedly commended PPH's TPP Program performance.  (*Id.* ¶ 16).  For example, in reviewing PPH's annual progress report for Year 1, OAH staff praised PPH for "maintain[ing] partnerships with 14 formal partners and 27 informal partners" and "successfully determin[ing] program selection and fit, and work[ing] closely with project partners to pilot test and implement" its programs.  (*Id.*, Ex. C).  The reviewer concluded: "I look forward to the continued progress in the coming years.  Congratulations on a job well done, on your Year 1 achievements, and thank you for all that you and your team do each and every day to improve the lives of adolescents!" (*Id.*).

**Plaintiff PPGNHI,** a Tier 1 recipient, is  implementing a program called "Stronger Together: The Northwest Coalition for Adolescent Health Capacity Building Project."  (PPGNHI Decl. ¶¶ 17-19).  PPGNHI helps non-profit

- 7 -

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

organizations deliver programs that target homeless and foster care youth in Oregon and Washington. (*Id.*). For instance, PPGNHI works with a homeless support group called YouthCare in Seattle, Washington, to teach youth about sexual and reproductive health. (*Id.*). Through the Stronger Together program, Plaintiff PPGNHI planned to reach more than 3,500 young people during the five-year grant period. (*Id.*).

Plaintiff PPGNHI also implements a Tier 1 grant program called "Improving the Lives of Teens." (*Id.* ¶¶ 20-22). This programs aims to replicate evidence-based teen pregnancy prevention programs in seven communities with disproportionately high teen pregnancy rates in Alaska, Hawaii, Idaho, and Washington. (*Id.*). Through the Improving the Lives of Teens program, PPGNHI had aimed to serve 2,275 people per year for a total of 9,100 youth in years two through five of the program. (*Id.*).

Plaintiff PPGNHI is also using its Tier 2 funding to evaluate the effectiveness of a program called "Linking Families and Teens." (*Id.* ¶¶ 37-42). The program targets young people in grades 9 through 12 and their parent/caregiver(s) living in rural communities in Alaska, Hawaii, Idaho, Oregon, Utah, and Washington. (*Id.*). The goal of the program is to "reduce teen pregnancy rates, increase the use of contraceptives, and delay initiation of sexual activity by increasing parent/caregiver-youth connectedness, and increasing youth's self-efficacy, knowledge, and skill related to sexual health and pregnancy prevention." (*Id.*). As contemplated for Tier 2 programs, Plaintiff PPGNHI planned to evaluate the program's effectiveness through a rigorous randomized control trial measuring the program's impact by evaluating changes in knowledge, communication and self-efficacy, sexual initiation, contraceptive use, and pregnancy. (*Id.*).

HHS has lauded PPGNHI as a success story for its implementation of TPP programs during the previous round of funding from 2010–2015, and also consistently praised PPGNHI for its performance during the second, current round of funding, always indicating that PPGNHI is meeting or exceeding expectations and

milestones.  (*Id.* ¶¶ 50-52, 58-59).  Among various commendations, OAH noted that PPGNHI has "retained qualified, strong staff to work in their program"; is "fully staffed for program implementation"; "provided goals and objectives that are appropriate for the project."  (*Id.* ¶ 52; *see also id.*, Ex. J).

## C.    HHS's Termination of Plaintiffs' TPP Awards and the TPP Program

Despite the commendations that Plaintiffs received from HHS and Plaintiffs' success in implementing their projects, in July 2017, HHS notified Plaintiffs that their TPP Program agreements would be terminated as of June 30, 2018, two full years before their respective projects were set to end.  (PPGWNI Decl. ¶¶ 29-30; PPGNHI Decl. ¶¶ 50-53; PPH Decl. ¶ 18).  HHS neither provided an explanation for that decision nor gave Plaintiffs any ability to challenge that decision.  On August 1, 2017, Plaintiffs each wrote to HHS challenging the premature termination of their awards, particularly in light of the commendations that Plaintiffs had each received from HHS since 2015.  (*See* PPGNHI Decl. ¶¶ 54-58).  As of the date of this filing, HHS still has not responded, let alone provided Plaintiffs any explanation for the abrupt termination.  (*See id.*).  Nor was there any indication in Plaintiffs' annual evaluations that there were any issues that could result in termination.  (*See id.*).

## III.    ARGUMENT

The APA grants this Court authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion" of these proceedings "as may be required and to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  Further, "[a] party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'"  *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

The Ninth Circuit evaluates "these factors via a sliding scale approach, such that serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (internal quotations omitted). "As a result, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be established by the party." *Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 759-60 (9th Cir. 2004) (internal quotation omitted). Plaintiffs are entitled to injunctive relief in this case.

### A.   Plaintiffs Are Likely To Succeed on the Merits.

#### 1.   HHS's Actions Must Be Set Aside Under the APA

A court must set aside agency action which is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance of law." 5 U.S.C. § 706(2)(A). Here, HHS's termination of Plaintiffs' cooperative agreements is both contrary to law and arbitrary and capricious. First, HHS's unilateral termination of Plaintiffs' cooperative agreements is inconsistent with HHS's own regulations regarding when and how such agreements may be terminated. Second, HHS's improper termination of Plaintiffs' cooperative agreements cannot be saved by HHS's decision to terminate the TPP Program as a whole, as that decision defies clear statutory direction. Third, HHS's decision to terminate the TPP Program is arbitrary and capricious.

##### a.   HHS's Actions Are Inconsistent With HHS Regulations

An agency acts arbitrarily and capriciously when it adopts a course of action that is contrary to its own regulations. *See Salehpour v. INS*, 761 F.2d 1442, 1445-48 (9th Cir. 1985). In administering federal grants and cooperative agreements under the TPP Program, HHS is bound by its regulations at 45 C.F.R. Part 75.

These HHS regulations largely duplicate the agency-wide "Uniform Guidance" issued by the Office of Management and Budget (OMB) at 2 C.F.R. Part

- 10 -

200.[15]  A "termination" is defined as "any ending of a Federal award, in whole or in part, at any time prior to the planned end of a period of performance."  45 C.F.R. § 75.2; 2 C.F.R. § 200.95.  HHS may terminate an award in only three circumstances: (1) if the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of" the grantee.  45 C.F.R. § 75.372(a).[16]  Where termination is for failure to comply with the terms and conditions of the award, HHS must provide grantees "an opportunity to object and provide information and documentation challenging the suspension or termination action."  *Id.* § 75.374.

Here, Plaintiffs each received a competitively-awarded cooperative agreement, providing a "period of performance" from July 1, 2015 through June 30, 2020.  In July 2017, HHS notified Plaintiffs unilaterally that their period of performance would terminate on June 30, 2018, eliminating the final two years of their projects.  Thus, because HHS ended the TPP awards "prior to the planned end of a period of performance," its action amounts to a "termination" under 45 C.F.R. § 75.2.  HHS lacked authority to terminate Plaintiffs' awards because HHS cannot demonstrate that any Plaintiff "failed to comply with the terms and conditions of the award" or that the termination was "for cause," and no Plaintiff has consented to the termination.

***First***, HHS has never claimed that Plaintiffs failed to "comply with the terms and conditions of the award" but rather has consistently commended Plaintiffs for their performance.  If HHS was claiming termination for non-compliance, HHS would have had to provide Plaintiffs with "an opportunity to object and provide information and documentation challenging the suspension or termination action."  45 C.F.R. § 75.374.  But HHS did not provide Plaintiffs with so much as an *explanation* for the termination, let alone an opportunity to challenge the same.  Thus, 45 C.F.R. § 75.372(a)(1) does not apply to this case.

---

[15] *See* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013).

[16] The fourth circumstance applies to termination *by the grantee* and thus is not applicable here.  *See* 45 C.F.R. § 75.372(a)(4).

**Second**, HHS has not demonstrated that the termination was "for cause."  As explained in the OMB Uniform Guidance, which the HHS regulations follow, "for cause" termination is intended to apply to a limited set of circumstances that are "beyond the Federal agency's . . . control," such as "where congressional mandates encouraged expedited performance, or changes to appropriated amounts require modifications to programs."[17]  No such circumstances warranting "for cause" termination are present here.  There is nothing "beyond the agency's control" that would warrant termination, nor has there been any material change to the appropriated funds requiring any modifications to the program.  To the contrary, appropriation levels for the TPP Program have remained largely consistent since the Program's inception and funds for the TPP Program continue to be appropriated.[18]

**Third**, Plaintiffs did not consent to termination under 45 C.F.R. § 75.372(a)(3).  Accordingly, HHS's actions in terminating Plaintiffs' TPP awards are inconsistent with its own regulations and must be set aside.

b.    **HHS's Actions Are Contrary to Clear Statutory Direction**

HHS's improper termination of Plaintiffs' cooperative agreements cannot be saved by HHS's apparent decision to terminate the TPP Program as a whole, as that decision defies clear statutory direction.  The APA authorizes this Court to hold unlawful and set aside action found to be "not in accordance with law" and to "compel agency action unlawfully withheld."  5 U.S.C. §§ 706(1), (2)(A).

Since 2010, Congress has consistently directed HHS to implement the TPP Program.  That statutory direction was in full effect when HHS shortened Plaintiffs' periods of performance, and it is still in effect today.[19]  Unless and until Congress

---

[17] Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013).

[18] *See* Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017, 131 Stat. 135, 536.

[19] *See id.*; Consolidated Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No 115-56, 131 Stat. 1129, 1139-40;

(Footnote Cont'd on Following Page)

1    removes its direction that HHS continue to implement the TPP Program, HHS has no

2    discretion to terminate the program, and its decision to do so must be set aside as

3    contrary to law.

4         In other words, it is irrelevant whether current HHS leadership believe the TPP

5    Program is ineffective or a poor use of resources.  Congress has already determined

6    that TPP is worth the effort, and appropriated funds accordingly.  *See Local 2677,*

7    *Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 77–78 (D.D.C. 1973) ("An

8    administrator's responsibility to carry out the Congressional objectives of a program

9    does not give him the power to discontinue that program, especially in the face of a

10   Congressional mandate that it shall go on.").

11        c.    **HHS's Actions Are Arbitrary and Capricious**

12        Agency action is arbitrary and capricious if the agency "has [1] relied on

13   factors which Congress has not intended it to consider, [2] entirely failed to consider

14   an important aspect of the problem, [3] offered an explanation for its decision that

15   runs counter to the evidence before the agency, or [4] is so implausible that it could

16   not be ascribed to a difference in view or the product of agency expertise." *Motor*

17   *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

18   (1983).  When choosing a course of action, an "agency must examine the relevant

19   data and articulate a satisfactory explanation for its action including a 'rational

20   connection between the facts found and the choice made.'" *Id.*  An "agency's action

21   must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50.

22        An agency departing from a prior policy must "display awareness that it *is*

23   changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)

24   (emphasis in original); *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d

25   1112, 1119 (D.C. Cir. 2010) (Where government reverses an earlier  determination,

26   "[r]easoned decision making necessarily requires [an] agency to acknowledge and

27   (Footnote Cont'd From Previous Page)
     Bipartisan Budget Act of 2018 § 20402, Pub. L. No. 115-123, Feb. 9, 2018, 132 Stat. 64,

28   119.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

provide an adequate explanation for its departure from established precedent and an agency that neglects to do so acts arbitrarily and capriciously").  The "APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."  *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (internal quotation omitted).

HHS's stated grounds for terminating the TPP program fail to satisfy these requirements.

*First,* HHS's various stated rationales for terminating the TPP Program are inconsistent with each other, and inconsistent with language on HHS's own website praising the TPP Program.  Initially, in mid-July 2017, HHS explained in a media statement that the termination decision was made because "the President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout."[20]  Of course, this explanation alone is insufficient to justify terminating a Congressionally mandated program.  HHS still operates under a continuing resolution that, by statute, directs HHS to continue TPP funding today at the same levels provided in FY 2017; thus, it is irrelevant whether the President's Budget proposed eliminating TPP funding.[21]  Not surprisingly, it did not take long for HHS's explanation to change.

One month later, in August 2017, HHS offered a new rationale for ending the TPP Program.  HHS now claimed that the TPP Program was "a poor use of more

---

[20] Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding*, Wired.com (July 19, 2017) (Harker Decl., Ex. H).

[21] *See* Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017, 131 Stat. 135, 536; Bipartisan Budget Act of 2018 § 20402, Pub. L. No. 115-123, Feb. 9, 2018, 132 Stat. 64, 119.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

than $800 million in taxpayer dollars" and that "HHS hit the pause button on it."[22] Hitting the "pause button" on the congressionally mandated program, HHS said, was meant to "give[] the Department time to continue its review of the program and the evidence, to ensure that should Congress continue it, the program provides positive reinforcement of the healthy decisions being made by a growing majority of teens."[23] That was not HHS's final position, however.

In late November 2017, HHS responded to inquiries by several U.S. Senators and Representatives by repeating its conclusory assertions that continuing TPP was "not a reasonable option" due to "strong evidence of negative impact or no impact"; that the TPP Program had "failed to deliver" on its promises and "jeopardize[ed] the youth who were served"; and that the program was "a poor use" of taxpayer dollars.[24]

Not only are there inconsistencies among the agency's various explanations for terminating TPP, all of its explanations are flatly contradicted by HHS's praise for the TPP Program—which is posted publicly on an official OAH webpage:

> The OAH TPP Program is an effective and responsible use of taxpayers' dollars and is cited by independent experts as a promising example of evidence-based policymaking. It is one of the few government programs that funds evidence-based programs and continues to rigorously evaluate efforts and results.[25]

This unexplained inconsistency in HHS's reasoning is the hallmark of arbitrary decision making. "'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Village of Kake*, 795 F.3d at 966-67 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

---

[22] Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN.com (Aug. 17, 2017) (Harker Decl., Ex. I).
[23] *Id.*
[24] Letter from Barbara Pisaro Clark, Acting Assistant Sec'y for Legislation, HHS, to Sen. Patty Murray (Nov. 22, 2017) (Harker Decl., Ex. J).
[25] HHS, Office of Adolescent Health, *Results from the OAH Teen Pregnancy Prevention Program* (Harker Decl., Ex. K).

***Second,*** HHS's various stated rationales fail to take account of all the evidence before it, ignoring the facts in favor of the Administration's political agenda, particularly the agenda of Valerie Huber, Chief of Staff for the Office of the Assistant Secretary of Heath, with responsibility for OAH. [26]  Soon before her appointment to HHS, Ms. Huber penned an op-ed maligning the TPP Program, referring to it as "so-called comprehensive sex education" and claiming that it "normalizes teen sex." [27]

She also attacked the effectiveness of the TPP Program, stating inaccurately that "more than 80 percent of teens in the [TPP] program fared either worse or no better than their peers who were not a part of the program."  In the same op-ed, Ms. Huber complained about the lack of funding for abstinence-only education, stating that "[o]nly ten cents out of every federal sex education dollar is devoted to" it.  Generally, abstinence-only education programs teach that abstinence from sexual activity is the only certain way to avoid out-of-wedlock pregnancy, sexually transmitted diseases, and other associated health problems. [28]  Abstinence only programs have been proven ineffective in delaying initiation of sexual intercourse or changing other sexual risk behaviors, and moreover, may provide medically inaccurate and stigmatizing information, as well as withhold important information about sexuality that young people need to make healthy decisions.[29]

Huber has also claimed that peer-reviewed scientific studies concerning the effectiveness of contraceptives in preventing teen pregnancy are biased.[30]  Less than

---

[26] HHS, Office of the Assistant Sec'y for Health, *Org. Chart* (Harker Decl., Ex. L).

[27] Valerie Huber, *Sexual Risk Avoidance Education: Common sense, science and health are winning the day*, TheHill.com (Mar. 12, 2017) (Harker Decl., Ex. M).

[28] *See generally* John S. Santelli et al., *Abstinence-Only-Until-Marriage: An Updated Review of U.S. Policies and Programs and Their Impact*, 61 J. Adolescent Health 273 (2017) (Harker Decl., Ex. N).

[29] *Id.*

[30] Julie Rovner Kaiser, *Drop in Pregnancies Is Due to More Contraceptives, Not Less Sex*, PBS Newshour (Sept. 2, 2016) (Harker Decl., Ex. O).

one month after her appointment to her position as Chief of Staff, HHS terminated all TPP Program grants.  That the TPP Program was terminated to satisfy an ideological opposition to the program, and a preference for abstinence-only education is a far more  plausible explanation than any HHS has offered thus far.

**Third,** the agency's claim that the TPP Program as a whole was ineffective, is contradicted by the demonstrated evidence of the Program's success and HHS's own positive statements about the Program.  There were forty-one rigorous program evaluations conducted as part of the first round of TPP Program funding during the 2010-2015 cohort.[31]  The studies were primarily randomized controlled trials (RCTs), the gold standard for research, and included "19 evaluations of evidence-based programs [Tier 1]and 22 evaluations of new or innovative approaches [Tier 2]."[32] The studies measured the programs' effectiveness in at least one of each of the following areas:  "reducing adolescent pregnancy and births, delaying sexual initiation, improving contraceptive use, and reducing STIs."[33]

The results of these studies, published in 2016, showed the success of the program.[34]  As HHS has stated and continues to state on its website, a total of twelve evaluations out of the forty-one performed (29 percent, or one in three) showed positive impacts.[35]  This is well above the ten to twenty percent of randomized control trials that experts say typically demonstrate positive results.[36]  Further, as

---

[31] Amy Feldman Farb & Amy L. Margolis, *The Teen Pregnancy Prevention Program (2010-2015): Synthesis of Impact Findings*, 106 Am. J. Pub.  Health S1, S9 (2016) (Harker Decl., Ex. P).

[32] *Id.*

[33] *Id.*

[34] Lugo-Gil et al., *Updated Findings from the  HHS Teen Pregnancy Prevention Evidence Review: July 2014 through August 2015* (Harker Decl., Ex. E).

[35] HHS, Office of Adolescent Health, *Summary of Evaluated Programs Effective at Changing Behavior* (Harker Decl., Ex. Q).

[36] *See e.g.*, Gordon & Haskins, *Trump Team Doesn't Understand Evidence-Based Policies Regarding Social Problems* ( Harker Decl., Ex. A); Farb & Margolis, *The Teen Pregnancy Prevention Program (2010-2015): Synthesis of Impact Findings*, (Harker Decl., Ex. P).

1   HHS also acknowledges, the studies showed eight new and innovative approaches

2   under Tier 2 that were "effective at changing behavior."[37]

3          Attempting to justify its termination of the program to Congress, HHS made

4   reference to those "rigorous evaluation studies of the TPP Program funded and

5   released under the previous Administration" in order to support its claim that the TPP

6   Program is ineffective.[38]  But the evidence shows that HHS's claim is an unscientific

7   and unreasonable interpretation of the evidence produced by those forty-one studies

8   in the first cohort.

9          HHS's stated position to Congress also ignores that the TPP Program is

10  defined by its continual improvement process, and has become even more effective

11  since the studies cited by HHS.  Once the first round of the results of the 2010 to

12  2015 cohort were published, OAH encouraged grantees to shift to the most effective

13  models, which means that the program models implemented today are both very

14  different and stronger than the mix of models used in the first cohort.  (*See* PPGNHI

15  Decl. ¶ 25).  And in fact, OAH does not allow current grantees to implement two

16  program models from the first cohort in which the evaluation findings showed

17  statistically significant negative results.  (*See id.*).  HHS's stated justification to

18  Congress seemed to ignore these improvements completely, as it referred to the TPP

19  Program having "37 funded and evaluated projects."[39]  While HHS provided no

20  citations for these figures, the reference to 37 projects appears to refer to data that is

21  now out of date; specifically, the reference to 37 programs appears to refer to results

22  of the TPP Evidence Review as of February 2015 not the more current 2016 results.[40]

23         In sum, HHS's stated, post hoc justification for terminating the TPP

24  ---

[37]HHS, Office of Adolescent Health, *Summary of Evaluated Programs Effective at Changing Behavior* (Harker Decl., Ex. Q).

25  [38] Letter from Barbara Pisaro Clark, Acting Assistant Sec'y for Legislation, HHS, to Sen. Patty Murray at 1 (Nov. 22, 2017) (Harker Decl., Ex. J).

26  [39] *Id.*

27  [40] Lugo-Gil et al., *Updated Findings from the  HHS Teen Pregnancy Prevention Evidence Review: July 2014 through August 2015* (Harker Decl., Ex. E).

28

- 18 -

Program—apparently based on the older results of the Evidence Review—misses the mark in two important ways.  First, the results from the first cohort were impressive and *above* what one would expect to see in a typical replication of a randomized control trial in the social sciences.  And second, as Congress intended, OAH learned from the results of the first cohort and is using that knowledge to strengthen the current projects, including discontinuing the use of programs determined to be ineffective.  Yet, despite the prior evidence review, despite the fact that grantees are required to select programs that have been determined to have shown current positive results, and despite the fact that the purpose of the program is to determine what approaches to teen pregnancy prevention work, HHS has done an about-face and now claims that the TPP Program as a whole is ineffective.  This is a textbook example of an agency ignoring the evidence before it and arbitrarily changing its position without adequate, rational justification, particularly in light of Plaintiff's significant reliance interest in HHS's prior approach to the TPP Program.  *See e.g.*, *F.C.C. v. Fox*, 556 U.S. at 515; *Perez*, 135 S. Ct. at 1209.

Contrary to HHS's new, flawed interpretation, the evidence demonstrates the TPP Program's success and positive impact on underserved communities.  HHS's effort to end a highly-regarded program because it does not conveniently fit into the Administration's agenda is irreconcilable with the evidence before the agency, and must be set aside.  A change in administration does not authorize an unreasoned reversal of course. *See State v. U.S. Bureau of Land Mgmt.*, 277F.Supp.3d. 1106, 1123(N.D. Cal. 2017) ("New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA, they must give reasoned explanations for those changes and address the prior factual findings underpinning a prior regulatory regime.") (quotation marks and brackets omitted)).

### 2.    HHS's Actions Violate Plaintiffs' Due Process Rights

The Due Process Clause of the Fifth Amendment ensures that no one shall be "deprived of life, liberty, or property without due process of law."  U.S. Const.

amend. V.  The agency has deprived Plaintiffs of their property interests in the final two years of their TPP Program grants, and did so without the procedural protections required by the Fifth Amendment.  A procedural due process claim must contain two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections."  *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

In determining whether participation in a government program constitutes a protected property interest, courts look to whether the participant has a "legitimate claim of entitlement" to continued funding, as opposed to merely a "unilateral expectation of it."  *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). [41]  The scope of the "legitimate claim of entitlement" is defined by laws or other "existing rules or understandings."  *Id.*  The alleged interest simply must be based on a "mutually explicit understanding."  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

Here, Plaintiffs were two years into performance of a five-year cooperative agreement when they received notice that the agreement would be terminated after the third year.  The original Notice of Awards (NOAs), as well as the NOAs for year two, both clearly stated that the project period was from July 1, 2015, to June 30, 2020.[42]   The FOA for each tier within this cohort solicited applications with work plans for "the five-year project period."[43]  The FOA for the first year of the project noted that discontinuation of funding could only occur for reason of unavailability of funds or specific failures to meet certain project milestones.[44]  This created a

---

[41] *See also* Robert S. Catz, *Due Process and Federal Grant Termination: Challenging Agency Discretion Through a Reasons Requirement*, 59 Wash. U. L.Q. 1067, 1090 (1982) (due process protection for federal grant recipients is "predicated on a showing of legitimate claim of entitlement to grant benefits") (Harker Decl., Ex. R).

[42] *See, e.g.*, Notice of Award for PPH at 1(June 29, 2015) (PPH Decl., Ex. A).

[43] *See, e.g.*, Funding Opportunity Announcement and Application Instructions, Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need (Tier 1B), Announcement No. AH-TP1-15-002, at 15 (PPGNHI Decl., Ex. B).

[44] *Id.* at Appendix G (listing required milestones).

- 20 -

legitimate claim of entitlement to continued funding, so long as the required milestones were met.

In addition to the NOA and FOA, government communications consistently referred to the TPP Program as a five-year project. The first cohort, from FY 2010–2014, is described on an HHS website as including "102 grants to communities across the U.S. for a *five-year funding period*."[45] The same webpage also still states: "As the newest round of funded grants start operations, the TPP Program anticipates reaching 1.2 million youth in 39 states and the Marshall Islands from *FY2015-2019*."[46] It later says, "Applying lessons learned from the first round of funded grants, the second group funded in FY 2015-2019 expanded its focus."[47] HHS and its grantees had a mutual, explicit understanding that these grants were to be funded throughout the entire project period. Further, the relevant regulations provided that the grant could only be terminated by HHS under limited circumstances, including, non-compliance, with awardee consent, and "for cause." 45 C.F.R. § 75.372(a).

Thus, there was not merely a "unilateral expectation" that the TPP Program grants would continue for the full duration of the five-year performance period; rather, the NOA, FOA, the conduct and representations of HHS officials, and the relevant regulatory regime all demonstrated an explicit mutual understanding that the funded TPP projects would last five years. Plaintiffs designed their budgets, programming, and staffing with the understanding that the federal government would fulfill its obligation to disperse the funding it had promised. Thus, Plaintiffs had a legitimate claim of entitlement to continued funding under the TPP Program.

Because Plaintiffs had a legitimate claim of entitlement to complete all five years of their cooperative agreements, Plaintiffs were denied due process prior to HHS's termination decision. Determining what procedures are sufficient to satisfy

---

[45] HHS, *TPP Program Grantees (FY2010-2014)* (Harker Decl., Ex. S).
[46] *Id.*
[47] *Id.*

1  due process is "a function of context," *Brewster v. Bd. of Educ. of Lynwood Unified*

2  *Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998), and dependent upon a balancing of

3  three factors: (1) the private interest affected by the government action; (2) the risk of

4  erroneous deprivation as a result of insufficient procedures; and (3) the government's

5  interest in not providing more procedures. *Mathews v. Eldridge*, 424 U.S. 319

6  (1976).

7       The base requirement is that those who are deprived of a protected interest

8  should be "given an opportunity to be heard at a meaningful time and in a meaningful

9  manner." *Brewster*, 149 F.3d at 984.  The Supreme Court has "described the root

10  requirement of the Due Process Clause as being that an individual be given an

11  opportunity for a hearing *before* he is deprived of any significant [protected]

12  interest."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

13       Here, balancing of all three factors demonstrates that Plaintiffs were not

14  afforded the process they were due.  First, the Plaintiffs' interest here is high.  As

15  explained below, an estimated 1.2 million youth will participate in the TPP Program

16  nationwide to receive vital information about teen pregnancy prevention and

17  reproductive health.  Without the funding, those programs and the jobs of the people

18  who run the programs for both Planned Parenthood and their sub-grantees are at risk.

19  Further, Plaintiffs built networks of valuable relationships with community partners

20  predicated on the full five-year award period.  Because there was an understanding

21  between Plaintiffs and HHS that the cooperative agreements would continue until

22  2020, the Plaintiffs relied on this funding and have a strong interest in its

23  continuation.

24       Second, without sufficient procedures in place prior to an early termination of

25  the grant, there is a high risk that HHS would erroneously terminate a successful

26  award—as was done in this case.  Third, HHS cannot present any public interest that

27  would outweigh the heavy interest in procedural protections to Plaintiffs.  In fact,

28  there are extensive procedures in place for the review of TPP Program awards, and

HHS has provided no reason why it would not follow similarly thorough procedures for suddenly terminating a cooperative agreement two years early. Plaintiffs received notice that the cooperative agreements would be prematurely terminated, but were provided with no justification and no opportunity to provide evidence or challenge the agency's decision. *See* 45 C.F.R. § 75.374 (requiring opportunity to object to termination). At the bare minimum, Plaintiffs' right to due process of law should require that they had an opportunity to be heard in opposition to the grant terminations, in the form of a hearing *before* the termination. Plaintiffs are likely to succeed on their claim that the agency's actions deprived them of that right.

### B.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Plaintiffs will suffer irreparable harm if HHS is not enjoined from terminating Plaintiffs' cooperative agreements and the TPP Program. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The 9th Circuit has "recognized that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991); *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.")

Courts have found irreparable harm based on an organization's claims that the challenged action will cause them to "lay off employees, reduce services, cancel established programs, lose institutional knowledge, and ultimately lose goodwill with volunteers and community partners." *Doe v. Trump*, 2017 WL 6551491 at *23 (W.D. Wa. 2017). Irreparable harm sufficient to warrant an injunction has likewise been found where "any sudden shift in the organizations' priorities will threaten their relationships and goodwill with community partners." *Id*.; *see also Planned Parenthood Assoc. of Utah v. Herbert*, 828 F.3d 1245, 1263-64 (10th Cir. 2016)

- 23 -

1  (recognizing irreparable harm from reputational injury that would follow grant

2  termination).

3       Plaintiffs designed their budgets, programming, staffing, and partnerships with

4  community organizations based on the understanding that HHS would fulfill its

5  obligations .  (See PPGWNI Decl. ¶¶ 35-36; PPGNHI Decl. ¶¶ 60-67 ; PPH Decl.

6  ¶¶ 22.)  Thus, HHS's unlawful termination of Plaintiffs' cooperative agreements

7  disrupts Plaintiffs' abilities to continue operations as planned and threatens their

8  relationships and goodwill with local partners in the communities they serve.  (*See*

9  PPGWNI Decl. ¶ 40; PPGNHI Decl. ¶¶ 60-67; PPH Decl. ¶ 25 ("We developed

10  partnerships in the target communities with the understanding that the TPP Program

11  would run for at least five years, allowing us to deliver programs and services at no

12  cost to our partner organizations during that time.  With the grant ending early, we

13  will be unable to fulfill those commitments, and we are concerned that this will both

14  harm our current relationships and hamper our ability to establish partnerships with

15  other organizations on future projects.")).

16       The early termination also requires immediate action to scale down operations.

17  (*See* PPH Decl. ¶¶ 22-26; PPGWNI Decl. ¶ 36 ("We have already had to reduce our

18  direct programming to young people and instead focus on teacher training so that at

19  least a few of our partners can continue to administer the programs once our grant is

20  terminated.")).  That scale down threatens reductions in staffing.  (*See* PPGWNI

21  Decl. ¶ 37 ("PPGWNI has already lost four staff members because of the early

22  termination of the grant.  The employment status of an additional four staff members

23  will be in jeopardy if the early termination occurs on June 30, 2018.")).  Plaintiffs

24  also will not have the resources necessary to devote to increasing participation rates,

25  training, engaging new partners, or completing their research on program

26  effectiveness. (*See* PPGWNI Decl. ¶¶ 35-36; PPH Decl. ¶¶ 22-26).

27       Most importantly, HHS's actions hinder Plaintiffs' ability to provide health

28  services to the communities they serve.  (*See* PPGNHI Decl. ¶¶ 60-67 ("The

termination of funding for PPGNHI's grants will have adverse consequences for adolescent teens that have already relied on the services we are providing and that would have benefitted from the programs we initially planned to implement during our fourth and fifth years of performance"); PPGWNI Decl. ¶¶ 40-42 ("As we had planned to train additional teachers at our partner organizations during the fourth and fifth years of our grant, the young people who would have benefitted from that programming administered by our partner organizations will also be harmed."); PPH Decl. ¶¶ 22-26 ("termination of our grant will damage not only PPH as an organization, but also the young people who already rely on the services that PPH provides and those who would have benefitted from the programs we had planned to implement and expand during the next two years.")).

This form of irreparable harm is well established. *See e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (explaining evidence of irreparable harm exists due to an organization's "inability to provide adequate social services to its clients."); *Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684, 694–95 (S.D. Ohio 2016) (finding irreparable where "without the funds at issue here, Plaintiffs will be forced to stop providing services such as pap smears and other cancer screenings, tests for HIV/AIDS and tests and treatment for other STDs, infant mortality prevention programs, and sexual health education programs"); *Planned Parenthood Greater Memphis Region v. Drehyzehner*, 853 F. Supp. 2d 724, 738 (M.D. Tenn. 2012) ("Plaintiffs' conduct of its operations will be disrupted with the prospect of cuts in programming, community contacts and employees. . . . In the absence of an injunction, Plaintiffs' patients and communities throughout the State will suffer the loss of Plaintiffs' expert services for serious health problems."); *Planned Parenthood of Central N.C. v. Cansler*, 804 F. Supp. 2d 482, 498 (M.D.N.C. 2011) (finding irreparable harm where, plaintiffs "would be forced to close facilities, lay-off

1    employees and cease providing certain women's health services (not related to

2    abortion services) if a preliminary injunction is not granted.")

3         If the Court ultimately finds in favor of Plaintiffs on the merits, any harm

4    caused by terminating the cooperative agreements would not  be susceptible to

5    remedy.  Thus, Plaintiffs have satisfied the irreparable harm prong of the inquiry.

6        **C.**    **Preliminary Relief Will Not Cause Harm to HHS**

7         While Plaintiffs and the estimated 1.2 million youth served by the TPP Program

8    will suffer irreparable injury if the Court permits the termination to go forward, HHS

9    will suffer no harm from an injunction during the pendency of the litigation.  An

10    injunction will impose no costs on HHS; it merely maintains the status quo.  The agency

11    has never suggested that Plaintiffs are failing to carry out the terms of the cooperative

12    agreements or misusing the appropriated funds; to the contrary, the agency has

13    repeatedly commended Plaintiffs for their performance.  The balance of equities in this

14    case, therefore, tilts sharply in Plaintiffs' favor, outweighing any harm HHS could

15    plausibly allege from postponing its efforts to avoid the full period of performance it

16    issued these grants for.

17        **D.**    **A Preliminary Injunction Is In The Public Interest**

18         The public interest favors the granting of a preliminary injunction in order to

19     allow Plaintiffs' important work performed through the TPP Program to continue.

20    Courts have recognized the public harm that occurs where a grant termination would

21    hinder the public from receiving the grantee's services.  *See Planned Parenthood Assoc.*

22    *of Utah v. Herbert,* 828 F.3d 1245, 1246 (10th Cir. 2016).  HHS's unlawful termination

23    of the TPP Program harms the public by preventing those potential beneficiaries from

24    benefitting from these valuable programs.  (PPGNHI Decl. ¶ 67 ("At the end of the day,

25    the greatest consequence of terminating the TPP Program is that young people will not

26    be getting good, evidence-based sexuality education in communities that otherwise

27    would not have the resources to provide it.").

28         Further, cutting the TPP Program midstream means that the public as a whole will

be deprived of the benefits of the data generated through the program that sheds light on which teen pregnancy prevention methods are most effective.  (*Id.* ¶ 62 ("the public will not have the benefit of research into which programs are effective at reducing teen pregnancy and the data collected to date – data which is showing that the programs are having positive outcomes – will be wasted.").  Specifically, terminating the TPP Program mid-stream will prevent the completion of vital research on (1) whether program models that have demonstrated effectiveness work with additional populations; and (2) the effectiveness of new innovative programs that are needed to maintain the important gains that have been made in helping adolescents avoid unintended pregnancy.

This Court need not rest its analysis of public interest on Plaintiffs' statements alone.  Non-profit organizations working with Plaintiffs confirm the positive impact Plaintiffs have had on the communities they serve and reaffirm the strong public interest in keeping Plaintiffs' programming in place.  (*See* Decl. of YouthCare ¶¶ 6-9 (explaining partnership with PPGNHI to build a "customize curriculum tailored to the unique needs of minors experiencing homelessness" and noting that if "YouthCare loses the benefit of this partnership, the program will terminate"); Decl. of Transitions for Refugee Youth ("TRY") ¶¶ 7-10 (without its partnership with PPGNHI, TRY would have to terminate components of its after school programming)).

In addition to those who have worked with Plaintiffs directly, terminating the TPP program has been criticized by the medical community, members of Congress, and community advocates.[48]  In a letter to then-Secretary of HHS, Tom Price, 37 U.S. Senators stated that the action is "short-sighted and puts at risk the health and well-being

---

[48] *See, e.g.*, Statement of Haywood L. Brown, President, Am. Congress for Obstetricians & Gynecologists, Unintended Pregnancy Prevention Is Essential to Women's Health (July 17, 2017) (Harker Decl., Ex. T); Letter from Patty Murray et al., U.S. Senators, to Thomas E. Price, Sec'y of HHS (July 21, 2017) (Harker Decl., Ex. U); Letter from Big Cities Health Coalitionto Thomas E. Price, Sec'y of HHS (July 25, 2017) (Harker Decl., Ex. V).

1    of women and our most vulnerable youth who depend on the evidenced-based work that

2    TPP Program grantees are doing across the nation . . . ."[49]

3         Moreover, when weighing these factors, particular attention should be given to

4    preserving the status quo. *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del*

5    *Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). Here, the status quo is for Plaintiffs'

6    awards to extend through 2020, and for HHS to issue continuing applications so that

7    Plaintiffs may submit non-competitive applications to receive funding. *See id.* (status

8    quo is "the last uncontested status that preceded the parties' controversy"). Granting this

9    relief and enjoining HHS's unlawful termination of Plaintiffs' cooperative agreements

10   and the TPP Program as a whole is, therefore, in the public interest. Thus, enjoining

11   HHS's unlawful termination of Plaintiffs' cooperative agreements and the TPP Program

12   as a whole is, therefore, in the public interest.

13   **IV.    CONCLUSION & RELIEF REQUESTED**

14        Plaintiffs respectfully request this court set aside HHS's planned, unlawful

15   termination of Plaintiff's awards and the TPP Program pending resolution of these

16   proceedings. In addition, HHS must also be required to accept and administer the

17   continuing applications needed to provide for Plaintiffs to continue performance beyond

18   June 2018. It is critical that HHS review, process, and decide on Plaintiffs' continuing

19   applications by June 30, 2018, before Plaintiffs' current funding expires. Such relief

20   will prevent a lapse in Plaintiffs' TPP Program funding and ensure that the conditions

21   for fourth-year funding are in place pending final relief from this Court. HHS has

22   represented to Plaintiffs that it needs a minimum of two months to review Plaintiffs'

23   continuing applications, and will not review those applications by June 30 unless

24   ordered by a court to do so. HHS has provided no explanation as to why it would need

25   two months to review Plaintiffs' six continuing applications, when it was able to review

26   dozens of such applications over the same period in previous years. Nevertheless,

27   Plaintiffs are compelled to respectfully seek an order from the Court by no later than

28   _____
     [49] Harker Decl., Ex. U, at 1.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION; CASE NO. 2:18-cv-00055-TOR

1   April 30, 2018 that HHS accept and process Plaintiffs' continuing grant applications no

2   later than June 30, 2018.

3          Finally, this Court should waive any injunction bond under Rule 65(c).  First, this

4   case directly affects the public interest.  *See Santa Rosa Mem. Hosp. v. Maxwell-Jolly*, 380

5   F. App'x 656, 658 (9th Cir. 2010), *vacated and remanded on other grounds by Douglas*,

6   565 U.S. 606.  Second, Plaintiffs will be denied effective review if required to post a bond.

7   *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *People of the*

8   *State of Cal. ex rel. Van de Kamp v. Tahoe Reg. Planning Agency*, 766 F.2d 1319, 1325-

9   1326 (9th Cir. 1985).  Third, the federal government will not incur any damages from the

10  injunction.  *See Planned Parenthood of Greater Texas Family Planning & Preventative*

11  *Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 999-1000 (W.D. Tex. 2017) (injunction

12  barring Texas from terminating PPFA affiliates' participation in the Texas Medicaid

13  program "will not harm Texas's budget," and declining to requiring plaintiffs to provide

14  security).  Finally, Plaintiffs' "'likelihood of success on the merits … tips in favor of a

15  minimal bond or no bond at all.'"  *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692

16  F. App'x 366, 369 (9th Cir. 2017); *California v. Tahoe Reg. Planning Agency*, 766 F.2d

17  1319, 1326 (9th Cir. 1985).

18

19

20

21

22

23

24

25

26

27

28

DATED: March 16, 2018          Respectfully submitted,

                              By:   /s/ Rick Eichstaedt_____

                              RICK EICHSTAEDT (WSB # 36487)
                              CENTER FOR JUSTICE
                              35 West Main Ave, Suite 300
                              Spokane, WA 99201
                              Telephone: (509) 835-5211
                              ricke@cforjustice.org

                              DREW A. HARKER (*pro hac vice*)
                              ALLYSON HIMELFARB (*pro hac vice*)
                              NATHANIEL CASTELLANO (*pro hac vice*)
                              ALICE C.C. HULING (*pro hac vice*)
                              ANDREW TUTT (*pro hac vice*)
                              ARNOLD & PORTER KAYE SCHOLER LLP
                              601 Massachusetts Avenue, NW
                              Washington, DC 20001
                              Telephone: 202.942.5000
                              Facsimile: 202.942.5999
                              Drew.Harker@arnoldporter.com
                              Allyson.Himelfarb@arnoldporter.com
                              Nathaniel.Castellano@arnoldporter.com
                              Alice.Huling@arnoldporter.com
                              Andrew.Tutt@arnoldporter.com

                              CARRIE Y. FLAXMAN (*pro hac vice*)
                              RICHARD MUNIZ (*pro hac vice*)
                              PLANNED PARENTHOOD FEDERATION
                              OF AMERICA
                              1110 Vermont Ave, NW, Suite 300
                              Washington, DC 20005
                              Telephone: 202.973.4800
                              Facsimile: 202.296.3480
                              Carrie.Flaxman@ppfa.org
                              Richard.Muniz@ppfa.org

                              Attorneys for Plaintiffs

1
2

### CERTIFICATE OF SERVICE

3          I, Rick Eichstaedt, hereby certify that on March 16, 2018, I electronically filed

4   the foregoing with the Clerk of the Court using the CM/ECF system which will send

5
6   notification of such filing to the following:

7          Michael J. Gerardi
           Trial Attorney
8          United States Department of Justice
           Civil Division, Federal Programs Branch
9          20 Massachusetts Ave. NW, Room 7223
           Washington, D.C. 20530
10         Tel: (202)616-0680
           Fax: (202) 616-8460
11         E-mail: Michael.j.gerardi@usdoj.gov

12

13

14

15                                      By:   /s/ Rick Eichstaedt

16                                      RICK EICHSTAEDT (WSB # 36487)
                                        CENTER FOR JUSTICE
17                                      35 West Main Ave, Suite 300
                                        Spokane, WA 99201
18                                      Telephone: (509) 835-5211
                                        ricke@cforjustice.org
19

20

21

22

23

24

25

26

27

28