1  CHAD A. READLER
2  Acting Assistant Attorney General
   JOSEPH H. HARRINGTON
3  United States Attorney
4  JOEL McELVAIN
   Assistant Branch Director
5  MICHAEL J. GERARDI
6  Trial Attorney
7  U.S. Department of Justice, Civil Division
   20 Massachusetts Ave. NW
8  Washington, DC 20530
9  Telephone:  (202) 616-0680
   Fax: (202) 616-8460
10 E-mail: michael.j.gerardi@usdoj.gov

11

12              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF WASHINGTON
13                    SPOKANE DIVISION

14
   PLANNED PARENTHOOD OF          )
15 GREATER WASHINGTON AND          )
   NORTH IDAHO; PLANNED            ) Case No.: 2:18-cv-00055-TOR
16 PARENTHOOD OF THE GREAT         )
17 NORTHWEST, AND THE HAWAIIAN     ) DEFENDANTS' OPPOSITION TO
   ISLANDS; AND PLANNED            ) PLAINTIFFS' MOTION FOR A
18 PARENTHOOD OF THE HEARTLAND,    ) PRELIMINARY INJUNCTION
19                                 ) AND CROSS-MOTION TO
                                   ) DISMISS OR FOR SUMMARY
20             Plaintiffs,         ) JUDGMENT
21                                 )
        vs.                        )
22                                 ) 04/24/2017
23 U.S. DEPARTMENT OF HEALTH AND   ) WITH ORAL ARGUMENT:
   HUMAN SERVICES AND ALEX         ) 9:30 A.M., COURTROOM #2
24 MICHAEL AZAR II in his official capacity )
25 as Secretary of the U.S. Department of )
   Health and Human Services,      )
26                                 )
                                   )
27 _____ )
             Defendants.           )
28

   DEFENDANTS' OPPOSITION AND CROSS-MOTION

# <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................3

I.    Under the TPP Program, HHS Provided One-Year Grants and Retained Its Discretion to Issue Continuation or Competing Future Awards ..........................................................................................................3

II.    HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards ............................................................................7

PROCEDURAL HISTORY..................................................................................8

DISCUSSION ....................................................................................................10

I.    Plaintiffs Are Not Entitled to a Preliminary Injunction ............................10

    A.    Plaintiffs' APA Claims (Count I, Count II) Are Unlikely to Succeed on the Merits ...........................................................11

        1.    Plaintiffs' Interpretation of Their Awards Would Violate the Anti-Deficiency Act ........................................................11

        2.    Plaintiffs' Award Documents Reserve HHS's Discretion Not to Continue Future Years' Funds..................................15

        3.    The Regulations Governing "Termination" Do Not Negate the Plain Terms of Plaintiffs' Award Documents ........................................................................18

        4.    HHS's Decision Not to Issue Future Continuing Awards Is "Committed to Agency Discretion" and Unreviewable ................................................................19

        5.    HHS's Decision Was Not Arbitrary or Capricious Under the APA..........................................................................21

    B.    Plaintiffs' Due Process Claim (Count IV) Is Without Merit ..........22

C.    The Remaining Preliminary Injunction Factors Do Not Support
      Relief ........................................................................................23

      1.    Plaintiffs' Delay In Seeking Relief Wholly Undermines
            Any Assertion of Irreparable Harm ......................................23

      2.    The Balance of Equities Favors HHS ...................................25

      3.    Plaintiffs' Requested Relief Will Deprive the Public of
            the Opportunity to Compete for TPP Program Funds ..........26

II.   The Court Should Dismiss, or Enter Summary Judgment, on all of
      Plaintiffs' Claims ................................................................................27

      A.    Counts I, II, and IV Fail as a Matter of Law ...................................27

      B.    The Establishment Clause Claim (Count III) Should Also Be
            Dismissed ........................................................................................27

            1.    Plaintiffs' Lack Standing to Assert Claims Implicating
                  HHS's Alleged Intentions Regarding the TPP
                  Program ................................................................................28

            2.    The Complaint Fails to State a Plausible Establishment
                  Clause Claim ........................................................................29

                  a. HHS's Actions Have a Secular Purpose ..........................30

                  b. HHS's Actions Do Not Meet the Remaining Prongs
                     of the *Lemon* Test ............................................................34

CONCLUSION .....................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alan Guttmacher Inst. v. McPherson*,
    597 F. Supp. 1530 (S.D.N.Y. 1984), *aff'd*, 805 F.2d 888 (2nd Cir. 1986) .......21

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................10

*Apter v. Richardson*,
    510 F.2d 351 (7th Cir. 1975) .............................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................30

*Autonomy, Inc. v. TASC, Inc.*,
    No. 1:15-cv-505 (AJT/TCB), 2015 WL 7313380 (E.D. Va. Nov. 19, 2015) ...13

*Barnes-Wallace v. City of San Diego*,
    704 F.3d 1067 (9th Cir. 2012) ...........................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................30

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ......................................................................19

*Board of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ......................................................................23

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) ...........................................................28

*Bowen v. Kendrick*,
    487 U.S. 589 (1988) .................................................................*passim*

*Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*,
    149 F.3d 971 (9th Cir. 1998) ............................................................22

*Cal. Human Dev. Corp. v. Brock*,
  762 F.2d 1044 (D.C. Cir. 1985) ........................................................20

*Card v. City of Everett*,
  520 F.3d 1009 (9th Cir. 2008) ..........................................................30

*Cessna Aircraft Co. v. Dalton*,
  126 F.3d 1442 (Fed. Cir. 1997) .........................................................14

*Citizens Health Corp. v. Sebelius*,
  725 F.3d 687 (7th Cir. 2013) .............................................................22

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ..........................................................................19

*Cmty. Action of Laramie Cty. v. Bowen*,
  866 F.2d 347 (10th Cir. 1989) ...........................................................20

*Cray Research, Inc. v. United States*,
  44 Fed. Cl. 327 (1999) ......................................................................14

*Davis & Assocs., Inc. v. District of Columbia*,
  501 F. Supp. 2d 77 (D.D.C. 2007) ...............................................12, 13

*Edwards v. Aguillard*,
  482 U.S. 578 (1987) ..........................................................................32

*Fed. Crop Ins. Corp. v. Merrill*,
  332 U.S. 380 (1947) ..........................................................................14

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) .............................................................24

*George v. Bay Area Rapid Transit*,
  577 F.3d 1005 (9th Cir. 2009) ...........................................................22

*Goodisman v. Lytle*,
  724 F.2d 818 (9th Cir. 1984)..............................................................23

*Grassetti v. Weinberger,*
    408 F. Supp. 142 (N.D. Cal. 1976) ........................................... 20

*Harris v. McRae,*
    448 U.S. 297 (1980) ....................................................... 31, 33

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ....................................................... 19, 20

*Hein v. Freedom of Religion Found., Inc.,*
    551 U.S. 587 (2007) ........................................................ 29

*Hercules, Inc. v. United States,*
    516 U.S. 417 (1996) ....................................................... 11, 14

*In re Vance-Warren Comprehensive Health Plan, Inc.,*
    DAB No. 2180, 2008 WL 2649498 (H.H.S. Dep't App. Bd. June 18, 2008) .... 7

*In re Youth Network Council of Chicago, Inc.,*
    DAB No. 1150, 1990 WL 600164 (H.H.S. Dep't App. Bd. May 3, 1990) ........ 7

*Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conf. of Bldg. Officials,*
    79 F.3d 1153 (table), 1996 WL 117447 (9th Cir. 1996) ..................... 24

*Kletschka v. Driver,*
    411 F.2d 436 (2nd Cir. 1969) .............................................. 20

*Kobell v. Suburban Lines, Inc.,*
    731 F.2d 1076 (3rd Cir. 1984) ............................................. 25

*Lands Council v. Vaught,*
    198 F. Supp. 2d 1211 (E.D. Wash. 2002) ..................................... 2

*Leiter v. United States,*
    271 U.S. 204 (1926) ....................................................... 12, 13

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ....................................................... 30

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................... 19, 20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 28

*McCreary Cty. v. ACLU of Ky.*,
    545 U.S. 844 (2005) ............................................................... 30, 32

*McGowan v. Maryland*,
    366 U.S. 420 (1961) ..................................................................... 31

*Md. Dep't of Human Res. v. Dep't of HHS*,
    854 F.2d 40 (4th Cir. 1988) ......................................................... 11

*Midwater Trawlers Co-operative v. Dep't of Commerce*,
    282 F.3d 710 (9th Cir. 2002) ....................................................... 22

*Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*,
    991 F.2d 536 (9th Cir. 1993) ....................................................... 25

*Mueller v. Allen*,
    463 U.S. 388 (1983) ..................................................................... 31

*Nat'l Consumer Info. Ctr. v. Gallegos*,
    549 F.2d 822 (D.C. Cir. 1977) ..................................................... 23

*Natl. Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017), *petition for cert. docketed*,
    No. 17-1286 (Mar. 13, 2018) ....................................................... 30

*Navajo Nation v. Azar*,
    No. 18-cv-0253 (DLF), 2018 WL 1092155 (D.D.C. Feb. 28, 2018) ............... 16

*Nunez v. City of L.A.*,
    147 F.3d 867 (9th Cir. 1998) ....................................................... 23

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
    475 F.3d 1136 (9th Cir. 2007) ..................................................... 22

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
  762 F.2d 1374 (9th Cir. 1985)...................................................................25

*Off. of Personnel Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ...........................................................................14

*Phila. Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*,
  553 F. Supp. 2d 433 (E.D. Pa. 2008) .............................................20

*RCS Enters. v. United States*,
  57 Fed. Cl. 590 (2003).......................................................................13

*Sam Gray Enters. v. United States*,
  250 F.3d 755, 2000 WL 701733 (Fed. Cir. May 31, 2000) ...........................13

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000) ...........................................................................32

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013).........................................................10

*Siebert v. Gene Sec. Network, Inc.*,
  75 F. Supp. 3d 1108 (N.D. Cal. 2014) ..........................................16

*St. Germain v. U.S. Dep't of Interior*,
  No. C13-945RAJ, 2013 WL 3148332 (W.D. Wash. June 19, 2013)...............25

*Texas v. United States*,
  523 U.S. 296 (1998) ...........................................................................28

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ...........................................................................28

*United States ex rel. Bauchwitz v. Holloman*,
  671 F. Supp. 2d 674 (E.D. Pa. 2009) ..........................................18

*Williams v. District of Columbia*,
  902 A.2d 91 (D.C. 2006)....................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................. 10

**STATUTES**

5 U.S.C. § 701(a)(2) ............................................................ 19, 20

22 U.S.C. § 2151b(d) ................................................................ 21

31 U.S.C. § 1341 ................................................................. 11, 13

42 U.S.C. § 300z(b)(1) .............................................................. 34

Consolidated Appropriations Act, 2010,
  Pub. L. No. 111-117, 123 Stat. 3034 (Dec. 16, 2009) ...................... 3

Consolidated Appropriations Act, 2017,
  Pub. L. No. 115-31, 131 Stat. 135 (May 5, 2017) ...................... 3, 15

**UNITED STATES CONSTITUTION**

U.S. Const. art. 1, § 8 ............................................................. 11

**RULES**

Fed. R. Civ. P. 12(b)(1) ............................................................ 27

Fed. R. Civ. P. 12(b)(6) ............................................................ 27

Fed. R. Civ. P. 56(a) ............................................................... 27

**REGULATIONS**

45 C.F.R. § 75.2 ................................................................. 7, 17

45 C.F.R. § 75.309(a) ............................................................... 7

**OTHER AUTHORITIES**

GAO Principles of Federal Appropriations Law (3d ed. 2015),
  https://www.gao.gov/assets/210/202819.pdf .................. 11, 12, 13, 14

DEFENDANTS' OPPOSITION AND CROSS-MOTION - viii

H.R. 1625, 115th Cong. (Mar. 23, 2018)...............................................9

H.R. 3358, 115th Cong. (2017)..........................................................8

Scott H. Frank, *Report on Abstinence-Only-Until-Marriage Programs in Ohio*, (June 2005), https://www.researchgate.net/publication/266456924_Report_on_Abstinence-Only-Until-Marriage_Programs_in_Ohio ...............32

## INTRODUCTION

This case is not about the termination of an existing grant in the Teen Pregnancy Prevention Program ("TPP Program"), as no grant has been terminated. It is about whether an awardee of a one-year grant may convert that time-limited, discretionary benefit into a multi-year grant, before Congress has even appropriated funds for the grant program and before the agency has an opportunity to decide whether it wants to renew the grant or open the award to competition. Plaintiffs, all current grantees under the TPP Program, have asked this Court to compel the U.S. Department of Health and Human Services ("HHS") to renew their grants, even though the agency has inherent discretion not to award a grant in future years and is affirmatively precluded from obligating public funds until Congress appropriates funds for that purpose. This creative effort to obtain renewed funding arrives after months of unexplained delay, and threatens HHS's legal right to recompete the grants and the public's interest in a competitive grant program.

Plaintiffs' theory of grant awards is inconsistent with both federal law and Plaintiffs' agreements. Each Plaintiff, in accepting funds under its grant with HHS, also accepted all of the terms of the grant, including provisions stating that Plaintiffs have no guarantee of a continuation of funds beyond the one-year "budget period." Indeed, HHS could not have given Plaintiffs any such guarantee, as it is prohibited by law from obligating funds beyond the period of time for which it has an appropriation. An agency's decision whether to recompete grant funds under a new appropriation, or to issue those funds on a non-competitive basis, is committed to its discretion and not subject to judicial review. A decision to the contrary would upend the statutorily mandated system of discretionary grants under which HHS's agencies, such as the National Institutes of Health, Centers for Disease Control and Prevention, Substance Abuse and Mental Health Services Administration, and Office of the Assistant Secretary for Health, fund

more than $30 billion of biomedical research, prevention, and treatment projects annually.

Because Plaintiffs have received the funds for all TPP Program grants awarded to them and have no legal right to further funding, their motion for a preliminary injunction must be denied, and the Court should either dismiss or enter summary judgment on their APA and Due Process Clause claims.  Plaintiffs' only remaining claim, that HHS's decision not to award them further grants violates the Establishment Clause, must also be dismissed.  HHS has yet to set the terms on which it will recompete the grants and therefore Plaintiffs' claim is not ripe for review.  Even if it were, Plaintiffs' claim proceeds from a faulty premise: that the alleged preferences of HHS officials for certain types of sex education violate the First Amendment.  The Supreme Court squarely rejected that premise in *Bowen v. Kendrick*, 487 U.S. 589 (1988), holding that alignment of policy preferences with certain religious beliefs does not turn those preferences into a violation of the Establishment Clause.

Plaintiffs' pleadings are long on rhetoric about the value of the TPP Program and their projects, but short on a legal theory that would obligate HHS to continue issuing grant awards to them.  Accordingly, the Court should deny the motion for a preliminary injunction and dismiss Plaintiffs' complaint with prejudice or, in the alternative, enter judgment in HHS's favor on Plaintiffs' claims.

**BACKGROUND**

**I.    Under the TPP Program, HHS Provided One-Year Grants and Retained Its Discretion to Issue Continuation or Competing Future Awards**

In 2010, Congress appropriated $110 million to HHS to administer the TPP Program.[1]  At the time this suit was filed, this funding, with minor variations in amount, had been renewed annually through the fiscal year ("FY") 2017 appropriations bill, passed in May 2017.  Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536 (May 5, 2017).  Congress funded the TPP Program for making "*competitive* contracts and grants."  *Id.* (emphasis added).

After five years of administering the program, HHS issued new Funding Opportunity Announcements ("FOAs") for the TPP Program in 2015.  The FOAs

---

[1] The original appropriation makes funds available for

> [C]ompetitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, of which not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities: Provided further, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches.

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (Dec. 16, 2009).

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 3

announced HHS would fund TPP Program awards using a one year "budget
period"—that is, awarding one year of funds at a time—and a five-year "project
period," subject to Congress's decision to renew the TPP Program and to HHS's
discretion over whether to continue awards or issue a new competition.  Therefore,
the FOAs did not guarantee funding for any year beyond the first year of award.
Rather, the FOAs stated that for "[e]ach year of the approved project period,
grantees are required to submit a noncompeting application which includes a
progress report for the current budget year, and work plan, budget and budget
justification for the upcoming year." (*See, e.g.*, Tier 1A Funding Opportunity
Announcement, Office of Adolescent Health, Dep't of Health & Human Servs.,
Gerardi Decl., Ex. A, at 72 (2015)).  The FOAs also explained that "recipients
must comply with all terms and conditions outlined in their grant awards, the
Department of Health and Human Services (HHS) Grants Policy Statement,
requirements imposed by program statutes and regulations and HHS grant
administration regulations, as applicable, as well as any requirements or limitations
in any applicable appropriations acts." (*Id.* at 68.)

Plaintiffs, all participants in various aspects of the TPP Program, received
their first notices of award in the summer of 2015, which included a budgeted
award of financial assistance for one year only (July 1, 2015 to June 30, 2016),
along with "recommended future support" for subsequent budget years. (*See, e.g.*,
PPH FY 2015 Notice of Award, Grubb Decl., Ex. A, at 1.)[2]  Consistent with the
FOAs, the awards indicated that future years of funding were contingent on HHS

_____

[2] Some continuing awards issued after FY 2015 did not include a
recommendation for any future support. (*See, e.g.*, PPGWNI FY 2016 Award,
Eastlund Decl., Ex. B, at 1; PPGNWHI FY 2016 Tier 1A Award, Miller Decl., Ex.
F, at 1; PPGNWHI FY 2016 Tier 1B Award, Miller Decl., Ex. F, at 1; PPGN FY
2016 Tier 2B Award (YPE), Miller Decl., Ex. F, at 1; PPGN FY 2016 Tier 2B
Award (LIFT), Miller Decl., Ex. F, at 1.) Awards for subsequent budget periods
were explicitly denominated "Non-Competing Continuation" awards. (*Id.*; *see
also* PPH FY 2016 Award, Grubb Decl., Ex. B, at 1.)

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 4

approval.  The awards did this when they stated that grantees must "comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in applicable [HHS] Grants Policy Statements," and then hyperlinked to those policies on HHS's website.  (*Id.* at 4-5.)  The FY 2017 awards twice declared that when grantees draw down their award money, they were accepting those terms and conditions.  (*See, e.g.*, PPH FY 2017 Notice of Award, Grubb Decl., Ex. D, at 1, 3.)

In the Grants Policy Statement ("GPS") incorporated into those awards, HHS repeatedly declares that continuation awards beyond the budget year are contingent on HHS's discretionary decision to issue them, a decision based in part on its determination of whether government interests have changed so that future funds should be recompeted.  When describing the "project period" system, the GPS states that although the "project period[s]" may "indicat[e] the [operating division's] intention to provide continued financial support" beyond the budget period, such projections:

> are contingent on satisfactory progress, the availability of funds, and *the continued best interest of the Federal government*.  They are not guarantees that the project or program will be funded or will be funded at those levels, and they create *no legal obligation to provide funding beyond the ending date of the current budget period* as shown in the [notice of award].

(Grants Policy Statement, U.S. Dep't of Health & Human Servs., Gerardi Decl., Ex. B,  at I-34 (emphasis added).)  The "Terms and Conditions" of the Grants Policy Statement further reserves HHS's broad discretion to deny a continuation award:

> An [operating division] may decide not to make a non-competing continuation award within the current competitive segment for one or more of the following reasons:
>
> • Adequate Federal funds are not available to support the project.

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 5

- A recipient failed to show satisfactory progress in achieving the objectives of the project.
- A recipient failed to meet the terms and conditions of a previous award.
- *For whatever reason, continued funding would not be in the best interests of the Federal government.*

*Id.* at II-89 (emphasis added).

Under the "project period" system, grants are accordingly "programmatically approved" for a period of up to five years, "but are funded in annual increments called budget periods." (*Id.* at I-34.) Because continuation awards are not guaranteed, each year grantees must submit an "official request to OAH for continued funding" known as a "non-competing continuation application." (Guidance for Preparing a Non-Competing Continuation Grant Application, Office of Adolescent Health, U.S. Dep't of Health & Human Servs. (Nov. 2016), Gerardi Decl. Ex. C, at 3.)[3] If HHS approves a grantee's request for funding—whether an initial award or a continuation award—the grantee receives a "Notice of Award" that includes the "[a]pproved project period and budget period start and end dates," and distinctly, the "[a]mount of Federal funds authorized for obligation by the recipient" within the next "budget period" in response to the grantee's application for funding. (Gerardi Decl., Ex. B, at I-33.)

The discretionary character of decisions not to issue continuation awards is reinforced by HHS's position that such decisions cannot be appealed unless the denial was because the grantee failed "to meet the terms and conditions of a previous award." (*Id.* at II-89.) Where HHS makes a policy decision not to issue

---

[3] *See also* Gerardi Decl., Ex. B, at I-16 (defining non-competing continuation application as "a request … for funding the second or subsequent budget period within an approved competitive segment"); *id.* at B-3 (defining "competitive segment" as "[t]he initial project period recommended for support (up to 5 years) or each extension of a project period resulting from a competing continuation award").

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 6

continuation awards, the departmental appeals board "has no power to review" the decision because such decisions "generally are matters committed to the federal agency's discretion." *In re Vance-Warren Comprehensive Health Plan, Inc.*, DAB No. 2180, 2008 WL 2649498, at *1 (H.H.S. Dep't App. Bd. June 18, 2008); *see also In re Youth Network Council of Chicago, Inc.*, DAB No. 1150, 1990 WL 600164, at *1 (H.H.S. Dep't App. Bd. May 3, 1990).

## II.  HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards

HHS's announcement that it had reevaluated government interests and would not issue a future year of continuation awards did not "terminate" any existing award, because the past awards had not obligated any future funding. "Termination" is a term of art in HHS regulations concerning grants; not every decision to discontinue funding constitutes a "termination," and a decision not to issue future continuation awards is not a termination at all.

HHS regulations provide several useful definitions for understanding the difference between terminating a grant and declining to issue a future continuation award.  A "termination" is "the ending of a Federal award, in whole or in part, at any time prior to the planned end of period of performance." 45 C.F.R. § 75.2. The "period of performance" is the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award," such as "orders placed for property and services" and "contract and subawards." 45 C.F.R. § 75.2; *see also id.* § 75.309(a) ("A non-Federal entity may charge to the Federal award only allowable costs incurred during the period of performance," subject to limited exceptions for pre-award costs necessary to carry out the work approved under the award).  "Project period" is defined by cross-reference to the substantive definition of a "period of performance."  *Id.*

In the context of continuation awards such as the Plaintiffs received in 2017, the time during which the grantee can incur new obligations—i.e., the "period of

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 7

performance" during which an award cannot be terminated except consistent with HHS regulations—is the "budget period."  Grantees obtain funding one "budget period" at a time after submitting and obtaining HHS approval for their detailed budgets and work plans.  As the GPS explains, the Notice of Award received by the grantee "show[s] the amount of Federal funds *authorized for obligation*" by the grantee, which is limited to a particular "budget period," "and any future-year commitments," which are the funds the agency currently projects (but does not guarantee) will be awarded to the grantee in remaining years of the "project period."  (Gerardi Decl. Ex. B at I-33 (emphasis added).)  The reference to the "project period" in the grant documents confers no authority on Plaintiffs to incur new obligations beyond the "budget period" and accordingly cannot be equated with the "period of performance" used in the regulations.  To read the grant documents otherwise would be to render them inconsistent with the ADA's prohibition on committing funds in advance of annual appropriations, since the term "project period," as used in the grant documents, includes future fiscal years for which funds have yet to be appropriated by Congress.

## PROCEDURAL HISTORY

Funding for the TPP Program in FY 2018 (which began October 1, 2017) has been a subject of significant debate.  The President's FY 2018 budget request, announced in May 2017, recommended eliminating the program.  (*See* 2018 Budget Request for Gen. Departmental Mgmt., U.S. Dep't of Health & Human Servs., Gerardi Decl., Ex. D, at 91.)  The HHS appropriations bill proposed in the House of Representatives would have declined to fund the program.  H.R. 3358, 115th Cong. (2017).  In response, a number of members of Congress expressed their support for the program.  (Letter to the Honorable Tom Price, M.D., from 149 House Members, July 25, 2017, Gerardi Decl., Ex. E; Letter to the Honorable Tom Price, M.D., from 37 Senators, July 21, 2017, Gerardi Decl. Ex. F.)  Disagreement over the future of the TPP Program was a contributing factor to the larger budget

impasse.  (*See* Jennifer Haberkorn & Sarah Ferris, "Planned Parenthood Defunding Threatens Government Spending Package," *Politico*, Mar. 7, 2018, Gerardi Decl., Ex. G (noting disagreement between Republicans and Democrats over riders that would "ax the Teen Pregnancy Prevention Program").)  On March 23, Congress finally agreed to a budget that renewed the program using the same language used in the FY 2017 appropriations bill.  H.R. 1625, 115th Cong. (March 23, 2018), https://www.gpo. gov/fdsys/pkg/BILLS-115hr1625eah/pdf/BILLS-115hr1625eah.pdf.

With the fate of the TPP Program uncertain in Congress, and having further examined the priorities and effects of previous awards under the program, HHS awarded FY 2017 funds to Plaintiffs in the summer of 2017, but announced it would not issue continuation awards beyond FY 2018.  (*See, e.g.*, Grubb Decl., Ex. D; Eastlund Decl., Ex. C; Miller Decl., Ex. K.)  The agency announced this change in interests and priorities publicly.  ("Teen Pregnancy Prevention Program Facts," Press Release, Office of the Assistant Secretary for Health, U.S. Dep't of Health & Human Servs., Aug. 28, 2017, Gerardi Decl., Ex. H; Letter to Hon. Patty Murray from Barbara Pisaro Clark, Assistant Sec'y for Legislation, U.S. Dep't of Health & Human Servs., Nov. 22, 2017, Gerardi Decl., Ex. I.)  It also informed grantees of this decision in July 2017 in the text of their awards for the 2017-18 "budget period," which shortened the "project period" of their awards to end in 2018.  Now that Congress has renewed TPP Program funding, HHS will recompete the funds by issuing a new FOA to interested parties, which could include Plaintiffs. (Kretschmaier Decl. ¶¶ 3-4; Gerardi Decl., Ex. I.)

When Plaintiffs accepted and began drawing down their FY 2017 funds, they accepted the change in project period and the underlying terms.  (*Id.* ¶ 2.) Then, seven months later—before Congress had appropriated any future funds for the TPP Program—Plaintiffs filed this suit seeking to "bar[] Defendants, their successors and agents, from terminating Plaintiffs' cooperative agreements or the

TPP Program as a whole except as allowed by federal law and consistent with due process."  Compl., ECF No. 1, at Prayer for Relief, ¶ 3.

## DISCUSSION

### I.    Plaintiffs Are Not Entitled to a Preliminary Injunction

In seeking a preliminary injunction, Plaintiffs must show (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

Plaintiffs cannot show that there is a "serious question" on the legal merits of their position, much less a "reasonable likelihood of success."  They acknowledged every time they accepted a TPP Program grant from the government that they had no legal right to future awards within the "project period," and that HHS could cease making future continuation awards by deciding, "for whatever reason," that issuing continuation awards was not in the federal government's interest.  (Gerardi Decl., Ex. B, at II-89.)  HHS exercised this explicit authority, and Plaintiffs accepted that decision by drawing down their funds for this budget period.  Plaintiffs' attempt to recast their relationship with HHS as a "five-year" grant would cast aside the terms and conditions of their grants and violate the Anti-Deficiency Act.  The timing of Plaintiffs' request and the harm that would befall both HHS and the public if relief were granted further militates against equitable relief here.  The Court should reject Plaintiffs' unlawful termination theory—given

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 10

that it is impossible to "terminate" a grant the agency has yet to award—and deny their motion.

### A. Plaintiffs' APA Claims (Counts I and II) Are Unlikely to Succeed on the Merits

#### 1. Plaintiffs' Interpretation of Their Awards Would Violate the Anti-Deficiency Act

Plaintiffs argue that HHS has violated the Anti-Deficiency Act, but it is Plaintiffs' request for relief that would violate the ADA.  The Constitution gives Congress primary authority over federal spending, *see* U.S. Const. art. 1, § 8, cl. 1, and the ADA enforces that authority.  *See* 31 U.S.C. § 1341.[4]  The ADA forbids agencies from "from entering into a contract for future payment of money in advance or, or in excess of, an existing appropriation." *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996).  This prohibition applies to grants and cooperative agreements.  *Md. Dep't of Human Res. v. Dep't of HHS*, 854 F.2d 40, 42 (4th Cir. 1988) (applying ADA principles to an HHS grant program); GAO Principles of Federal Appropriations Law, 3rd ed., vol. 2, ch. 10, at 10-43, GAO-06-382SP [hereinafter "*GAO Red Book*"] (3d ed. 2015), https://www.gao.gov/assets/210/202819.pdf.  Following Congress's directive, "the Supreme Court … and other federal courts have explicitly and repeatedly held that *all* contracts for future payments of money, in advance of or in excess of existing appropriations,

---

[4] As relevant here, the ADA provides:

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

(A)  make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]

(B)  involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law ....

1   are void ab initio" unless Congress provides otherwise.  *Davis & Assocs., Inc. v.*

2   *District of Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007) (emphasis in original)

3   (quoting *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C. 2006)).  Absent

4   congressional authority to make "multi-year" commitments, any agreement that

5   contemplates payment of money is valid only if (1) the contract is contingent on

6   "an appropriation be[ing] made available" and (2) "the government …

7   affirmatively continue[s] the [commitment] for such subsequent year; thereby, in

8   effect … making a new [commitment] under the authority of such appropriation

9   for the subsequent year."  *Leiter v. United States*, 271 U.S. 204, 206-07 (1926)

10  (invalidating a multi-year lease); *see also GAO Red Book*, vol. 2, ch. 6, at 6-52–6-

11  56 (summarizing the *Leiter* rule).

12       The Supreme Court's decision in *Leiter* is the foundational case.  There, the

13  plaintiff had leased office space to government agencies that eventually merged

14  into the Veterans' Bureau "for terms of four and five years."  271 U.S. at 204.  The

15  leases "stipulated annual rentals" and were made contingent on Congress

16  appropriating funds.  *Id.* at 205.  But before the full term of the leases had expired,

17  the Veterans' Bureau notified the plaintiff that it would cancel its lease for future

18  years, even though Congress eventually appropriated funds for the space. *Id.* at

19  205-06.  The Court held that because "at the time [the leases] were made there was

20  no appropriation available for the payment of rent after the first fiscal year," the

21  leases violated the ADA and "created no binding obligation against the United

22  States after the first year."  *Id.* at 207.  The only way the contract would be

23  "binding for any subsequent year" is if the government, in addition to making the

24  contract contingent on appropriations, had "affirmatively continue[d] the lease for

25  such subsequent year … making a new lease under the authority of such

26  appropriation for the subsequent year."  *Id.*

27       After *Leiter*, unless another congressional directive states otherwise (and no

28  such authority is invoked by Plaintiffs or the grant documents), a "subject to

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 12

availability" clause is not sufficient to permit multiyear funding.  *GAO Red Book*, vol. 2, ch. 6, at 6-55.  The government must have a position akin to an option contract.  *RCS Enters. v. United States*, 57 Fed. Cl. 590, 595 (2003) (distinguishing a "true option" in a contract governed by *Leiter* as one the government can "decline to exercise" for future years).  A "contract 'dies' at the end of the fiscal year" unless it is "revived … by affirmative action of the government" to create a "'new' contract."  *GAO Red Book*, vol. 2, ch. 6, at 6-55.[5]

Plaintiffs' view of their TPP Program awards is inconsistent with the ADA.  They insist that HHS obliged itself in 2015 to award unappropriated funds through 2020, but no multi-year obligating authority exists for grants between HHS and TPP Program grantees.  The ADA accordingly requires, and the TPP Program grant documents promise, only a "one-year contract followed by a series of government renewal options" that can be "exercised only by the government's affirmative action."  *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 332

---

[5] *See also Sam Gray Enters. v. United States*, 250 F.3d 755 (table), 2000 WL 701733 (Fed. Cir. May 31, 2000) (rejecting claim of a five-year lease agreement with the government over housing the plaintiff purchased in the Bahamas because "'annual appropriations' can be obligated only in the specified fiscal year" and plaintiff failed to show any appropriations that could fund a multi-year contract); *Autonomy, Inc. v. TASC, Inc.*, No. 1:15-cv-505 (AJT/TCB), 2015 WL 7313380, at *5 n.7 (E.D. Va. Nov. 19, 2015) ("To the extent that Autonomy understood that TASC's agency authorized it to commit the federal government to purchase the Software in advance of obtaining appropriated funds, there is a strong argument that such an understanding concerning the scope of TASC's agency was unreasonable as a matter of law.") (citing *Leiter*, 271 U.S. at 207, and the ADA, 31 U.S.C. § 1341); *Cray Research*, 44 Fed. Cl. at 333 (rejecting plaintiff's argument that would have "obligate[d] the CIA to make payments for all five years of the contract, so long as Congress appropriates funds each year," without giving the government the option to renew); *Davis & Assocs.*, 501 F. Supp. 2d at 80 (voiding contingency fee contracts between collection agencies and D.C. government entities because the contracts "provided for the payment of money that had not been previously authorized and appropriated," over plaintiff's argument that "no prior appropriations were necessary" under the agreement).

(1999).  HHS could not lawfully commit the government to "a future payment of money in advance of, or in excess of, an existing appropriation."  *Hercules*, 416 U.S. at 427; *see also Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1449 (Fed. Cir. 1997) ("By its terms, the Antideficiency Act restricts the ability of the government to enter into multi-year contracts because funds generally cannot be obligated beyond the current fiscal year.").

Plaintiffs cannot rely upon statements in the funding announcements that future funding would be "contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of Federal funds," (*see, e.g.*, Gerardi Decl., Ex. A, at 33), to create a multiyear obligation for funding.  *See GAO Red Book*, vol. 2, ch. 6, at 6-55 ("If a 'subject to availability' clause were sufficient to permit multiyear contracting, the effect would be automatic continuation from year to year unless the government terminated," which violates the ADA).  The funding announcements must be read in the context of other grant documents that explain the grantees' lack of legal rights to future continuation awards, and they must be read in light of the ADA, which prohibits any obligation attaching to future funds unless the government affirmatively exercises its option to continue the relationship.

Even if Plaintiffs were right about what the grant documents mean (and as demonstrated below, they are not), the government cannot be bound by the acts of agents beyond the scope of their actual legal authority.  *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *see also Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990) ("[J]udicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized.").  HHS is not authorized to agree to the future award scheme Plaintiffs describe.  Agreements that do not comport with *Leiter* and the ADA are void ab initio.  Moreover, the TPP Program appropriation specifically appropriates funds "for making *competitive* contracts and grants."  Pub. L. No. 115-56, 131 Stat. at

536 (2017) (emphasis added).  Plaintiffs cannot use that statute to *prohibit* HHS from competing FY 2018 funds.  HHS did what it was legally obliged to do by reserving the option not to give continuation grants, and exercised that option by choosing to recompete the funds appropriated to the TPP Program by Congress.

### 2.  Plaintiffs' Award Documents Reserve HHS's Discretion Not to Continue Future Years' Funds

Plaintiffs' theory of their TPP awards is not only inconsistent with the ADA, it is inconsistent with the terms of those awards.  The TPP Program grant awards explicitly reserves HHS's discretion to not continue future years of funding and to recompete such funding if HHS decides "for whatever reason, continued funding would not be in the interest of the Federal government."  (Gerardi Decl., Ex. B, at II-89.)  Plaintiffs accepted these terms and cannot now demand equitable relief to receive future awards.

Each Notice of Award received by the Plaintiffs stated that by drawing down money in that award, Plaintiffs accepted the terms referenced in that award.  First, each Notice stated, "Acceptance of the grant terms and conditions is acknowledged by the grantee when funds are drawn or otherwise obtained from the grant payment system."  (*See, e.g.*, Grubb Decl., Ex. D, at 1.)  In addition, awards issued in 2017 stated that, "[b]y drawing or otherwise obtaining funds for the award from the grant payment system or office, you accept the terms and conditions of the award and agree to perform in accordance with the requirements of the award."  (*Id.* at 3.)

The terms and conditions further notified Plaintiffs that they were required to comply with "grant policy terms and conditions contained in applicable Department of Health and Human Services (HHS) Grant Policy Statements" and provided a link to the GPS.  (*Id.*)  The GPS states that "[a]n [operating division] may decide not to make a non-competing continuation award within the current competitive segment" if "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." (Gerardi Decl., Ex. B, at II-89.)  It

provides that "projected levels of future support [from project periods] are *contingent* on satisfactory progress, the availability of funds, and *the continued best interest of the Federal government*." (*Id.* at I-34 (emphasis added).)

The GPS controls here. The terms and conditions of the GPS bind the grantees, absent a statute or regulation to the contrary. *See Navajo Nation v. Azar*, No. 18-cv-2253, 2018 WL 1092155, at *5 (D.D.C. Feb. 28, 2018) (applying GPS terms to grant dispute); *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1124 (N.D. Cal. 2014) (same). No statute or regulation impairs HHS's authority to deny a continuation award to a grantee. Indeed, as explained above, any regulation by HHS that interfered with its ability to decline a continuation award in these circumstances would run afoul of the ADA. By accepting the Notices of Award, Plaintiffs acknowledged that HHS could decline to approve a continuation award for whatever reason, in its sole discretion, and HHS did not act arbitrarily, capriciously, or contrary to law by doing so.

Consequently, Plaintiffs are asking this court to negate the express, repeated terms of their own awards—terms that declare Plaintiffs are not entitled to any future years of continuation funds if HHS deems the interests of the government have changed. Indeed, their position is even further removed from the terms of their grants, as Plaintiffs' 2017 awards explicitly declares that "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year." (*See, e.g.*, Grubb Decl., Ex. D, at 1.) After accepting those terms and drawing down their funds, Plaintiffs now wish to be free of them and insist that they need urgent injunctive relief from this Court. But Plaintiffs have known each year since 2015 that future years of funding might not be awarded on a continuation basis, and each year they accepted funds subject to that condition. Plaintiffs, like the rest of the public, remain free to participate in the competition for the newly appropriated funds, but Plaintiffs have no basis to deprive the public of that same opportunity.

### 3.  The Regulations Governing "Termination" Do Not Contradict the Plain Terms of Plaintiffs' Award Documents

The regulations themselves, when read in their entirety and applied properly to the grant documents, confirm that HHS did not enter an arrangement that would violate the ADA.  Plaintiffs hinge their whole case on the phrase "period of performance," but their brief never mentions the actual substantive definition of that term.  For good reason: "period of performance" is defined as the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award."  45 C.F.R. § 75.2.  And for purposes of Plaintiffs' awards, "the amount of Federal funds authorized for obligation" is limited to a particular budget period.  (Gerardi Decl., Ex. B, at I-33.)  Because Plaintiffs could not incur any new obligations under the TPP Program awards beyond the year for which the funds were appropriated, it is clear that the period of performance for those awards was the budget period.

Plaintiffs seek to escape that straightforward conclusion by relying on a lone cross-reference in the regulations for "project period" to "period of performance," 45 C.F.R. § 75.2, but that cross-reference cannot overcome the substantive definition of "period of performance" in the regulations.  The "work authorized under the Federal award" by HHS is the one year of work authorized by the Notice of Award, and "the time during which the non-Federal entity may incur new obligations to carry out [that] work" is the "budget period," the only time period in which funds are made available for obligation to the grantee.  The cross-reference in 45 C.F.R. § 75.2 between "project period" and "period of performance" does not alter the actual substantive definition of "period of performance."  Plaintiffs cannot override that definition, particularly when doing so would impose financial obligations on the government that go beyond a single fiscal year, in violation of the ADA.

The cross-reference for "project period" also cannot overcome the plain terms of the awards. The GPS, incorporated in each award, states that the "amount of Federal funds authorized for obligation by the recipient" are for the current budget period only. (Gerardi Decl., Ex. B, at I-33.) The Notice of Award under HHS's "project period" system accordingly "only commit[ted] [HHS] to fund[] the grant for the current budget period due to dependency upon the annual Congressional appropriations process." *See United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 681 (E.D. Pa. 2009). The "projections of future funding levels" found in the Notice of Awards "[we]re not guarantees that the project will be funded beyond the end date of the current budget period." *Id.*

Agency practice confirms these straightforward points. Grantees submit, and HHS approves, budgets and work plans for continuing applications on a year-by-year basis. (Gerardi Decl., Ex. C, at 3.) Remaining years of the "project period" are nothing more than recommendations or projections of future support. Such support is secured only after an applicant applies for a continuation award and HHS authorizes that new award. Until that point, it is only "projected" support (if it is mentioned in the award at all). *See supra* at n.2. And the denial of a continuation award is treated very differently from the "termination" of grant funds that are already available for the grantee to obligate, as such terminations are afforded enhanced due process procedures and appeal rights.

In sum, Plaintiffs' view of the TPP grants would displace the regulations, the law at the time of their agreement, and common agency practice. It must be rejected.

### 4. HHS's Decision Not to Issue Future Continuing Awards Is "Committed to Agency Discretion" and Unreviewable

Given that neither the agency's regulations nor the grant documents afford Plaintiffs a right to multi-year funding, the choice whether to obligate appropriated TPP Program funds on a non-competitive basis or to recompete those funds is

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 18

committed to HHS's discretion and therefore unreviewable here.  Although the Administrative Procedure Act ("APA") presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption …. [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 831). The discretionary nature of HHS's decision whether to approve a continuation award or recompete funds is evident from the absence of a meaningful standard by which a court could judge it.  Neither the TPP Program nor regulations provide any guidance about that decision.  And grantees understood that continuation awards could be withheld if, "for whatever reason, continued funding would not be in the interest of the federal government."  (Gerardi Decl., Ex. B, at II-89.)  The absence of "law to apply" in this area strongly suggests it is committed to agency discretion.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

A choice by agencies as to how to spend appropriated TPP Program funds also falls peculiarly within their area of expertise.  Section 701(a)(2) applies to an agency's decision to spend appropriated funds "as long as the agency allocates funds … to meet permissible statutory objectives" and Congress has not "put[] restrictions in the operative statutes" to prohibit particular expenditures.  *Lincoln*, 508 U.S. at 193-94 (addressing lump-sum appropriations).  Plaintiffs have not alleged a violation of any of the statutory guidelines for appropriated TPP Program

funds, but merely the decision not to extend continuation awards to them.  And "the allocation of grant funds among various eligible recipients, none of which has any statutory entitlement to them, is traditionally a matter 'committed to agency discretion by law'" because it "shares with agency decisions not to prosecute what the Supreme Court has called in the latter context a 'general unsuitability for judicial review.'"  *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting *Heckler*, 470 U.S. at 823)).

Unsurprisingly, courts presented with similar issues have concluded that decisions regarding the conferral of research grants or the renewal of contracts are committed to agency discretion.[6]

The Southern District of New York's decision in *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530 (S.D.N.Y. 1984), *aff'd*, 805 F.2d 888 (2nd Cir.

---

[6]  *See Cmty. Action of Laramie Cty. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Without manageable substantive standards against which to judge HHS' exercise of discretion, our review would amount to nothing more than an impermissible ad hoc assessment of the fairness of agency action. We are not empowered to ask whether HHS's decision was wise in the absence of controlling guidelines . . . . Funding determinations are 'notoriously unsuitable for judicial review.'"); *Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("[T]he medical merits of NIH decisions on training grants may be committed to the unreviewable discretion of the agency."); *Kletschka v. Driver*, 411 F.2d 436, 443 (2nd Cir. 1969) ("It would not be feasible for the courts to review decisions by the V.A. awarding or refusing to award research grants," which "involves a determination by the agency with respect to the relative merits of the many proposed research projects for which funds are sought."); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976)("It is probable that the medical merits of agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory or procedural directive."); *accord Phila. Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, 553 F. Supp. 2d 433, 439 (E.D. Pa. 2008) ("[Plaintiff] has cited no case law—and I have found none—even suggesting that the APA empowers a district court to review an agency's refusal to renew a contract or to accede to particular contract terms.").

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 20

1986), points to the proper result here.  In *Guttmacher*, the plaintiff operated a
publication funded by a grant awarded by the Agency for International
Development ("AID") under the Foreign Assistance Act ("FAA").  *Id.* at 1534.
AID chose not to renew the grant after concluding that it was "economic[ally]
superfluous" and promoted "abortion as a family-planning tool"; plaintiff sued,
alleging that the decision not to renew the grant violated the FAA.  *Id.* at 1533.
Like the TPP Program, the FAA gave substantive guidelines for administering
funds under the program, but the Court nonetheless ruled that AID's decision was
committed to agency discretion.  *Id.* at 1535-36 (citing 22 U.S.C. § 2151b(d)).
Even though the FAA "might … permit a court to decide whether a project was
particularly inappropriate for funding," it did not "give courts any guidance in
sorting among the many projects consistent with the goals stated."  *Id.* at 1536.
Because "it would be virtually impossible for a court to make a determination that
[plaintiff's publication] served such an important role … that its rejection by [AID]
was an abuse of discretion," such decision was not subject to review under the
APA.  *Id.* at 1537.

The same conclusion should apply to HHS's decision to recompete funds
appropriated under the TPP Program.  As Plaintiffs note, the FY 2015 award
process for the TPP Program was "highly competitive." Pls.' Br. at 4.  TPP
Program's statutory authorization does not give any guidance by which a court
could effectively evaluate whether HHS abused its discretion by declining to issue
continuation awards in order to recompete the funds.  That decision is accordingly
unreviewable under the APA.

## 5.  HHS's Decision Was Not Arbitrary or Capricious Under the APA

As noted above, numerous doctrines preclude APA review of HHS's
decision to hold a recompete for TPP Program funds.  Even if that decision were
reviewable, Plaintiffs could not establish that it was arbitrary and capricious.  That

standard is "highly deferential," *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007), requiring only a "rational connection between the facts found and the choice made," *Midwater Trawlers Co-operative v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002). Moreover, "the party challenging an agency's action as arbitrary and capricious bears the burden of proof." *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009).

HHS did not act arbitrarily or capriciously by exercising its rights under the terms and conditions of the Plaintiffs' grants. The Grants Policy Statement, which controls the parties' conduct, emphasized that (1) HHS carried "no legal obligation to provide funding beyond the ending date of the current budget period" and (2) future continuation awards could be denied with no opportunity to appeal if, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." (Gerardi Decl., Ex. B, at I-34, II-89.) HHS's policy concerns with the current TPP Program are a matter of public record. (*See* Gerardi Decl., Ex. H, Ex. I.) In accepting and drawing down the funds of their grants, Plaintiffs agreed that HHS could decline to issue continuation awards in its sole discretion, and HHS did not act arbitrarily, capriciously, or contrary to law by doing so.

## B. Plaintiffs' Due Process Claim (Count IV) Is Without Merit

Plaintiffs' claim under the Due Process Clause fails for much the same reasons its APA claims fail. Such claims require "a deprivation of a constitutionally protected liberty or property interest" that does not exist here. *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). "To have a protectable property interest in a benefit such as a grant, a person 'must have more than a unilateral expectation of [the claimed interest]. He must, instead, have a legitimate claim of entitlement to it.'" *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) (dismissing due process claim because plaintiff "failed to offer any evidence indicating that it had a legitimate

claim of entitlement to the grant or that it was deprived of a protected liberty interest" (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *see also Nunez v. City of L.A.*, 147 F.3d 867, 872-73 (9th Cir. 1998) (rejecting due process claim by police officers who "anticipated a promotion").

Plaintiffs' complaint states that HHS deprived Plaintiffs of "protected property interests in the final two years of their five-year federal grant agreements with HHS."  Compl. ¶¶ 128-29.  But Plaintiffs were told, consistent with the ADA, HHS regulations, and the terms of their grant documents, that projections of future funding within a project period "create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the [Notice of Award]."  (Gerardi Decl., Ex. B, at I-34.)  Plaintiffs have "always received [their] grants on a year-to-year basis, and grants made on this basis, even over a period of years, cannot create more than a 'unilateral expectation'" of future benefits that is "not entitled to constitutional protection."  *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822, 828 (D.C. Cir. 1977).  Even if HHS regulations required some form of process to grantees who are not issued continuation awards, "[p]rocedural requirements ordinarily do not transform a unilateral expectation into a constitutionally protected property interest."  *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984).  This claim therefore lacks sufficient merit to justify a preliminary injunction.

## C. The Remaining Preliminary Injunction Factors Do Not Support Relief

### 1. Plaintiffs' Delay In Seeking Relief Wholly Undermines Any Assertion of Irreparable Harm

Plaintiffs received notice that their TPP Program grants would not be renewed by early July, 2017.  Their claim—i.e., they are entitled to additional years of funding for their TPP grants absent a determination that they violated the terms and conditions of the grant or a lapse in program funding—has been

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 23

available to them since they received those notices.  Yet Plaintiffs waited nearly seven months to file this suit, long after they accepted the terms of their grant documents by drawing down their grant funds.  The only evidence that might justify this delay is a set of challenges they filed with HHS in August of 2017.  Pls. Br. at 9.  But Plaintiffs tarried over six months after those filings before bringing suit, even though they maintained they were under no obligation to exhaust administrative appeals prior to seeking relief in court.  (*See, e.g.*, Letter from Drew A. Harker to Evelyn M. Kappeler dated August 1, 2017, Grubb Decl., Ex. E.)  This delay persisted despite Plaintiffs' allegations that they were already sustaining harm to their programs as early as September of 2017.  (*See, e.g.*, Grubb Decl. ¶¶ 22-24; Eastlund Decl. ¶¶ 36-37.)  Finally, even after filing this suit, Plaintiffs waited another month to lodge their request for injunctive relief with this Court.

This eight-month delay in seeking relief betrays a "lack of urgency and irreparable harm" that dooms Plaintiffs' motion.  *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (three-month delay in filing motion for preliminary injunction "undercut [plaintiff's] claim of irreparable harm"); *Int'l Ass'n of Plumbing & Mech. Officials v. Int'l Conf. of Bldg. Officials*, 79 F.3d 1153 (table), 1996 WL 117447, at *2 (9th Cir. 1996) ("[T]he fact that [plaintiff] waited seven months before seeking injunctive relief undermines its claim of immediate threatened irreparable injury.").  Plaintiffs' motion offers no explanation for their seven-month delay between receipt of their FY 2017 Notices of Award and their complaint, or for the additional month's delay between their complaint and the instant motion.  Nor do any of the decisions Plaintiffs cite show a court granting relief in spite of such a protracted delay.  *See* Pls.' Br. at 23-24.  On the contrary, Plaintiffs' declarations demonstrate a willing acceptance of further funding subject to the new award terms that shortened the "project period" while allegedly

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 24

1  sustaining what they contend to be reputational harm and negative impacts to their
2  programs all the while.  This Court "may legitimately think it suspicious that the
3  party who asks to preserve the status quo through interim relief has allowed the
4  status quo to change through unexplained delay," as Plaintiffs have done here.
5  *Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993)
6  (quoting *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1092 n.27 (3rd Cir.
7  1984))).

8       "The judicial process … suffers greatly when a party manufactures an
9  'emergency' necessitating a ruling on short notice," and the Court should weigh
10  Plaintiffs' delay against them in assessing whether the equities justify relief in this
11  case.  *St. Germain v. U.S. Dep't of Interior*, No. C13-945RAJ, 2013 WL 3148332,
12  at *3 (W.D. Wash. June 19, 2013).  No relief is warranted here.

## 2.  The Balance of Equities Favors HHS

14       Plaintiffs' tardy demand for injunctive relief has created significant
15  administrative problems for HHS.  To recompete TPP Program funds and obligate
16  them before the fiscal year ends as required by law, HHS must announce a new
17  funding opportunity to solicit competitive grant applications.  At the same time,
18  Plaintiffs are demanding issuance of new continuing awards by late June.  The
19  processing of those awards will double the workload of staff responsible for
20  administering the TPP Program because OASH will, in effect, be administering
21  two versions of the TPP Program.  (Kretschmaier Decl. ¶ 5.) HHS is already
22  defending TPP Program claims in three other jurisdictions, and this has created
23  significant uncertainty regarding how TPP Program funds will be awarded in the
24  future.  (*Id.* ¶ 6.)  All of this could have been avoided had Plaintiffs sought relief
25  earlier.  Contrary to Plaintiffs' unsupported assertions, HHS's harm is palpable and
26  weighs against relief.

27
28

### 3.  Plaintiffs' Requested Relief Will Deprive the Public of the Opportunity to Compete for TPP Program Funds

Unlike the asserted damage to Plaintiffs' specific programs discussed in their brief, a preliminary injunction in favor of Plaintiffs will harm the public at large in two significant ways.  First, by tying up HHS's grant-making processes with their eleventh-hour request for relief, Plaintiffs would deprive the public of the opportunity to participate in a competitive grant-making process.  Congress directed HHS to issue "competitive contracts and grants" using TPP Program funds.  The regulations, terms, and conditions governing HHS's grant programs give the agency the authority to open up a grant program to competition if it believes current grantees are no longer serving the best interests of the federal government.  Plaintiffs requested relief deprives the public of that opportunity.

Second, injunctive relief would cast significant uncertainty upon HHS and other agencies that use "project periods" to structure grants for projects funded through annual appropriations.  If true, Plaintiffs' theory would confer a vested property interest upon all grantees with multi-year projects, subject only to each grantee's compliance with the terms of their grants and successive appropriations by Congress to fund the work.  Such a theory would not only be at odds with controlling precedent, it would harm the public fisc by mandating ongoing funding of projects, even when they no longer advance the government's best interests.  It would also handcuff policymakers from adjusting program priorities and making lawful changes to federal programs, allowing prior administrations to "lock in" a particular class of grantees to grant funding for untold years and impairing political accountability.

The Court should not take such a drastic step at this preliminary stage, especially in light of the weakness of the underlying merits.  Plaintiffs' lack of diligence in seeking relief, the detriment that competing applicants would suffer, and the inevitable disruption to HHS's grant-making processes.

**II.    The Court Should Dismiss, or Enter Summary Judgment, on all of Plaintiffs' Claims**

HHS moves to dismiss the complaint under Rule 12(b)(1) or 12(b)(6), or for summary judgment pursuant to Rule 56.  Judgment under Rule 12(b)(1) or Rule 12(b)(6) is appropriate if, assuming the truth of all allegations in the complaint, plaintiffs have failed to either establish this Court's jurisdiction or to state a claim upon which relief can be granted.  Judgment under Rule 56 is acceptable if the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**A. Counts I, II, and IV Fail as a Matter of Law**

Neither Congress's appropriations for the TPP Program nor HHS's regulations guarantee participants in a five-year 'project period' continuous funding for all of those years.  On the contrary, the grant documents state that grantees have no right to funds for future project years and that HHS has a right not to award funds in future years if, "*for whatever reaso*n, continued funding would not be in the interests of the Federal government." (Gerardi Decl., Ex. B., at II-89 (emphasis added).)  Plaintiffs accepted those terms when they drew down their grant funds.  (Grubb Decl., Ex. D, at 1, 3; Kretschmaier Decl. ¶ 2.) Therefore, as demonstrated already in "Discussion" Sections I.A-B, *supra*, Plaintiffs' have no cognizable claims under the APA or the Due Process Clause. The Court should either dismiss them with prejudice or enter summary judgment in favor of the government.

**B. The Establishment Clause Claim (Count III) Should Also Be Dismissed**

Although Plaintiffs chose not to move for a preliminary relief with respect to their Establishment Clause claim, the Court should dispose of this meritless claim, as well.  Count III is nothing more than an effort to impugn what Plaintiffs presume to be the religious convictions of agency officials, and it states no claim

for relief.  Plaintiffs have no standing to bring claims directed to the intentions of agency officials about TPP Program grants that HHS *might* award in the future; such claims are not yet ripe for review.  Moreover, even under a generous reading of Plaintiffs' complaint, HHS's actions easily pass muster under the Establishment Clause, for the mere alignment of policy preferences and certain religious beliefs is insufficient to establish a violation under the controlling *Lemon* test and well-established Supreme Court precedent.  Accordingly, this claim should be dismissed.

### 1. Plaintiffs' Lack Standing to Assert Claims Implicating HHS's Alleged Intentions Regarding the TPP Program

Plaintiffs' Establishment Clause claim is not an attack on decisions made regarding their projects' continued funding, but a challenge to what HHS may later decide to do with the TPP Program.  That is, Plaintiffs seek to enjoin HHS regarding policy decisions before those decisions are even made.  Assessing such claims before they are ripe for review would go beyond the Court's limited jurisdiction under Article III.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric Prods. Co.*, 473 U.S. 568, 580-81 (1985)).  Plaintiffs whose claims are not ripe for review lack Article III standing because they cannot establish a "concrete and particularized" injury that the Court can redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  If "contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009).

When Plaintiffs filed suit, the only decision HHS had made with respect to the TPP Program is that it would not make continuation awards to current grantees. HHS has the right to recompete TPP Program funds in the event Congress renewed

the program, and Plaintiffs have the right to participate in any such recompete.  But Congress only recently renewed the program, and HHS has not yet released a funding announcement for a new round of competitive grant applications, much less reviewed applications or approved any new grants.[7]  The complaint relies on HHS's criticism of current programs and the professional backgrounds of current HHS officials to presume that TPP Program funds will be disbursed in a way that violates the Establishment Clause, but such speculation about possible future decisions is no basis for standing under Article III.

To the extent Plaintiffs have any Establishment Clause claim at all, therefore, it must be based solely on HHS's actual decision not to continue awarding them funds.  But even assuming, *arguendo,* that current HHS officials disfavor the comprehensive sexual education programs Plaintiffs advocate, Plaintiffs cannot prove an Establishment Clause violation based solely on a decision to recompete the funds.  After all, Plaintiffs will be eligible to participate in such a recompete.  Their challenge could accordingly be made, if at all, only after HHS articulates criteria for how the money will be spent moving forward, and makes a decision after the new competition.  In the absence of such facts, that "potential injur[y] rest[s], again, on future contingent events … that may or may not occur."  *Bova*, 564 F.3d at 1097.  Any attempt to adjudicate the merits of Count III would be premature and lies beyond this Court's limited jurisdiction.

## 2. The Complaint Fails to State a Plausible Establishment Clause Claim

Plaintiffs make the remarkable assertion that HHS's decision to withhold continuation awards from them is tantamount to "coerc[ing] grantees into adopting

---

[7] Moreover, as potential grant applicants, plaintiffs would fare no better to sue on Establishment Clause grounds than the taxpayers denied standing in *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007), because they sought to challenge Executive action rather than "any specific congressional action or appropriation."  *Id.* at 589.

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 29

1    Christian views." Compl. ¶ 121. But "Rule 8 … does not unlock the doors of

2    discovery for a plaintiff armed with nothing more than conclusions," *Ashcroft v.*

3    *Iqbal*, 556 U.S. 662, 678-79 (2009), and Plaintiffs' Establishment Clause claim

4    amounts to little more than the conclusions stated in Count III of the complaint.

5    Plaintiffs do not allege facts that would "nudge" this claim "across the line from

6    conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

7        The *Lemon* test continues to be used to assess Establishment Clause claims.

8    Under *Lemon*, "state action does not violate the Establishment Clause if it (1) has a

9    secular purpose, (2) does not have the principle or primary effect of advancing or

10   inhibiting religion, and (3) does not foster excessive government entanglement

11   with religion." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 873 (9th Cir. 2017)

12   (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971)), *petition for cert.*

13   *docketed*, No. 17-1286 (Mar. 13 2018)). In the Ninth Circuit, prongs two and three

14   of the *Lemon* test are analyzed jointly to determine "(i) whether governmental aid

15   results in government indoctrination; (ii) whether recipients of the aid are defined

16   by reference to religion; and (iii) whether the aid creates excessive governmental

17   entanglement with religion." *Card v. City of Everett*, 520 F.3d 1009, 1015 (9th

18   Cir. 2008). As discussed below, Plaintiffs' complaint, even taken as well-pled,

19   does not demonstrate that HHS's actions fail the *Lemon* test. As such, the

20   complaint should be dismissed with prejudice under Rule 12.

### a. HHS's Actions Have a Secular Purpose

22       The *Lemon* "purpose" test is intended to catch government action that has

23   the "ostensible and predominant purpose of advancing religion." *McCreary Cty v.*

24   *ACLU of Ky.*, 545 U.S. 844, 860 (2005). "Purpose" is judged by whether an

25   "objective observer" would conclude that the public official's action is advancing

26   religion. *Id.* at 863. Thus, the "purpose" must be publically identifiable as

27   religious, for "[a] secret motive stirs up no strife and does nothing to make

28   outsiders of nonadherents." *Id.* And an impermissible "purpose" under *Lemon*

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 30

requires more than a showing that a policy "happens to coincide or harmonize with the tenets of some or all religions." *Harris v. McRae*, 448 U.S. 297, 319 (1980) (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)).  That is why courts are generally "reluctan[t] to attribute unconstitutional motives" under the Establishment Clause when a plausible secular purpose exists for the action. *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983).

HHS's actions to date have advanced the secular purpose of recompeting the TPP Program.  HHS has broad authority, as Plaintiffs agreed in the grant documents, to recompete TPP Program funds if it decides the best interests of the federal government may be served by a different use.  In HHS's responses to congressional inquiries regarding the TPP Program (which are cited in Plaintiffs' complaint), the agency stated that the cessation of continuation awards will "give[] the Department time to continue its review of the TPP Program and the evidence" in light of poor results observed in the latest funded projects.  (Gerardi Decl., Ex. H.)  Now that Congress has reauthorized the TPP Program for another year, HHS's goal is to "continu[e] to distribute funds in accordance with the parameters set by Congress."  (*Id.*)

Plaintiffs hold a different view of their programs, but a difference of opinion is no license to argue that HHS's stated purpose is a mere pretext for "endorsing and advancing religion."  Compl. ¶ 118.  The complaint is devoid of any alleged action by HHS that would support such a claim.  All HHS had done as of the date of the complaint is tell current grantees that it would not issue continuation awards, which will, in turn, enable HHS to recompete the funds.  It has not even released criteria for recompeting grants, much less chosen new grantees.  At this stage, no basis exists to contend, much less draw a conclusion, that TPP Program funds will be spent to "endors[e]" and "advanc[e]" religion.  That, by its very logic, is a challenge for a different day, if at all.

Lacking any government action on which an Establishment Clause claim could be based, Plaintiffs' resort to ad hominem attacks on the motivations of HHS officials. Plaintiffs allege, for example, that two of the thirty-one curricula[8] used in sexual education programs managed by Valerie Huber in 2005, while she was responsible for administering abstinence-only sexual education dollars in Ohio, had a religious message. Compl. ¶¶ 70-71. No connection, however, exists between those decade-old curricula in Ohio and HHS's putative future conduct, with different staffs and leadership, operating a different program that is governed by a different set of legal standards. Plaintiffs do not allege that Ms. Huber shares the religious views expressed in the 2005 curricula discussed in the complaint, or that she or anyone else now at HHS has an interest in funding similar curricula through the TPP Program.

Even if, as Plaintiffs seem ready to assume, Ms. Huber personally endorsed the religious message in those curricula, the Establishment Clause is not offended simply because a person involved with the decision-making process has religious convictions. To violate the Establishment Clause under the first prong of *Lemon,* sectarian religious aims must be apparent on the face of the policy. *See, e.g.*, *McCreary Cty.*, 545 U.S. at 851-58 (Ten Commandments displays); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294-95 (2000) (school prayer policies); *Edwards v. Aguillard*, 482 U.S. 578, 581-82 (1987) (teaching of creationism in public schools). By contrast, "secret motive[s]" of policymakers invisible to an objective observer cannot support such an argument. *McCreary Cty.*, 545 U.S. at 863.

---

[8] *See* Scott H. Frank, *Report on Abstinence-Only-Until-Marriage Programs in Ohio*, at 11 (June 2005), https://www.researchgate.net/publication/266456924_Report_on_Abstinence-Only-Until-Marriage_Programs_in_Ohio (cited in complaint) (listing thirty-one recommended programs); *id.* at 17-18 (discussing two programs with religious elements).

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 32

With no evidence of actual religious purpose, Plaintiffs turn to HHS's alleged preference for "abstinence-only sex education" programs and reservations about "comprehensive sex education."[9]  *See* Compl. ¶¶ 67-74, 91, 93-95.  Such preferences, however, are no proxy for finding a religious "purpose" behind the lack of a continuation award for these Plaintiffs.  Even if one could presume that HHS's action ultimately has a goal of promoting abstinence-only programs at the expense of more comprehensive programs, that goal is not itself religious because it aligns with Christian morality.  Theft offends Christian morality, as well, but that "does not mean[] that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny."  *Harris*, 448 U.S. at 319.  And the Supreme Court has consistently rejected Establishment Clause claims that attack a policy because it happens to align with a particular set of religious beliefs about morality.

*Harris v. McRae* is the leading case on this point.  There, the plaintiff argued that the federal Hyde Amendment, which restricts public funding of abortion, constituted an establishment of Catholicism.  The Court rejected the challenge, distinguishing between laws that "aid one religion, aid all religions, or prefer one religion over another," and laws that "happen[] to coincide or harmonize with the tenets of some or all religions."  448 U.S. at 319 (quotations omitted).  The Hyde Amendment was just "as much a reflection of 'traditionalist' values towards abortion, as it is an embodiment of the views of any particular religion," and so was constitutional.  *Id.*

Even more to the point, the Court has previously applied *Lemon* to abstinence-based sex education programs and found them constitutional.  In *Bowen v. Kendrick*, 487 U.S. 589, 605 (1988), the Court rejected a facial challenge to the Adolescent Family Life Act ("AFLA"), an early federal law designed to fund

---

[9] Plaintiffs' motion notes that "abstinence education" program models are already eligible for Tier 1 TPP Funding.  Pls.' Br. at 5-6.

programs that "promote[d] … 'self discipline and other prudent approaches to the problem of adolescent premarital sexual relations'" and encouraged adoption for teens who became pregnant.  487 U.S. at 593-94 (describing these programs) (quoting 42 U.S.C. § 300z(b)(1)).  The Court found that "AFLA was motivated primarily, if not entirely, by a legitimate secular purpose—the elimination or reduction of social and economic problems caused by teenage sexuality, pregnancy, and parenthood."  *Id.* at 602.  Although the statute's approach to teenage sexuality "coincide[d] with the approach taken by certain religions," the Court held that these motivations were "not inherently religious" and therefore not a source of concern under the first prong of *Lemon*.  *Id.* at 605.  Thus, Plaintiffs' Establishment Clause claim has no prospect of success here.

For all of these reasons, the complaint alleges no fact showing a sectarian motivation behind HHS's actions, and Plaintiffs have no prospect of success on their Establishment Clause claim.  Plaintiffs have not alleged religious purpose in the decision to recompete the funds.  And even assuming that HHS officials prefer abstinence-based approaches to teen pregnancy prevention, *Harris* and *Brown* make clear that HHS officials are not required to abnegate such preferences because those approaches coincide with religious beliefs.  HHS's actions satisfy *Lemon*'s "secular purpose" test.

### b. HHS's Actions Do Not Meet the Remaining Prongs of the *Lemon* Test

HHS's actions also easily pass muster under the remaining prongs of the *Lemon* test.  Not one iota of evidence exists that, by deciding to recompete the TPP Program funds, HHS has been "engaged in religious indoctrination, or was defining aid recipients by reference to religion."  *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1083-84 (9th Cir. 2012).  Nor can its action "be seen to be involved or entangled in [the] religious activities" of any outside entity.  *Id.* at 1084.

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 34

1    To the extent Plaintiffs' complaint expresses concerns about how new grants
2    will be awarded and whether future awards could be subject to some imagined
3    religious test, that is not this case.  HHS has yet to even release criteria for new
4    TPP Program funding opportunities, much less apply any new criteria to new
5    competitive applications.  Plaintiffs are free to challenge HHS's decisions on how
6    it distributes TPP Program in subsequent litigation, but they cannot challenge those
7    decisions before they are made.

8    Even if Plaintiffs could allege sufficient facts to suggest that HHS's decision
9    to recompete the funds was based on a preference for abstinence-only education,
10   *Bowen* makes clear that such a preference implicates neither the "effect" nor
11   "entanglement" prong of the *Lemon* test.   In *Bowen*, the Court rejected the
12   contention that Congress had unconstitutionally advanced religion when it
13   acknowledged that "religious organizations have a role to play" in addressing
14   teenage sexuality, and "it allow[ed] religiously affiliated organizations to
15   participate as grantees or subgrantees in AFLA programs."  *Bowen*, 487 U.S. at
16   605-06.  The Court held that Congress could recognize the "important part that
17   religion or religious organizations may play in resolving certain secular problems,"
18   and that religious organizations could participate as recipients of federal grants on
19   the same terms as other, non-sectarian organizations.  *Id.* at 607-09.

20   The Court in *Bowen* further rejected the claim that pregnancy prevention
21   programs, which may include religious organizations as grantees, necessarily lead
22   to excessive entanglement between government and religion.  The Court held that
23   there was "no reason to assume" under AFLA "that the religious organizations
24   which may receive grants are 'pervasively sectarian.'"  *Id.* at 616.  Any risk of the
25   program falling afoul of this prong of *Lemon* could be resolved by "a review of …
26   the educational materials that a grantee proposes to use," as well as site visits to
27   ensure that the programs "are in fact being administered in accordance with
28

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 35

statutory and constitutional requirements." *Id.* at 616-17.  The need for such monitoring "d[id] not amount to 'excessive entanglement.'" *Id.* at 617.

*Bowen* controls Count III here and requires dismissal.  Assuming the Court could adjudicate a dispute over HHS's initial decision over continuation awards as a prelude to competitive awards that could be made in the future to groups that hold religious views, that decision does not have the effect of advancing religion or entangling the federal government with religion.  That remains true even if those funds go to actual religious organizations.

Accordingly, Count III fails to state a set of facts that could establish an entitlement to relief under the Establishment Clause, and must be dismissed with prejudice.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction, grant Defendants' cross motion to dismiss or for summary judgment, and either dismiss Plaintiffs' complaint with prejudice or enter judgment in favor of Defendants.

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 36

DATED: March 30, 2018.            Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOSEPH H. HARRINGTON
United States Attorney

RUTH A. HARVEY
Director, Commercial Litigation Branch
JOEL McELVAIN
Assistant Director, Federal Programs Branch
MICHAEL J. QUINN
Senior Litigation Counsel
Commercial Litigation Branch

/s/ *Michael J. Gerardi*
MICHAEL J. GERARDI
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7223
Washington, D.C. 20530
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

/s/ *Jonathan E. Jacobson*
ALICIA M. HUNT
Trial Attorneys
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L St. NW, 10th floor
Washington, D.C. 20005

DEFENDANTS' OPPOSITION AND CROSS-MOTION - 37

Tel: (202) 353-7971
Fax: (202) 514-9163
E-mail: jonathan.e.jacobson@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Michael J. Gerardi*
MICHAEL J. GEARDI