1  RICK EICHSTAEDT (WSB # 36487)
2  CENTER FOR JUSTICE
3  35 West Main Ave, Suite 300
   Spokane, WA 99201
4  Telephone: (509) 835-5211
5  ricke@cforjustice.org

6  DREW A. HARKER (*pro hac vice*)
   ALLYSON HIMELFARB (*pro hac vice*)
7  ARNOLD & PORTER KAYE
   SCHOLER LLP
8  601 Massachusetts Avenue, NW
   Washington, DC 20001
9  Telephone: 202.942.5000
   Facsimile: 202.942.5999
10 Drew.Harker@arnoldporter.com
11 Allyson.Himelfarb@arnoldporter.com

12 (Additional Counsel Listed Below)

13
14 *Attorneys for Plaintiffs*

15        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF WASHINGTON
16              SPOKANE DIVISION

17
   PLANNED PARENTHOOD OF GREATER
18 WASHINGTON AND NORTH IDAHO;
   PLANNED PARENTHOOD OF THE          Case No. 2:18-cv-00055-TOR
19 GREAT NORTHWEST AND THE
   HAWAIIAN ISLANDS; and PLANNED      PLAINTIFFS' REPLY IN
20 PARENTHOOD OF THE HEARTLAND,       SUPPORT OF MOTION FOR
                                      PRELIMINARY INJUNCTION
21            Plaintiffs,             AND OPPOSITION TO
                                      DEFENDANTS' MOTION TO
22       v.                           DISMISS OR MOTION FOR
                                      SUMMARY JUDGMENT
23 U.S. DEPARTMENT OF HEALTH AND
   HUMAN SERVICES and ALEX MICHAEL
24 AZAR II in his official capacity
   as Secretary of the U.S.
25 Department of Health and Human
   Services,
26
27            Defendants.

28

1

# **TABLE OF CONTENTS**

2
**Page(s)**

3  PRELIMINARY STATEMENT ...................................................................1

4  I.    PLAINTIFFS HAVE ESTABLISHED THAT THEY ARE ENTITLED TO
5        A PRELIMINARY INJUNCTION ...................................................2

6        A.    Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims
              (Counts I and II). ...................................................................2
7
8              1.    HHS All But Concedes Its Conduct Was Arbitrary and
                    Capricious. ...............................................................2
9
10             2.    HHS's Conduct Is Contrary to HHS Regulations .........6

11       B.    Plaintiffs Are Likely To Succeed on the Merits of Their Due Process
              Claim. ...................................................................................20
12
13       C.    Plaintiffs Satisfy The Remaining Injunction Factors ...............21

14  II.   DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE
        FOR SUMMARY JUDGMENT SHOULD BE DENIED..............................24
15
16       A.    Plaintiffs Have Plausibly Alleged Claims for Violations of the APA
              and the Due Process Clause Claims For Relief (Counts I, II, and IV) ...24
17
18       B.    Plaintiffs Have Plausibly Alleged a Violation of the Establishment
              Clause (Count III)...................................................................25
19
20             1.    Plaintiffs Have Article III Standing.............................25
21             2.    Plaintiffs Have Plausibly Alleged An Establishment Clause
                    Violation ...................................................................25
22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

5

*Am. Indian Ctr. of Omaha, Inc.*,
   DAB 1141 (1990) (H.H.S. Mar. 26, 1990)..............................................13

6

7

*Apter v. Richardson*,
   510 F.2d 351 (7th Cir. 1975) ..................................................................15

8

9

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) .............................................................22, 23

10

11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................24

12

13

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985).................................................................................19

14

15

*Bowen v. Kendrick*,
   487 U.S. 589 (1988).................................................................................28

16

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)...................................................................................5

17

18

*Citizens Health Corp. v. Sebelius*,
   725 F.3d 687 (7th Cir. 2013) ..............................................................20, 21

19

20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)............................................................................14, 29

21

22

*Cmty. Action of Laramie Cty., Inc. v. Bowen*,
   866 F.2d 347 (10th Cir. 1989) ...........................................................15, 28

23

24

*Confederated Tribes & Bands of the Yakama Nation v. U.S. Fish & Wildlife Serv.*,
   No. 1:14-CV-3052-TOR (E.D. Wash. Mar. 20, 2015)...........................12

25

26

*Democracy Forward Found. v. U.S. Dep't of Health and Human Servs*,
   No. 1:17-cv-02449-TJK (D.D.C. Compl. filed Nov. 13, 2017) ...............3

27

28

*Edwards v. Aguillard*,
   482 U.S. 578 (1987)...........................................................................25, 26

*Fayant v. U.S. Bank Nat'l Ass'n*,
   No. 2:16-CV-00139-SMJ, (E.D. Wash. Jan. 26, 2017)............................................. 1

*Grassetti v. Weinberger*,
   408 F. Supp. 142 (N.D. Cal. 1976) ................................................................... 16

*Hercules, Inc. v. United States*,
   516 U.S. 417 (1996)........................................................................................ 18

*Krygoski Constr. Co. v. United States*,
   94 F.3d 1537 (Fed. Cir. 1996) ...................................................................... 16

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ......................................................................... 24

*Leiter v. United States*,
   271 U.S. 204 (1926)................................................................................. 17, 18

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971).................................................................. 25, 26, 27, 28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................... 25

*Lydo Enters., Inc. v. City of Las Vegas*,
   745 F.2d 1211 (9th Cir. 1984) ...................................................................... 23

*Marsh v. Chambers*,
   463 U.S. 783 (1983)....................................................................................... 29

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................... 24

*McCreary County v. ACLU*,
   545 U.S. 844 (2005)............................................................................ 25, 26, 27

*Md. Dep't of Human Res. v. HHS*,
   762 F.2d 406 (4th Cir. 1985) ........................................................................ 20

*Miller ex rel N.L.R.B. v. Cal. Pac. Med. Ctr.*,
   991 F.2d 536 (9th Cir. 1993) ........................................................................ 23

*Nat'l Consumer Info. Ctr. v. Gallegos*,
   549 F.2d 822 (D.C. Cir. 1977)................................................................. 20, 21

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*,
384 F.3d 1163 (9th Cir. 2004) ...................................................................5

*Norfolk S. Ry. Co. v. Shanklin*,
529 U.S. 344 (2000)..............................................................................13

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
762 F.2d 1374 ......................................................................................23

*Perry v. Sindermann*,
408 U.S. 593 (1972)..............................................................................20

*Public Citizen Inc. v. Mineta*,
343 F.3d 1159 (9th Cir. 2003) ...............................................................13

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000)..............................................................................27

*Schlesinger v. United States*,
390 F.2d 702 (1968) ................................................................................3

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)................................................................................5

*Service v. Dulles*,
354 U.S. 363 (1957)..............................................................................14

*Siebert v. Gene Sec. Network, Inc.*,
75 F. Supp. 3d 1108 (N.D. Cal. 2014)....................................................13

*Southern Mutual Help Association, Inc. v. Califano*,
574 F.2d 518 (D.C. Cir. 1977).............................................9, 10, 11, 19

*Stone v. Graham*,
449 U.S. 39 (1980)................................................................................28

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
809 F.2d 626 (9th Cir. 1987) .................................................................24

*To the Secretary of the Interior*,
39 Comp. Gen. 340, Oct. 29, 1959, 1959 CPD ¶ 79 ..............................18

*Town of Greece, N.Y. v. Galloway*,
134 S. Ct. 1811 (2014)..........................................................................29

- iv -

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954)..................................................................14

*United States v. Hatcher*,
    922 F.2d 1402 (1990) ............................................................20

*Vance-Warren Comprehensive Health Plan, Inc.*,
    DAB 2180 (2008) (H.H.S. June 18, 2008) ............................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................27

*Youth Network Council of Chicago, Inc.*,
    DAB 1150 (1990) (H.H.S. May 3, 1990) .........................5, 16

**Statutes**

31 U.S.C. § 1341(a)(1)..................................................................17

Anti-Deficiency Act (ADA) ...........................................1, 17, 18, 19

Administrative Procedure Act ........................................................14

Bipartisan Budget Act of 2018 § 20402, Pub. L. No. 115-123, Feb. 9,
    2018, 132 Stat. 64, 119 .........................................................19

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L.
    113-235, Dec. 16, 2014, 128 Stat. 2130, 2481 ......................19

Consolidated Appropriation Act, 2018, Pub. L. 115-141, March 23,
    2018, 132 Stat. 348 ...............................................................19

Consolidated Appropriations Act, 2016, Pub. L. 114-113, Dec. 18, 2015,
    129 Stat. 2242, 2617 .............................................................19

Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017,
    131 Stat. 135, 536 .................................................................19

Continuing Appropriations Act, 2018 and Supplemental Appropriations
    for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, 131
    Stat. 1129, 1139-40 ...............................................................19

- v -

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT; NO. 2:18-cv-00055-TOR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Rules**

Fed. R. Civ. P. 8(a)(2) ................................................................24

Fed. R. Civ. P. 12(b)(6) .............................................................24

Fed. R. Civ. P. 56(a) .................................................................24

**Regulations**

2 C.F.R 200.339(a) ....................................................................16

2 C.F.R. Part 200 ......................................................................16

45 C.F.R. § 74.110 (1976) ........................................................10

45 C.F.R. § 75.2 ...............................................................6, 7, 10

45 C.F.R. § 75.372(a) ..........................................................6, 16

48 C.F.R. § 52.249-2(a) ............................................................16

78 Fed. Reg. 78590, 78599 (Dec. 26, 2013) ...........................16

5 C. Wright & A. Miller, Federal Practice and Procedure § 1202 (3d ed.) ................24

**Other Sources**

*Defund Planned Parenthood*, NY Mag., Mar. 7, 2018, *at*
http://nymag.com/daily/intelligencer/2018/03/planned-parenthood-
defunding-bid-could-derail-spending-bill.html .......................22

Frequently Asked Questions for OAH 2015 TPP FOAs,
https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-
faqs.pdf (last visited Apr. 6, 2018) .....................................7, 8

https://www.hhs.gov/ash/oah/grant-programs/funding-
opportunities/index.html (last visited Apr. 6, 2018) .................8

https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-
prevention-program-tpp/current-grantees/map/index.html (providing
a map of grantees for "Fiscal Year 2015-2019") (last visited Apr. 6,
2018) ........................................................................................8

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT; NO. 2:18-cv-00055-TOR

*Ohio Hires Grace Brethren Abstinence Coordinator*, CE News, Jan. 17, 2006, http://web.archive.org/web/20060117174631/ http://cenational.org/Publications/publicationsArticle.asp?IDNum=63 ...............26

*Planned Parenthood Defunding Threatens Government Spending Package*, Politico, Mar. 7, 2018, *at* https://www.politico.com/story/2018/03/07/planned-parenthood-defunding-government-spending-package-392513.................................................22

Politico, Jan. 22, 2018, https://www.politico.com/story/2018/01/22/ trump-religious-activists-hhs-351735......................................................................27

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT; NO. 2:18-cv-00055-TOR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRELIMINARY STATEMENT

It is remarkable how much Defendants fail to address in their brief. They fail to grapple with Plaintiffs' argument that the decision to terminate the Teen Pregnancy Prevention (TPP) Program is arbitrary and capricious, providing only slight reference to post-hoc justifications that were not before the agency at the time of its decision. They make no attempt to argue that their termination of Plaintiffs' cooperative agreements satisfy any of the three circumstances under which their own regulations allow for termination.  Instead, they suggest that the Department of Health and Human Services' (HHS) informal, internal guidance bestows HHS with authority to terminate an award whenever it determines that doing so would be in the "best interests of the government."  But Defendants do not even attempt to show that such a determination was made, much less explain why ending a successful, evidence-based program was in the best interest of *anyone*.  Nor can they.

Failing to engage Plaintiffs substantively on the merits,[1] Defendants argue that they are immune from any scrutiny, and are vested with unfettered and unreviewable discretion to end Plaintiffs' cooperative agreements in order to advance the political agenda of the new administration.  Defendants are flat wrong.  They are not above their own regulations, are not free to act arbitrarily and capriciously, and are not beyond this Court's review.

---

[1] Nor may Defendants provide such arguments in their forthcoming reply in support of their motion to dismiss or for summary judgment, which is expressly limited to that motion and is not to be used as a sur-reply in opposition to Plaintiffs' motion for Preliminary Injunction. *See* ECF No. 23.  In light of the unusual posture of this case, where Defendants' opposition to Plaintiffs' motion for preliminary injunction was combined with a motion for summary judgment, Plaintiffs note that additional materials referenced herein are submitted in connection with the motion for preliminary injunction, not the motion for summary judgment. *See Fayant v. U.S. Bank Nat'l Ass'n*, No. 2:16-CV-00139-SMJ, 2017 WL 379450, at *2 (E.D. Wash. Jan. 26, 2017) (discussing ways in which additional materials can be introduced on motion to dismiss, including because materials are judicially noticeable).  Citations to extrinsic materials are referenced because of Plaintiffs' belief that the materials are judicially noticeable.

Once certain obfuscations regarding the Anti-Deficiency Act (ADA) and the HHS Grants Policy Statement (GPS) are addressed, it is readily apparent that Plaintiffs have established a likelihood of success on the merits.  Erroneously blaming Plaintiffs for the timing of this suit, Defendants fail to dispute the extensive showing Plaintiffs have made that, absent injunctive relief, irreparable harm will follow.  HHS cannot be heard to discount the severity of this irreparable harm with complaints of the administrative burden it will face if forced to comply with its own regulations, nor can HHS assert any public interest in competition for federal awards when it was HHS that made five-year awards to Plaintiffs.

Accordingly, Plaintiffs are entitled to injunctive relief prohibiting HHS from going forward with its unlawful termination of Plaintiffs' awards, and requiring HHS to continue administering the TPP Program and Plaintiffs' cooperative agreements.  In contrast, Defendants' attempt to dismiss or obtain summary judgment denying Plaintiffs' claim under the Establishment Clause rests on a fundamental misunderstanding of the parties' burdens and applicable standards at these preliminary stages of litigation.  Plaintiffs clearly have standing to challenge HHS's actions under the Establishment Clause, and have plausibly alleged a violation of the Establishment Clause; they need not prove the claim before discovery.[2]

## ARGUMENT

I. **PLAINTIFFS HAVE ESTABLISHED THAT THEY ARE ENTITLED TO A PRELIMINARY INJUNCTION**

    A. **Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims (Counts I and II).**

        1. **HHS All But Concedes Its Conduct Was Arbitrary and Capricious.**

Plaintiffs described in detail the multiple ways in which HHS's actions were arbitrary and capricious: HHS consistently changed its purported justifications for terminating the TPP Program, which in any event were inconsistent with HHS's prior

---

[2] Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiffs attach the Declaration of Andrew Tutt, affirming that Plaintiffs require discovery to gather the facts necessary to oppose a motion for summary judgment in this case.

statements about the effectiveness of the Program; HHS relied on a flawed interpretation of the evidence, and a misunderstanding of the purpose of the TPP Program; and HHS disregarded the facts before it in favor of an ideological agenda. *See* Mtn., ECF No. 24, at 13–19.

Defendants do not dispute any of this, and documents recently produced as part of a Freedom of Information Act (FOIA) litigation[3] confirm (even when heavily redacted) the arguments set forth in Plaintiffs' motion. For example, Plaintiffs discussed the political agenda of political appointees within HHS, particularly Valerie Huber, chief of Staff for the Office of the Secretary of Health, who has publicly maligned the TPP Program. *See* Mtn. at 16. Internal agency documents now confirm that it was those same officials—the "policy team"[4]—that were principally involved in the decision to terminate the TPP Program, and that there was no consultation with the Office of Adolescent Health (OAH)—the Office specifically created to oversee TPP Program funding. A Note to File authored by Evelyn Kappeler, the Director of OAH, confirms that the teenage pregnancy experts in OAH who were in charge of overseeing the grants had no involvement in the decision to terminate the grants, and that officials from OAH were not provided any explanation for the decision until the policy team provided them with "the official talking points" after the decision to terminate already had been made.[5] That same document confirms that the agency put out inaccurate information about the results of TPP Program research, and never went directly to OAH for information about how the TPP Program was working.[6]

---

[3] *See Democracy Forward Foundation v. U.S. Dep't of Health and Human Servs*, No. 1:17-cv-02449-TJK (D.D.C. Complaint filed Nov. 13, 2017).

[4] *See* Link Decl., Ex. E; *see also id.*, Ex. F.

[5] *See* Note to the File of Evelyn Kappeler (Director of OAH) Dated July 28, 2018, Link Decl. Ex. G.

[6] *Id.* Note that, in the context of a procurement contract, one of the few limits to a Contracting Officer's authority to terminate a contract for default where a contractor fails to perform as required is where the Contracting Officer's decision to terminate is driven by politically motivated pressure, rather than independent judgment as to

(Footnote Cont'd on Following Page)

Plaintiffs also explained that, in claiming that the TPP Program was not effective, HHS apparently had relied on outdated research.  *See* Mtn. at 18.  Internal agency documents now confirm this.  For instance, in one document Evelyn Kappeler noted that OAH staff were "not clear where some of the statements" that HHS had put out about the TPP Program were coming from; explained to the policy team that statements made in press articles "contains several errors" about the TPP Program findings; and offered to provide the Office of the Assistant Secretary with "accurate data" about the TPP Program.[7]  Similarly, an email from HHS staffer Emily Novick dated August 4, 2017 sought to explain to senior HHS officials, including Valerie Huber, that HHS's recitation of prior research results of the effectiveness of certain curricula under the TPP Program was incorrect.[8]

Plaintiffs had also detailed the post hoc nature of HHS's justifications.  This, too, has been confirmed by recently-produced documents.  For example, internal agency documents show that in August 2017—i.e., after the termination decision already had been made, and after the agency received negative press for cutting the TPP Program grants—HHS and its communications staff met with the strategic communications firm Nahigian Strategies (run by a member of the Trump Transition Team) to discuss work surrounding the TPP Program—suggesting an after-the-fact effort to justify HHS's decision.[9]

Defendants devote only one sentence to responding to Plaintiffs' argument that HHS acted arbitrarily and capriciously, noting in passing that "HHS's policy concerns

(Footnote Cont'd From Previous Page)
the Government's real interests.  *See Schlesinger v. United States*, 390 F.2d 702, 581–84 (1968).

[7] Link Decl., Ex. D.

[8] *See* Link Decl., Ex. C (correcting HHS's statement that "of the 37 projects for which evaluation reports had been submitted, 73 percent were found to have no or negative impact on the behavior of the teens who participated" and clarifying that "now there are 44 (not 37) programs accepted as effective evidence-based model").

[9] *See* Email from Ken Nahigan re "TPPP Info/Articles" (Aug. 14, 2017), Link Decl., Ex. N.

1  with the current TTP Program are a matter of public record." Opp. at 22. Defendants

2  cite two documents buried within a 500-plus page set of exhibits—the first a self-

3  serving press release, and the second a letter from HHS responding to a Senate inquiry

4  about why it discontinued the TPP Program—both of which contained the same

5  inaccurate representations of the research that OAH staff had previously explained

6  was incorrect. *Id.* (citing Geradi Decl., Ex. H, Ex. I.). But these documents do little to

7  help Defendants. Both statements post-date HHS's decision to terminate Plaintiffs'

8  awards and cannot provide justification for HHS's decision-making at the time. Thus,

9  they cannot serve as the record against which the Agency's actions are judged, and the

10  government does not include them in what it considers the administrative record. *See*

11  ECF No. 28-1 (Certification of Administrative Record).

12      It is fundamental that a "reviewing court must review the administrative record

13  before the agency at the time the agency made its decision," *Nat'l Wildlife Fed'n v.*

14  *U.S. Army Corps of Engineers*, 384 F.3d 1163, 1170 (9th Cir. 2004), and the court

15  "may not supply a reasoned basis for the agency's action that the agency itself has not

16  given." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–

17  86 (1974). Here, given that Defendants have not sufficiently identified the grounds on

18  which their actions were based (and the documents suggest grounds that were

19  improper), "the court is powerless to affirm the administrative action by substituting

20  what it considers to be a more adequate or proper basis." *SEC v. Chenery Corp.*, 332

21  U.S. 194, 196 (1947).

22      Moreover, these post hoc documents cited by Defendants simply reflect HHS's

23  views of the TPP Program *as a whole*—they say nothing of Plaintiffs' performance or

24  compliance, or why discontinuing funding to the individual awardee would be

25  appropriate. In *Youth Network Council of Chicago, Inc.*, DAB 1150 (1990) (H.H.S.

26  May 3, 1990), an administrative decision on which Defendants rely (Opp. at 7), the

27  administrative appeals board noted that the decision of whether to eliminate or

28  discontinue funding *must be tethered to the grantee's conduct*, finding that "[b]oth the

1  applicable regulations and grants administration policies recognize that organizations

2  whose management practices create risks of poor programmatic use or poor financial

3  stewardship of grants funds are to be identified and eliminated from program

4  participation." Defendants identify no similar management or other practices of

5  Plaintiffs (or any grantees) here.

6       Accordingly, Plaintiffs are likely to succeed on the merits of their claim that

7  HHS's actions were arbitrary and capricious.

## 2. HHS's Conduct Is Contrary to HHS Regulations

8

9       Recognizing that they have no substantive grounds to terminate Plaintiffs'

   agreements, Defendants rely on a technical argument that the HHS regulations

10 regarding "terminations" do not apply. This position is inconsistent with the plain

11

12 language of the regulations, Defendants' prior conduct, and applicable case law.

### a. HHS's Conduct Amounts to an Unlawful "Termination"

13

14      HHS's grant regulations provide for termination of a grant or cooperative

15 agreement in only three circumstances: (1) if the awardee "fails to comply with the

16 terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of"

17 the awardee. 45 C.F.R. § 75.372(a).[10] Defendants make no attempt to argue that

18 their actions satisfy this regulation. Instead, Defendants argue that these

19 regulations are inapplicable because no "termination" has occurred.

20      Pursuant to HHS regulations, a "termination" is broadly defined as "any

21 ending of a Federal award, in whole or in part, at any time prior to the planned end

22 of a period of performance." 45 C.F.R. § 75.2. Defendants argue that the

23 definition of "termination" is limited to any ending of a federal award within a

24 single-year funding period, i.e., the "budget period." Opp. at 17. In other words,

25 Defendants' position is that a "termination" only occurs where funding is

26 withdrawn within a budget period. Accordingly, Defendants assert, HHS has

27

28 ───────────────

[10] The fourth circumstance applies to termination by the *grantee* and thus is not applicable here. *See* 45 C.F.R. § 75.372(a)(4).

- 6 -

1    complete (indeed, unreviewable) discretion to end a federal award any time after

2    the current budget period expires.

3            Defendants' argument rests entirely on the suggestion that the phrase

4    "period of performance" in the definition of "termination" applies only to the

5    single year "budget period" identified on each award, and not the five-year "project

6    period." Not so. HHS regulations define "project period" with a cross-reference

7    to "period of performance," indicating they are one and the same. The relevant

8    definitions excerpted from HHS regulations are as follows:

> Period of performance means the time during which the non–
> Federal entity may incur new obligations to carry out the work
> authorized under the Federal award. The Federal awarding
> agency or pass-through entity must include start and end dates
> of the period of performance in the Federal award (see §§
> 75.210(a)(5) and 75.352(a)(1)(v)).
>
>                                . . . .
>
> Project period (*see* Period of performance).
>
>                                . . . .
>
> Termination means the ending of a Federal award, in whole or
> in part at any time prior to the planned end of period of
> performance.

45 C.F.R. § 75.2.

        HHS guidance documents explain how the "project period" differs from the

"budget period." In response to the Frequently Asked Question (FAQ) "What is a

project period versus a budget period?," HHS explains that "[t]he project period is the

total time for which support of a project has been programmatically approved by

OAH. For budgetary and reporting purposes, funding is provided in annual

increments called budget periods."[11] In response to the FAQ "How many years of

funding can a grantee receive?," HHS explained that "[g]rants will be funded in

---

[11] *See, e.g.*, Frequently Asked Questions for OAH 2015 TPP FOAs,
https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-faqs.pdf, at 8 (last
visited Apr. 6, 2018).

annual increments (budget periods) and are generally approved for a project period of up to five years, although shorter project periods may be approved."[12]

Thus, Defendants' argument that a termination has not occurred when a cooperative agreement with a five-year project period is ended after year three is inconsistent with HHS's own regulations and guidance, which indicate that the "planned period of performance" is the five-year project period, not single year budget periods.

Moreover, beyond the regulations and guidance, HHS consistently has referred to the cooperative agreements at issue here as *five-year programs*. For example, in describing the awards, HHS's website refers to them as "FY15-FY19" awards (i.e., covering Fiscal Years 2015-2019).[13] In addition, the Funding Opportunity Announcements (FOAs) for each of the TPP Program awards repeatedly refer to the "five-year" nature of the awards, including: (1) by expressly referring to a **"five-year grant"**;[14] (2) by stating that "[a]wards will be in the form of a **five-year cooperative agreement** with the grantee";[15] and (3) by setting forth the grantees expectations "[o]ver the **five-year project period**."[16]

That Plaintiffs' cooperative agreements were structured over the course of five years is also consistent with the expectations of both parties in implementing the awards; the initial round of TPP funding from 2010-2015 was also structured as a

----

[12] *Id.* at 7-8.

[13] *See* https://www.hhs.gov/ash/oah/grant-programs/funding-opportunities/index.html (last visited Apr. 6, 2018); *see also* https://www.hhs.gov/ash/oah/grant-programs/teen-pregnancy-prevention-program-tpp/current-grantees/map/index.html (providing a map of grantees for "Fiscal Year 2015-2019") (last visited Apr. 6, 2018).

[14] *See* Miller Decl., Ex A (Tier 1A FOA) at 17; Miller Decl., Ex. C (Tier 2A FOA) at 6; Miller Decl., Ex. D (Tier 2B FOA) at 48.

[15] *See* Miller Decl., Ex A (Tier 1A FOA) at 31; Miller Decl., Ex. B (Tier 1B FOA) at 38; Miller Decl., Ex. C (Tier 2A FOA) at 27; Miller Decl., Ex. D (Tier 2B FOA) at 33.

[16] Miller Decl., Ex A (Tier 1A FOA) at 5; Miller Decl., Ex. B (Tier 1B FOA) at 13; Miller Decl., Ex. C (Tier 2A FOA) at 12; Miller Decl., Ex. D (Tier 2B FOA) at 13.

1  five-year program.  Moreover, in structuring the awards as five-year programs, HHS
2  required that the first year of the project be used for planning purposes and the
3  remaining years for implementation.  Plaintiffs structured their grant programs with
4  those requirements in mind.[17]  If these programs were single-year arrangements, as
5  Defendants now suggest, an initial planning year would make no sense.  Furthermore,
6  it is illogical to require award recipients to specifically set forth a work plan for the
7  course of five years and to distribute results at the conclusion of the five-year period if
8  HHS could decide on a whim to re-compete the program.

9       Thus, contrary to HHS's argument that Plaintiffs "attempt to recast their
10  relationship with HHS as a 'five-year' grant," (Opp. at 10), there is simply nothing to
11  recast here.  Rather, it is HHS who—by virtue of terminating Plaintiffs' cooperative
12  agreements and the TPP Program as a whole prior to the end of the five-year period—
13  is attempting to sidestep its own regulations.

14       The D.C. Circuit's decision in *Southern Mutual Help Association, Inc. v.*
15  *Califano*, 574 F.2d 518, 519 (D.C. Cir. 1977) is instructive, as it reveals that HHS's
16  argument with respect to termination has already been soundly rejected.  Strikingly
17  similar to this case, *Southern Mutual* concerned HHS's predecessor, the Department
18  of Health, Education and Welfare's (HEW) grant award to the Southern Mutual Help
19  Association (SMHA) for a five year "Project Period" and a single-year "Budget
20  Period."  *Id*.  The D.C. Circuit explained as follows HEW's system of project periods
21  and budget periods, which is essentially the same as that used in the TPP Program:
22  "Generally, the 'Project Period System' is used to obligate funds for such grants.
23  Under this system, projects are approved for multi-year support, but are funded in
24  annual increments called budget periods.  *Id.* at 521.

25       At the end of the third budget period, HEW rejected SMHA's continuing
26  application for the fourth budget period based on documented concerns with

27  _____
    [17] *See, e.g.*, Miller Decl., Ex B (Tier 1B FOA) at 15 (noting that grantees must
28  "[e]ngage[] in a planning, pilot, and readiness period of up to 12 months").

SMHA's performance.  Such documented concerns do not exist in the present case; nevertheless, HEW announced the same position HHS adopts now:  "'[O]ur administrative decision not to renew this grant at the end of the budget period does not constitute grant termination.  Therefore, those rules and regulations governing grant termination procedures . . . do not apply.'"  *Id.* at 520-21 (citing Joint Appendix at 45-46) (ellipses in original.)  SMHA filed suit, arguing, among other things, that HEW's actions violated its own regulations, and sought to enjoin HEW to provide the termination procedures required under HEW's grant regulations.  *Id.* at 521.  Like Defendants here, HEW argued that although the original grant was approved for a five-year project period, it was "composed of five individual one-year grants (and corresponding budget periods), for which [the grantee] had to apply each year."  *Id.*  Thus, according to the Government, its decision not to re-fund the grantee after the third year did not result in the "termination" of the grant, since the grant for the existing fiscal year was not affected and the grants for years four and five had not been made.  *Id.*

The district court denied SMHA's claims, but the D.C. Circuit reversed, finding that termination of the grant between budget periods did in fact, constitute a "termination" under its grant regulations.  *See id.* at 525–28.  Importantly, the HEW grant regulation's definition of termination was nearly identical to the definition in HHS's current regulations.  *Compare id.* at 527 ("Termination" under 45 C.F.R. § 74.110 (1976) means the "cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion"), *with* 45 C.F.R. § 75.2 ("Termination" means the "ending of a Federal award, in whole or in part, at any time prior to the planned end of the period of performance").

The D.C. Circuit focused on the "project period" stated on SMHA's award documents.[18]  Although there was no grant period specified in the awarding

---

[18] The Grants Administration Manual in force at the time provided that the grant period is defined as "(t)he period for which funds have been awarded; i. e., the remainder of the project period."  *S. Mut.*, 574 F.2d at 527 (citing 1970 Policy

(Footnote Cont'd on Following Page)

document, there was a "project period" extending for five years after the initial grant award was made.  By withdrawing support from the grantee prior to the expiration of the project period, the D.C. Circuit determined that the agency's conduct amounted to a "termination." *Id.* at 528.

Moreover, contrary to Defendants' assertion herein that "termination" is a term of art in HHS grants (Opp. at 7), the D.C. Circuit in *Southern Mutual* recognized that "termination" is an important term for all federal grants, and that therefore no deference was due to HEW's interpretation, given that "neither notoriety of interpretation nor a subject peculiarly within agency expertise is present." *Id.* at 526.

Here, as in *Southern Mutual*, when HHS initially issued the TPP awards in 2015, it provided each Plaintiff with a Notice of Award (NOA) that identified a "project period" of five years—from July 1, 2015 through June 30, 2020.[19]  The NOAs also identified a "budget period" that corresponded to the single fiscal year of funding that Congress had appropriated and HHS had awarded to Plaintiffs in response to Plaintiffs' continuing applications.  By informing Plaintiffs of their intent to discontinue funding prior to the originally planned project period, Defendants' conduct amounts to the "ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance" and thus is a "termination" under the regulations. There is no dispute that HHS's regulations permit termination by HHS in only three circumstances, and Defendants do not even attempt to argue that those circumstances are present here.

Because Defendants have failed to comply with the mandatory procedural requirements regarding a "termination," such termination "is necessarily 'arbitrary

---

(Footnote Cont'd From Previous Page)

Statement on project grants under section 310 of the Public Health Service Act: a grant period is that "time period from the beginning date of the requested budget period through the terminal date of the project period.").

[19] Miller Decl., Exs. E & F (PPGNWHI NOAs for 2015 and 2016); Grubb Decl., Exs. A &B (PPH NOAs for 2015 and 2016); Eastlund Decl., Exs. A & B (PPGWNI NOA for 2015 and 2016).

1    and capricious' or otherwise without observance of procedure required by law and

2    must be set aside." *Confederated Tribes & Bands of the Yakama Nation v. U.S.*

3    *Fish & Wildlife Serv.*, No. 1:14-CV-3052-TOR, 2015 WL 1276811, at *9 (E.D.

4    Wash. Mar. 20, 2015).

5                    **b.    HHS Cannot Rely on Informal Guidance to Override
                            Express Regulations**

6            Without any shelter from the regulations themselves, Defendants resort to

7    arguing that the Grant Policy Statement (GPS) controls.  But HHS's GPS is,

8    informal internal guidance at best, not a binding regulation, and the GPS expressly

9    states that its terms are not binding on grant recipients unless expressly written into

10   an award document:

11           Recipients are not directly subject to the requirements of HHS Grants
             Policy Directives and implementing HHS Grants Administration
12           Manuals . . ., which are internal documents guiding HHS operations.  *If
             an [operating division] implements a requirement in an internal*
13           *document that does not affect recipient, it will not do so by citing that*
14           *document; rather, the requirement is placed on the recipient through*
             *explicit coverage in the NoA [notice of award].[20]*
15
16   GPS, Gerardi Decl., Ex. B, at ii (emphasis added).  Even if the GPS provisions that

17   Defendants rely upon have been expressly written into Plaintiffs' cooperative

18   agreements, the GPS cannot be used to contradict HHS's regulations that limit the

19   circumstances under which termination is allowed.  Indeed, the GPS expressly

20   acknowledges that its terms "apply as indicated in the HHS GPS *unless there are*

21   *statutory, regulatory, or award-specific requirements to the contrary* (as specified in

22   individual Notices of Award."  GPS, Gerardi Decl., Ex. B, at I (emphasis added).[21]

23   _____

24   [20] Accordingly, Defendants' reliance on the GPS being incorporated reference is of no
     avail.  Opp. at 4–5.

25   [21] Perhaps because Defendants recognize that the GPS cannot alter its own
26   regulations, Opp. at 16, they cite only to cases that relate to entirely different GPS
     provisions, where no apparent conflict exists between the GPS and HHS's
27   regulations.  In *Navajo Nation v. Azar*, cited by Defendants for the proposition that
     the GPS is binding, the court simply suggested that Plaintiffs' alleged irreparable
28   harm from a reduction in funding might be mitigated by a GPS provision allowing

                                                         (Footnote Cont'd on Following Page)

1    The internal GPS policy document cannot bestow HHS with unreviewable

2   discretion to unilaterally terminate an award beyond the three circumstances

3   identified in HHS's regulations.  *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344,

4   356 (2000) (no deference due to agency position that is inconsistent with the plain

5   text of its regulations.); *Public Citizen Inc. v. Mineta*, 343 F.3d 1159, 1166 (9th

6   Cir. 2003) ("[W]e need not accord any deference to an unreasonable construction

7   that does not conform with the wording and purpose of the regulation.").

8    Finally, Defendants' suggestion that the GPS gives HHS unreviewable

9   authority to terminate an award between budget periods is an over-reading of the

10   GPS itself.  Even under the GPS, a decision to deny a continuing application is

11   contingent on a determination that "continued funding would not be in the best

12   interests of the Federal government."  (GPS, Gerardi Decl., Ex. B, at II-89).

13   Defendants make no attempt to show that HHS actually reached such a

14   determination.  Thus, unlike in *Am. Indian Ctr. of Omaha, Inc.*, DAB 1141 (1990)

15   (H.H.S. Mar. 26, 1990), this is not a case in which HHS has specifically informed

16   the grantee that the agency "concluded that continued support was not in the best

17   interest of the government," nor that it based its decision on any conduct specific to

18   that grantee.  *See id.* (agency reasonably determined that it was not in the best

19   interest of the government to make a continuation award based on the grantee's

20   lack of an audit).  Rather, here, the terminations were made across the board, and

21   Defendants point to nothing at all—let alone anything within what they contend is

22

23   _____

24   (Footnote Cont'd From Previous Page)
     grantees (with Agency approval) to carry over excess funds from prior fiscal years.
25   2018 WL 1092155 at *5 (D.D.C. 2018) (citing GPS at II-51).  The other case cited,
     *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1124 (N.D. Cal. 2014), is
26   a False Claims Act case in which the defendant's obligations under the GPS were
     at issue, and again provides no indication that the GPS can be used to provide HHS
27   with any termination rights broader than or inconsistent with those in its own
     regulations.
28

1   the administrative record in this case—to explain why re-competing the entire

2   Program now would be in the best interest of the government.

3                   **c.    HHS's Conduct Is Capable of Review**

4           Defendants' assertion that their termination of Plaintiffs' awards is beyond

5   judicial review and left to agency discretion as a matter of law is one that distorts

6   administrative law.  The doctrine that precludes judicial review of action

7   committed to agency discretion "is a very narrow exception," as the "legislative

8   history of the Administrative Procedure Act indicates that it is applicable in those

9   rare instances where 'statues are drawn in such broad terms that in a given case

10  there is no law to apply.'"  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

11  U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).

12  However, there is nothing so rare about Congress' direction that HHS enter into

13  grants and cooperative agreements to implement the TPP Program that could make

14  HHS immune from following its own regulations governing the termination of

15  grants and cooperative agreements.

16          There is a clear standard to apply in this case: did HHS comply with its own

17  regulations that identify the only three circumstances under which it may terminate

18  a federal award?  The undisputed answer is: No.  HHS's regulations provide a

19  valid basis on which to judge whether its actions are in accordance with law, as

20  "regulations validly prescribed by a government administrator are binding upon

21  him as well as the citizen, and . . . this principle holds even when the

22  administrative action under review is discretionary in nature."  *Service v. Dulles*,

23  354 U.S. 363, 372  (1957) (*citing United States ex rel. Accardi v. Shaughnessy*,

24  347 U.S. 260 (1954)).

25          The cases cited by Defendants to suggest that an agency's termination of a

26  grant is beyond review do not support the proposition that an agency's action

27  cannot be reviewed for compliance with its own regulations.  Defendants cite

28  (Opp. at 20) then-Judge Scalia's concurrence to the D.C. Circuit's decision in

1    *California Human Development Corporation v. Brock*, which states: "[I]t seems to

2    me that the allocation of grant funds among various eligible recipients, none of

3    which has any statutory entitlement to them, is traditionally a matter 'committed to

4    agency discretion by law.'"  762 F.2d 1044, 1052 (D.C. Cir. 1985).  But even

5    assuming that Justice Scalia was correct and that his opinion were binding on this

6    Court, his point is irrelevant to Plaintiffs' claims in this case, which address HHS's

7    violation of its own regulation in terminating an existing federal award, not HHS's

8    initial decision on how to allocate funds when making awards.[22]

9        Indeed, many of the cases Defendants cite for the purpose of emphasizing

10    the difficulty of reviewing discretionary decisions of grant administration, Opp. at

11    20 n.6, actually confirm that review *is* available where the plaintiff claims that the

12    agency has violated a regulatory requirement.  *See e.g.*, *Cmty. Action of Laramie*

13    *Cty., Inc. v. Bowen*, 866 F.2d 347, 352 (10th Cir. 1989) (internal citation omitted)

14    (explaining that "[b]ecause a valid 'legislative rule' or substantive federal

15    regulation is binding to the same extent as a statute, HHS['s] failure to follow its

16    own regulations likewise may be challenged under the APA," but noting that

17    plaintiff failed to allege any such violation); *Apter v. Richardson*, 510 F.2d 351,

18    355–56 (7th Cir. 1975) ("Where it is alleged that the agency has transgressed a

19    constitutional guarantee or violated an express statutory or procedural directive,

20    otherwise non-reviewable agency action should be examined to the extent

21    necessary to determine the merits of the allegation.").

22        Plaintiffs do not contend that HHS lacks authority to terminate awards.  To

23    the contrary, HHS regulations provide three circumstances under which Federal

24    awards may be terminated, and Plaintiffs contend only that a termination must

25

26    _____

27    [22] Defendants' reliance on the Southern District of New York's decision in *Alan Guttmacher Inst. v. McPherson* is likewise inapplicable, because in that case there were no regulations in place that provided a clear limit to the agency's discretion to terminate

28    its grants.  597 F. Supp. 1530 (1984).

1    satisfy those basic regulatory requirements.[23]  What Defendants really want, but do

2    not have, is the right to terminate a federal grant or cooperative agreement without

3    cause.  Such a right to terminate without cause has long existed for federal

4    procurement contracts, in the "Termination For Convenience" Clause.  48 C.F.R.

5    § 52.249-2(a).[24]  The HHS regulations (and the Uniform Guidance on which they

6    are based),[25] do not provide HHS with an analogous right to terminate for

7    convenience, but instead limit agency authority to terminate grants and cooperative

8    agreements to three scenarios, none of which Defendants even attempt to argue are

9    satisfied here.  45 C.F.R. § 75.372(a); 2 C.F.R 200.339(a) (Uniform Guidance

10   providing the same three circumstances for termination by the Government as the

11   HHS regulations).

---

[23] Defendants cite several cases upholding HHS's decision to terminate for non-compliance, but termination for non-compliance is one of the three circumstances I which termination is allowed under HHS's regulations.  Those cases do not suggest that HHS's ability to terminate between budget periods is any broader than its right to terminate during a budget period.  *See Vance-Warren Comprehensive Health Plan, Inc.*, DAB 2180 (2008) (H.H.S. June 18, 2008) (finding that grantee's "failures to comply with the laws and regulations applicable to its grant persisted over a period of years" were "serious and fully justified HRSA's decision not to refund HRSA's grant after FY 2007"); *Youth Network Council of Chicago, Inc.*, DAB 1150 (1990) (H.H.S. May 3, 1990) (concluding that there was "strong support . . . to deny funding of the continuation awards" where grantee "failed to materially comply with the terms and conditions of the grant award"); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976) ("While we need not go so far as to decide the question, it is probable that the medical merits of agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory or procedural directive.").

[24] Even with a standard as deferential as "in the Government's interest," the decision to terminate for convenience is not immune from judicial review, and may be scrutinized for bad faith or abuse of discretion.  *See Krygoski Constr. Co. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996).

[25] These HHS grant regulations largely duplicate the federal agency-wide grant guidance recently issued by the Office of Management and Budget at 2 C.F.R. Part 200, often referred to as the "Uniform Guidance" and the "SuperCircular."  *See* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013).

---

- 16 -

d.      The Anti-Deficiency Act Is Irrelevant To This Case

Defendants open their argument with the false assertion: "Plaintiffs argue that HHS has violated the Anti-Deficiency Act, but it is Plaintiffs' request for relief that would violate the ADA." Opp. at 11. Plaintiffs have never argued that HHS's actions violate the ADA. Indeed, the term "Anti-Deficiency Act" does not appear in Plaintiffs' Complaint or Motion for Preliminary Injunction. That is because the ADA is irrelevant to this dispute, as it controls the Executive's authority to enter a contract for the payment of money, not an Agency's obligations to act reasonably and comply with its own regulations.

Defendants' argument is a red herring designed to change the subject of the litigation. Defendants would like to frame this case as one in which HHS is executing a contractual right to terminate Plaintiffs' cooperative agreements at will, and Plaintiffs are asserting an absolute right to five years' worth of public funds in contravention of Congress' power of the purse. That is not this case. Plaintiffs do not claim entitlement to unappropriated funds, money damages, or breach of contract. Instead, Plaintiffs seek to hold HHS accountable for administering the TPP Program in a way that is arbitrary and capricious and contrary to its own regulations.

The ADA, a codification of Congress' power of the purse, is entirely directed toward the obligation and expenditure of public funds. This is apparent from the plain terms of the ADA, which provide that a federal employee may not "make or authorize *an expenditure or obligation* exceeding an amount available in an appropriation . . . or involve either the government in *a contract for the payment of money* before an appropriation is made or authorized by law." 31 U.S.C. § 1341(a)(1) (emphasis added).

As the cases cited by Defendants show, the ADA prohibits government officials from entering into contracts that, at the time of formation, obligate the government to pay money that Congress has not yet appropriated. *See e.g. Leiter v. United States*, 271 U.S. 204, 206-07 (1926) (lessor cannot recover money damages

from the Government based on the alleged breach of a five-year lease where, at the time of the agreement, Congress has only authorized and appropriated one year's worth of rent payments, and the lease provided that future appropriations would automatically trigger liability); *Hercules, Inc. v. United States*, 516 U.S. 417, 426–27 (1996) (contracting officer would not have entered into an implied-in-fact contract to indemnify the plaintiff against third-party losses associated with use of Agent Orange, because to do so would have obligated the Government to pay funds beyond those then-appropriated or otherwise authorized by law).

However, there are no such improper contracts at issue here. As a matter of practicality and necessity, agencies routinely make plans, including entering into contracts, beyond the expiration date of their available appropriations. Accordingly, the Government Accountability Office (GAO), Congress' oversight agency in connection with its power of the purse, has consistently recognized, well after *Leiter* was decided, that the solution to this problem is that an agency may enter into multi-year agreements where, at the time of award, the United States incurs no financial obligation beyond current appropriation:

> Although the Government may not be obligated by contract or purchase, unless otherwise authorized by law, until an appropriation act providing funds with which to make payment has been enacted, a conditional contract which specifically provides that the government's liability is contingent upon the future availability of appropriations may be entered into prior to the enactment of an appropriation act; however, such contract would become operative only if and when the appropriation is made and should provide that no legal liability on the part of the government for any payment shall arise until the appropriation has been made.

*To the Secretary of the Interior*, 39 Comp. Gen. 340, B-140850, Oct. 29, 1959, 1959 CPD ¶ 79; GAO Red Book Vol. I, 5-43 (consistent with the ADA, "[m]ultiyear arrangements may be permissible … if they are structured in such a way that the agency, at [the] time of … award, incurs no financial obligation").

HHS's project period system does not contravene the ADA, precisely because the

- 18 -

five-year programmatic approval does not, in itself, obligate the Government to pay money beyond the first year of performance.  Additional years' funding are provided through annual funding announcements tied to current appropriations, which HHS must process and agree to before new liability attaches. *See e.g.*, Tier 1A FOA, Miller Decl., Ex. A at 32-33 (describing the awards "for a project period of up to five years" and explaining that "[f]unding for all approved budget periods beyond the first year of the grant is generally level with the initial award amount and is contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of federal funds.").  In any event, there is no dispute that there are currently-appropriated funds available for performance of the fourth year of the parties' cooperative agreements, which HHS has illegally terminated. [26]

HHS did not violate the ADA by agreeing to work with Plaintiffs for five-year project periods. However, agreeing to a five-year project period, HHS committed itself to acting in a manner that is not arbitrary, capricious, or otherwise contrary to law. "Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."  *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985); *see e.g.*, *Southern Mutual*, 574 F.2d at 525-527 (applying APA principles to assess whether agency acted contrary to its regulations when ending a five-year grant after only three

---

[26] Notably, on March 23, 2018—before the Government filed its opposition—Congress passed and the President signed the Consolidated Appropriation Act, 2018, Pub. L. 115-141, March 23, 2018, 132 Stat. 348, providing additional funding to HHS to administer the TPP Program in the fourth budget period of Plaintiffs' cooperative agreements.  Thus, at all times from the beginning of Plaintiffs' awards in 2015 to present, Congress has appropriated funds directing HHS to implement the TPP Program.  *See* Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, Dec. 16, 2014, 128 Stat. 2130, 2481; Consolidated Appropriations Act, 2016, Pub. L. 114-113, Dec. 18, 2015, 129 Stat. 2242, 2617; Consolidated Appropriations Act, 2017, Pub. L. 115-31, May 5, 2017, 131 Stat. 135, 536; Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, 131 Stat. 1129, 1139-40; Bipartisan Budget Act of 2018 § 20402, Pub. L. No. 115-123, Feb. 9, 2018, 132 Stat. 64, 119 (extending funding through March 23).

1 years without providing a pre-termination hearing); *United States v. Hatcher*, 922 F.2d

2 1402, 1406 (1990) (explaining that in a dispute over the parties' rights under a federally

3 administered scholarship program, the court would "review this case through the prism

4 of the APA, not contract law."); *Md. Dep't of Human Res. v. HHS*, 762 F.2d 406, 409

5 (4th Cir. 1985) (concluding that the relevant grant program was "governed by the

6 applicable statute and implementing regulations," not contract principles).   As explained

7 in the prior sections, HHS failed that basic obligation.[27]

8      **B.      Plaintiffs Are Likely To Succeed on the Merits of Their Due Process**
          **Claim.**

9      Defendants' response to Plaintiffs' Due Process claim similarly is based on their

10 erroneous belief that HHS had unrestricted authority to end Plaintiffs' cooperative

11 agreements between budget years.  Referring yet again to the non-binding GPS,

12 Defendants argue that HHS had no legal obligation to continue accepting non-competing

13 applications from Plaintiffs.  But the Notices of Awards, the Funding Opportunity

14 Announcements, the representations and conduct of HHS officials, and the relevant

15 regulations all established a "mutually explicit understanding" that the TPP Program

16 projects would last the full five years.  *Perry v. Sindermann*, 408 U.S. 593, 601 (1972).

17 This understanding amounted to a protected property interest, and as is demonstrated by

18 everything HHS said and did prior to the terminations, certainly was more than a

19 "unilateral expectation."  *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822, 828

20 (D.C. Cir. 1977).

21      Defendants cite *Citizens Health Corp. v. Sebelius*, 725 F.3d 687 (7th Cir. 2013),

22 to attempt to undermine Plaintiffs' protected property interest in the remainder of the

23 TPP Program's five-year project period.  But that case *supports* Plaintiffs' claim of

24 entitlement.  In *Citizens Health*, the plaintiff was a sub-grantee, in that it received

25 federal funds from a municipal health services corporation, which in turn received

26 funds directly from the federal Health Resources and Services Administration

27 ---
[27] The Government has represented to Plaintiffs that HHS will not be obligating TPP

28 Program funds prior to September 1, 2018 while it re-competes the funds.

("HRSA").  *Id.* at 690.  The Seventh Circuit held that the plaintiff did not have a property interest in receiving continued funds from HRSA, because the plaintiff was not the federal grantee.  *Id.* at 691–92.  However, the court went on to state that the "[municipal corporation], as sole grantee, *had an arguable entitlement to the grant funds from HRSA*."  *Id.* at 694 (emphasis added).  If the plaintiff in that case had been the true grantee, at Plaintiffs are here, then the court's analysis likely would have been different.

Defendant's reliance on *Gallegos* to suggest that no property interest exists here is similarly unavailing.  In that case, the plaintiff applied annually for new grants, which did not have set multi-year project periods like the TPP Program grants.  *Gallegos*, 549 F.2d at 824.  Further, the plaintiff in *Gallegos* argued that a single verbal representation by a government official that the plaintiff would receive "continued funding" to show a mutual understanding, and the court found this to be insufficient.  *Id.* at 828 n.6.  The breadth of facts demonstrating a mutual understanding in this case are far more voluminous than the "informal and somewhat ambiguous representation," disputed via affidavit by the defendants in *Gallegos*.  *Id.*

Once recognized that Plaintiffs' awards had five-year periods of performance during which they could only be terminated under three circumstances, it is clear that Plaintiffs possessed the requisite property interest in their awards to entitle them to, at a minimum, a pre-termination hearing.  Defendants do not attempt to argue that, if a protectable property right exists, sufficient process was provided in this case.  Indeed, it was not and Plaintiffs are likely to succeed on this claim as well.

## C.    Plaintiffs Satisfy The Remaining Injunction Factors

Plaintiffs have offered ample evidence that they face irreparable harm if HHS is not enjoined from terminating their cooperative agreements and the TPP Program.  Defendants do not dispute that such harm exists or that it flows from HHS's conduct.  Instead, Defendants' sole contention is that Plaintiffs' "delay" in seeking injunctive relief obviates a finding of irreparable harm.  As an initial matter, this is not a case in

which Plaintiffs have come to court on the eve of the termination of their agreements,
as Defendants suggest.  Plaintiffs moved for a preliminary injunction on March 16,
three and a half months before the scheduled termination.

Nor were Plaintiffs sitting idly since HHS announced the terminations, as
Defendants would have the Court believe.  Immediately following notice of the
terminations, Plaintiffs sent letters to OAH challenging the improper termination as
contrary to HHS's regulations.  Thus, HHS has known Plaintiffs' principal argument
all along and chose to forge ahead without so much as a response.[28]  TPP Program
participants also were not idle between then and this challenge, as the above-
referenced FOIA action was pursued to assess HHS's motives for terminating the TPP
Program, and Senators issued inquiries to HHS questioning HHS's approach to
terminating the TPP Program.[29]  At the same time, fiscal year 2018 funding was under
Congressional consideration and debate. [30]  Failure of Congress to approve fiscal year
2018 funding would have had a material impact on the Plaintiffs' claims.  "Under
such circumstances, waiting to file for preliminary relief until a credible case for
irreparable harm can be made is prudent rather than dilatory."  *Arc of Cal. v. Douglas*,
757 F.3d 975, 991 (9th Cir. 2014).  It is shocking to see Defendants now argue, as
grounds for denying Plaintiffs relief, that rather than attempt to work out an amicable
solution to their mysterious and unilateral grant termination with HHS, Plaintiffs
should have sued immediately.

[28] *See* Grubb Decl., Ex. E (August 1, 2017 Letter to HHS challenging termination);
Eastlund Decl., Ex. H (August 1, 2017 Letter to HHS challenging termination); Miller
Decl., Ex. L (July 31, 2017 Letters to HHS challenging termination).

[29] Letter from Patty Murray et al., U.S. Senators, to Thomas E. Price, Sec'y of HHS (July
21, 2017), (Harker Decl., Ex. O).

[30] *See e.g.*, Ed. Kilgore, *House GOP Could Derail Spending Bill With Bid to Defund
Planned Parenthood*, NY Mag., Mar. 7, 2018, *at*
http://nymag.com/daily/intelligencer/2018/03/planned-parenthood-defunding-bid-
could-derail-spending-bill.html (describing legislative battle over continued TPP
funding and plans to end the program); Jennifer Haberkorn & Sarah Ferris, *Planned
Parenthood Defunding Threatens Government Spending Package*, Politico, Mar. 7,
2018, *at* https://www.politico.com/story/2018/03/07/planned-parenthood-defunding-
government-spending-package-392513 (same).

1    Moreover, the Ninth Circuit has long recognized that, "[u]sually, delay is but a

2    single factor to consider in evaluating irreparable injury; courts are 'loath to withhold

3    relief solely on that ground.'" *Arc of Cal.*, 757 F.3d at 990 (citing *Lydo Enters., Inc. v.*

4    *City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).[31] Here, Defendants do not—

5    and cannot—dispute that Plaintiffs and the communities that they serve continue to

6    suffer harm as a result of HHS's actions, and that they will suffer worse injury still

7    once the current funding expires on July 1.

8    Ignoring this severe harm to Plaintiffs and the communities that they serve,

9    Defendants claim that injunctive relief would cause HHS to suffer administrative

10    hardship because it "will, in effect, be administering two versions of the TPP

11    Program." Opp. at 25. However, this is belied by the fact that HHS knew from the

12    outset that the validity of the terminations were in dispute, and that HHS chose to

13    ignore that dispute. Any administrative burden that HHS now faces due to its prior

14    decisions to violate its own regulations are properly attributed to HHS itself, not

15    Plaintiffs.

16    Defendants likewise fail to identify a viable public interest that could tip the

17    scales in their favor. Defendants' attempt to rely on the public's interest in competing

18    for federal funds fails, as it was HHS's decision to solicit and approve Plaintiffs' five-

19    year project periods in the first place. The benefits of open competition for

20    participation in federal programs, however desirable, cannot outweigh HHS's

21    obligation to comply with its own regulations when administering those federal

22    programs. For these reasons, and because Defendants do not otherwise dispute

23    Plaintiffs' claims of injury or identified public interests, the balance of equities and

24    public interest clearly favor Plaintiffs.

25    [31] The cases on which Defendants rely confirm that delay is not a dispositive factor in
determining whether preliminary relief is appropriate. *See Miller ex rel N.L.R.B. v. Cal.*

26    *Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) ("[D]elay by itself is not a
determinative factor in whether the grant of interim relief is just and proper." (citation

27    omitted)); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1376–77

28    (identifying three independent bases for denying injunction).

## II.    DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT SHOULD BE DENIED

Because Defendants made their motion to dismiss at the outset of this case, prior to any discovery, to survive such a motion, Plaintiffs' complaint need only include a short and plain statement of the claim showing that the pleader is entitled to relief.  *Lee v. City of Los Angeles*, 250 F.3d 668, 679  (9th Cir. 2001); *see* Fed. R. Civ. P. 12(b)(6); Fed. R. Civ. P. 8(a)(2).  The complaint must contain sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  At this early stage, all material allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiffs.  *Lee*, 250 F.3d at 679; *see also* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202 (3d ed.).

Defendants have also moved, in the alternative, for summary judgment.  Such a motion is inappropriate.  This case has not yet reached the summary judgment stage, and Plaintiffs have not yet engaged in discovery.  Summary judgment is appropriate if there are no genuine issues of material fact such that the moving parties are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Inferences must also be drawn in the light most favorable to the nonmoving party."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

### A.    Plaintiffs Have Plausibly Alleged Claims for Violations of the APA and the Due Process Clause Claims For Relief (Counts I, II, and IV)

As discussed in Section I, Plaintiffs have demonstrated that they are likely to succeed on their claims under the APA and the Due Process Clause.  Because the plausibility standard under Rule 8 is considerably less than that for demonstrating likelihood of success on the merits, *see, e.g.*, *Iqbal*, 556 U.S. at 678, Plaintiffs have necessarily pleaded viable claims for Counts I, II, and IV, and Plaintiffs incorporate those arguments in Section I here by reference.

**B.    Plaintiffs Have Plausibly Alleged a Violation of the Establishment Clause (Count III)**

**1.    Plaintiffs Have Article III Standing**

Defendants' argument that Plaintiffs lack standing to bring their Establishment Clause claims is meritless.  To establish Article III standing, a plaintiff must establish that it has suffered or will imminently suffer (1) an injury in fact, (2) fairly traceable to the actions of the defendant, (3) likely to be redressed by a favorable ruling.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Plaintiffs have plausibly alleged that HHS's decision to terminate the TPP program will cause them irreparable harm by causing the imminent loss of funds for programs that Plaintiffs currently carry out.  Defendants concede that HHS has chosen "not [to] make continuation awards to current grantees," Opp. at 28, and that Plaintiffs have an Establishment Clause claim "based solely on HHS's actual decision not to continue awarding them funds," Opp. at 29.  Plaintiffs have plausibly alleged that the decision was motived by the predominant purpose of advancing religion, in violation of the Establishment Clause.  *See, e.g., McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (purpose to advance religion violates Establishment Clause).  Remedying that Establishment Clause violation would likely remedy Plaintiffs' harms.  Plaintiffs therefore have standing to pursue their Establishment Clause claims, just as they have standing to pursue their other claims.

**2.    Plaintiffs Have Plausibly Alleged An Establishment Clause Violation**

Defendants concede that the appropriate test for a violation of the Establishment Clause is the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  Opp. at 28.  Under *Lemon*, governmental action (1) must have a secular purpose, (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) the action must not result in "excessive government entanglement with religion."  *Id.*  "State action violates the Establishment Clause if it fails to satisfy any of these prongs."  *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).  The Supreme Court has clarified that *Lemon* focuses on whether either the purpose or

the effect of the challenged governmental action results in the endorsement of religion. *Id.* at 585 ("The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion.").

As Defendants also concede, Opp. at 30, to determine purpose, one looks through the eyes of a reasonable, objective observer of the challenged action. *McCreary*, 545 U.S. at 863. "[A]n understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *Id.* at 862. "The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act." *Id.* "Reasonable observers have reasonable memories, and [the Supreme Court's] precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'" *McCreary*, 545 U.S. at 866.

Plaintiffs have plausibly alleged that HHS's decision to withdraw TPP funds was motivated by a predominantly religious purpose. Plaintiffs' complaint documents the many reasons why an objective observer would reasonably conclude that Valerie Huber, the official who decided to withdraw evidence-based TPP Program funding, acted with a predominantly religious purpose, including that the programs she administered as abstinence coordinator in Ohio contained explicitly religious teachings. Compl. ¶¶ 69-75. A voluminous public record also supports the reasonable inference that HHS's decision to end the evidence-based TPP Program was driven by a predominantly religious purpose. For example, a profile of Ms. Huber published in 2006 states that she became involved in the abstinence-only sex-education movement because "God placed a passion in Valerie's heart to provide parents and teachers with materials and skills to communicate the message of abstinence to youth."[32] Similarly, on January 22, 2018, Politico published an article

---

[32] *State of Ohio Hires Grace Brethren Abstinence Coordinator*, CE News, Jan. 17, 2006, http://web.archive.org/web/20060117174631/http://cenational.org/Publications/publicationsArticle.asp?IDNum=63.

describing the rise of Valerie Huber and other "religious activists" inside HHS, stating that "[c]ritics fret some agency leaders are blurring the lines between church and state."[33]

The inference of improper purpose is further bolstered by the procedural irregularities and inconsistent and implausible explanations at the heart of this case. "Departures from the normal procedural sequence" are themselves "evidence that improper purposes are playing a role." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Pretextual justifications for a challenged action can also give rise to an inference of illicit motive. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). HHS has given shifting and implausible explanations for prematurely terminating the five-year, evidence-based TPP Program, a program that by every measure was wildly successful. If HHS had a plausible and permissible reason for its actions, HHS would have come forward with it already.

Defendants state that "[t]o violate the Establishment Clause under the first prong of *Lemon*, sectarian religious aims must be apparent on the face of the policy." Opp. at 32. Not so. The Supreme Court's precedents instruct that it is the "context in which [the] policy arose," *McCreary*, 545 U.S. at 866, that determines whether the government has acted with a predominantly religious purpose. In *Wallace v. Jaffree* an Alabama law authorized teachers to set aside one minute at the start of each day for a moment for "meditation" or "voluntary prayer." 472 U.S. 38, 40 (1985). As Justice O'Connor noted in her concurrence in *Wallace*, "a moment of silence is not inherently religious," *id.* at 72 (O'Connor, J., concurring), and "[b]y mandating a moment of silence, a State does not necessarily endorse any activity that might occur during the period," *id.* at 73. Nonetheless, on review of the legislative record "candor require[d]" Justice O'Connor, like the Court, "to admit that this Alabama statute was intended to convey a message of state encouragement and endorsement of religion" and therefore

---

[33] Dan Diamond, *The religious activists on the rise inside Trump's health department*, Politico, Jan. 22, 2018, https://www.politico.com/story/2018/01/22/trump-religious-activists-hhs-351735.

1    violated the Establishment Clause.  *Id.* at 78.  Justice Powell agreed.  *Id.* at 62 & n.2

2    (Powell, J., concurring).  Similarly, in *Church of the Lukumi Babalu Aye, Inc. v. City*

3    *of Hialeah* the statute at issue violated the Free Exercise Clause even though on its

4    face it did not single out any religion for disfavored treatment.  *See* 508 U.S. 520, 534

5    (1993).  As the Court there wrote: "Facial neutrality is not determinative. The Free

6    Exercise Clause, *like the Establishment Clause*, extends beyond facial

7    discrimination." *Id.* (emphasis added).[34]

8        Defendants contend that *Bowen v. Kendrick*, 487 U.S. 589 (1988), a case in

9    which a different policy promulgated at a different time under different circumstances

10    survived a facial Establishment Clause challenge, means that HHS's decision to

11    withdraw TPP Program funds is immune to challenge under the Establishment

12    Clause.  *Bowen* could not be more irrelevant to this case.  In *Bowen*, the Supreme

13    Court held that "[t]here simply is no evidence that Congress' 'actual purpose' in

14    passing the [challenged law] was one of 'endorsing religion.'" *Id.* at 604.  The same

15    cannot be said here.

16        Moreover, *Bowen* was decided at summary judgment after discovery.  *Id.* at

17    597-98.  Plaintiffs in this case—just like the plaintiffs in *Bowen*—are entitled to

18    discovery into the motivations of the relevant officials.  *See* Decl. of Andrew Tutt.

19        As *Bowen* itself held, the question whether withdrawing TPP Program funds

20    would violate the "purpose," "effect," or "entanglement" prongs of *Lemon* is a factual

21    issue that can only be resolved after there has been an opportunity for discovery

22    regarding the purpose and effects of the government's actions.  *See id.* at 620-22.

23

24    _____

[34] *Stone v. Graham* most starkly illustrates the point.  There, the Kentucky legislature

25    sought to insulate the posting of the Ten Commandments in public school classrooms
     from Establishment Clause attack by requiring that they be posted with a disclaimer

26    attesting that they were being displayed to illustrate their important role in the
     development of the "fundamental legal code of Western Civilization and the

27    Common Law of the United States." *Stone v. Graham*, 449 U.S. 39, 41 (1980).  The
     Supreme Court nonetheless held that the posting requirement was "plainly religious."

28    *Id.* at 41-42.

Thus, Plaintiffs are, at minimum, entitled to proceed to discovery on the question of whether HHS has violated the Establishment Clause.[35] In Establishment Clause cases, plaintiffs have routinely deposed public officials in order to determine whether the relevant government official or government body acted with a predominantly religious purpose. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 799 n.8 (1983) (citing trial testimony of State legislator); *accord Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1829 (2014) (Alito, J., concurring) (citing the trial testimony of Town of Greece officials); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("The court may require the administrative officials who participated in the decision to give testimony explaining their action.").

Indeed, here, the limited discovery available through the FOIA suggests that discovery may very well provide irrefutable evidence that Defendants violated the Establishment Clause in their decision to terminate the evidence-based TPP Program. *See* Link Decl., Exs. N & O (showing Ms. Huber's commitment to a call with "pro-life Christian" organization Obria in response to Obria's request for TPP grant funding; documenting Ms. Huber's frequent meetings with Shannon Royce during the period in which TPP Program decisions were made).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be granted and Defendants' motion to dismiss, or in the alternative for summary judgment, should be denied.

---

[35] The government argues, as a reason to dismiss Plaintiffs' complaint, that "Plaintiffs do not allege that Ms. Huber shares the religious views expressed in the 2005 curricula discussed in the complaint, or that she or anyone else now at HHS has an interest in funding similar curricula through the TPP Program." Opp. at 32. It is hardly fair for the Government to seek to dismiss Plaintiffs' complaint on the grounds that Plaintiffs have not pleaded facts that they do not know. Plaintiffs' inability to allege such facts because they lack knowledge of those facts is precisely why Plaintiffs need access to discovery in this case.

1

DATED: April 6, 2018                    Respectfully submitted,

2

3                                       By:   /s/ Rick Eichstaedt_____

4                                       RICK EICHSTAEDT (WSB # 36487)
                                        CENTER FOR JUSTICE
5                                       35 West Main Ave, Suite 300
                                        Spokane, WA 99201
6                                       Telephone: (509) 835-5211
                                        ricke@cforjustice.org
7

8                                       DREW A. HARKER (*pro hac vice*)
                                        ALLYSON HIMELFARB (*pro hac vice*)
9                                       NATHANIEL CASTELLANO (*pro hac vice*)
                                        ALICE C.C. HULING (*pro hac vice*)
10                                      ANDREW TUTT (*pro hac vice*)
                                        ARNOLD & PORTER KAYE SCHOLER LLP
11                                      601 Massachusetts Avenue, NW
12                                      Washington, DC 20001
                                        Telephone: 202.942.5000
13                                      Facsimile: 202.942.5999
14                                      Drew.Harker@arnoldporter.com
                                        Allyson.Himelfarb@arnoldporter.com
15                                      Nathaniel.Castellano@arnoldporter.com
16                                      Alice.Huling@arnoldporter.com
                                        Andrew.Tutt@arnoldporter.com
17

18                                      CARRIE Y. FLAXMAN (*pro hac vice*)
                                        RICHARD MUNIZ (*pro hac vice*)
19                                      PLANNED PARENTHOOD FEDERATION
                                        OF AMERICA
20                                      1110 Vermont Ave, NW, Suite 300
21                                      Washington, DC 20005
                                        Telephone: 202.973.4800
22                                      Facsimile: 202.296.3480
23                                      Carrie.Flaxman@ppfa.org
                                        Richard.Muniz@ppfa.org
24

25                                      Attorneys for Plaintiffs

26

27

28

---

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR MOTION FOR SUMMARY JUDGMENT; NO. 2:18-cv-00055-TOR

1

2

### CERTIFICATE OF SERVICE

3       I, Rick Eichstaedt, hereby certify that on April 6, 2018, I electronically filed

4   the foregoing with the Clerk of the Court using the CM/ECF system which will send

5

6   notification of such filing to the following:

7       Michael J. Gerardi
        Trial Attorney
8       United States Department of Justice
        Civil Division, Federal Programs Branch
9       20 Massachusetts Ave. NW, Room 7223
        Washington, D.C. 20530
10      Tel: (202)616-0680
        Fax: (202) 616-8460
11      E-mail: Michael.j.gerardi@usdoj.gov

12

13

14

15
                                        By:___/s/ Rick Eichstaedt_____
16
                                        RICK EICHSTAEDT (WSB # 36487)
17                                      CENTER FOR JUSTICE
                                        35 West Main Ave, Suite 300
18                                      Spokane, WA 99201
                                        Telephone: (509) 835-5211
19                                      ricke@cforjustice.org

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR MOTION FOR
SUMMARY JUDGMENT; NO. 2:18-cv-00055-TOR