CHAD A. READLER
Acting Assistant Attorney General
JOSEPH H. HARRINGTON
United States Attorney
JOEL McELVAIN
Assistant Branch Director
MICHAEL J. GERARDI
Trial Attorney
U.S. Department of Justice, Civil Division
20 Massachusetts Ave. NW
Washington, DC 20530
Telephone:  (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
## SPOKANE DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER WASHINGTON AND NORTH IDAHO; PLANNED PARENTHOOD OF THE GREAT NORTHWEST, AND THE HAWAIIAN ISLANDS; AND PLANNED PARENTHOOD OF THE HEARTLAND,<br><br>      Plaintiffs,<br><br>    vs.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES AND ALEX MICHAEL AZAR II in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>      Defendants. | Case No.: 2:18-cv-00055-TOR<br><br>REPLY BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT<br><br>04/24/2017<br>WITH ORAL ARGUMENT:<br>9:30 A.M., COURTROOM #2 |

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION

# <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION ..................................................................................1

I.   The ADA and Due Process Claims Must Be Dismissed ......................3

  A.   The ADA and *Leiter* Preclude Agreements
       Purporting to Obligate The Government For More
       Than One Fiscal Year ................................................................3

  B.   Defendants Did Not Violate the APA or the Due Process
       Clause Because No Grant Award Was "Terminated" ...............7

  C.   Because No Grant Was "Terminated," Plaintiffs' APA
       and Due Process Claims Fail ...................................................14

II.  The Establishment Clause Claim Must Be Dismissed......................16

  A.   Any Standing For Plaintiffs' Claim Only Relates To
       Defendants' Decision to Recompete TPP Program Funds.......16

  B.   Plaintiffs Do Not Plausibly Allege That Defendants'
       Actions Were Motivated By Religious Purpose ......................16

CONCLUSION ....................................................................................20

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Alan Guttmacher Inst. v. McPherson*,
   597 F. Supp. 1530 (S.D.N.Y. 1984) *aff'd*, 805 F.2d 1088 (2nd Cir. 1986) ..........15

*Bd. Of Educ. of Westside Cmty. Sch. v. Mergens*,
   496 U.S. 226 (1990) ...............................................................................17

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................20

*Bowen v. Kendrick*,
   487 U.S. 589 (1988) ...............................................................................18

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1985) .................................................................................3

*Chisom v. Roemer*,
   501 U.S. 380 (1991) ...............................................................................13

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ...............................................................................19

*Citizens Health Corp. v. Sebelius*,
   725 F.3d 687 (7th Cir. 2013)....................................................................15

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1990)..................................................................17

*Hymas v. United States*,
   810 F.3d 1312 (Fed. Cir. 2016)................................................................14

*In re Nw. Rural Opportunities, Inc.*,
   DAB 324 (1982), 1982 WL 189564 (June 30, 1982) ...........................13

*Leiter v. United States*,
   271 U.S. 204 (1926) .................................................................................5

*McCreary Cty. v. ACLU of Ky.*,
    545 U.S. 844 (2005) .................................................................................17

*McDaniel v. Paty*,
    435 U.S. 618 (1978) .................................................................................17

*McDonnell Douglas Corp. v. United States*,
    182 F.3d 1319 (Fed. Cir. 1999) ...............................................................15

*Md. Dep't of Human Res. v. HHS*,
    854 F.2d 40 (4th Cir. 1988) .......................................................................5

*Mil-Ka-Ko Research & Dev. Corp. v. Office Of Econ. Opportunity*,
    352 F. Supp. 169, 173 (D.D.C. 1972),
    *aff'd*, 497 F.2d 684 (D.C. Cir. 1974) .............................................. 12, 15

*Missouri Health & Med. Org., Inc. v. United States*,
    641 F.2d 870 (Ct. Cl. 1981) .....................................................................12

*Nat'l Consumer Info. Ctr. v. Gallegos*,
    549 F.2d 822 (D.C. Cir. 1977) .................................................................12

*Nevada v. Dep't of Energy*,
    400 F.3d 9 (D.C. Cir. 2005) .......................................................................5

*Nikolao v. Lyon*,
    875 F.3d 310 (6th Cir. 2017) ...................................................................20

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ...................................................................................4

*S. Mut. Help Ass'n v. Califano*,
    574 F.2d 518 (D.C. Cir. 1977) ...................................................... 8, 11, 12

*E. Band of Cherokee Indians v. United States*,
    16 Cl. Ct. 75, 78-79 (1988) ........................................................................5

*Schlesinger v. United States*,
    390 F.2d 702 (Ct. Cl. 1968) .....................................................................14

*Serpentfoot v. Rome City Comm'n*,
  426 F. App'x 884 (11th Cir. 2011)........................................................20

*Stone v. Graham*,
  449 U.S. 39 (1980) .............................................................................18

*United Auto., Aerospace & Agric. Implement Workers v. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) .............................................................5

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) .............................................................................19

*Whitman v. Am. Trucking Ass'n*,
  531 U.S. 457 (2001) ...........................................................................9

**STATUTES**

5 U.S.C. § 701(a)(2).......................................................................... 2, 14

31 U.S.C. § 1112(c) ..............................................................................4

31 U.S.C. § 1341(a)(1)(A) .....................................................................4

The Congressional Budget and Impoundment Control Act of 1974,
  Pub. L. No. 93–344, § 801(a), 88 Stat. 297, 327 (1974) .........................4

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

42 C.F.R. § 50.404(a)(1) ............................................................ 13, 13-14

45 C.F.R. pt. 16, App'x A ....................................................................13

45 C.F.R. § 16.3(i) (1976)....................................................................12

45 C.F.R. § 74.210 (1976) ...................................................................11

45 C.F.R. § 75.2 ........................................................................... 11, 13

45 C.F.R. § 75.218 ..............................................................................17

45 C.F.R. § 75.309(a)............................................................................8

45 C.F.R. § 75.372(a) ................................................................4

45 C.F.R. § 75.372-73 ..............................................................8

45 C.F.R. § 75.374(b)(1) .........................................................13

HHS, Uniform Administrative Requirements for Awards and Subawards
   to Institutions of Higher Education, Hospitals, Other Non-Profit
   Organizations, and Commercial Organizations; and Certain Grants
   and Agreements with States, Local Governments, and Indian Tribal
   Governments, 59 Fed. Reg. 43,754-01 (Aug. 25, 1994) .......................................13

Executive Office of the President, Federal Awarding Agency Regulatory
   Implementation of OMB's Uniform Administrative Requirements,
   Cost Principles, and Audit Requirements for Federal Awards,
   79 Fed. Reg. 75,871 (Dec. 19, 2014) ...................................................13

**OTHER AUTHORITIES**

*Comptroller General Warren To The Postmaster General*,
   28 Comp. Gen. 553, April 1, 1949 ...................................................5

*To the Secretary of the Interior*,
   39 Comp. Gen. 340, B-140850, Oct. 29, 1959 .........................................6

Gov't Accounting Office, Principles of Federal Appropriations Law, 3rd ed.,
   GAO-06-382SP ["*GAO Red Book*"] (3rd ed. 2015),
   https://www.gao.gov/assets/210/202819.pdf ................................................ *passim*

OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10,
   2012), https://www.hhs.gov/ash/oah/ sites/default/files/oah-grantee-guidance-
   requesting-carryover-funds-2012.pdf (last visited Apr. 13, 2018) .......................8

"Reproductive Health," Religious Coalition for Reproductive Choice,
   http://rcrc.org/reproductive-health/ (last visited Apr. 12, 2018) ...........................18

**INTRODUCTION**[1]

Plaintiffs argue that their original grant award obligates the Department of Health and Human Services ("HHS") to continue their funding for two additional years unless Congress withdraws support for the program or the Plaintiffs take actions justifying grant "termination." That argument contradicts the explicit terms they accepted in their awards. Those terms specify HHS can reconsider the program's interests and compete future years of funds to the public (and to Plaintiffs). But Plaintiffs ask the Court both to deny the public the opportunity to compete for funds, and to prohibit the Executive Branch from pursuing its views as to the program interests that are authorized by statute. Under Plaintiffs' theory, one administration would have the unfettered power to enter into long-term obligations with grantees whose projects are amenable to its policy preferences, unless Congress defunds those projects entirely. A subsequent administration would be blocked from reconsidering these programs, or from carrying out its delegated policymaking authority under an annual appropriation, unless it could show that the grantees are violating the terms of their grants. For instance, under Plaintiffs' theory, after Plaintiffs get funding through FY 2019, Defendants could compete and obligate TPP Program funds from FY 2020 through FY 2025,[2] precluding the next administration from imposing its policy preferences on the TPP

_____

[1] This motion replies to Plaintiffs' arguments opposing Defendants' motion to dismiss or for summary judgment, including arguments Plaintiffs "incorporate[d] … by reference" from other sections of their brief. Pls.' Resp. Br. 24, ECF No. 29. Defendants' brief is accordingly "limited to issues raised in their motions to dismiss and for summary judgment." Mot. for Leave to File Overlength Br. 3, ECF No. 23. Defendants rely on their opening brief with respect to any remaining issues, such as the preliminary injunction factors.

[2] The Grants Policy Statement ("GPS") notes that "project periods" "generally will be no longer than 5 years[,]" but there is no statutory or regulatory limit on the length of a "project period." Gerardi Decl., Ex. B, at I-34.

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 1

Program.

Plaintiffs' view also contradicts appropriations law. Congress passed the Anti-Deficiency Act to prohibit executive agencies from obligating funds before an appropriation is made, unless Congress states otherwise. Plaintiffs' theory of their grants violates this statute because it would guarantee five years of funding, absent termination for cause or a lapse in appropriations, without giving the government the option to renew (or recompete) under authority of a new appropriation. Consistent with HHS's regulations and the terms of Plaintiffs' grants, HHS has long maintained that it has no obligation to provide continuation funding and that decisions not to extend continuation funding are not "terminations." With no statute or case law on point to support their creative theory, Plaintiffs rely heavily on a single cross-reference in HHS's regulations and a forty-year-old case from the D.C. Circuit that did not address entitlement to future years funding, did not examine the regulatory language at issue here, and that was repudiated by HHS's predecessor shortly thereafter. But Defendants have not violated any statute or regulation by declining to issue continuing support and Plaintiffs have no vested interest in continuing funding. Their APA claims are subject to dismissal under 5 U.S.C. § 701(a)(2) and their due process claim fails for lack of a cognizable substantive right.

Plaintiffs also offer little support for their Establishment Clause claim. They misunderstand *Lemon*'s purpose test and then argue that the alleged personal religious convictions of one HHS officer, along with actions she took in a different role over a decade ago, should open the door to invasive discovery even though no objective evidence of a sectarian purpose behind the choice to recompete the TPP Program has been pled. More is needed to state a plausible claim than the fact that Defendants made what is on its face a pure policy decision authorized by statute. The Establishment Clause claim should be dismissed.

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 2

1    For these reasons, the Court should grant Defendants' cross-motion and

2  dismiss this case with prejudice.

3  **I.    The ADA and Due Process Claims Must Be Dismissed**

4    Plaintiffs' theory would have troubling consequences for the authority and

5  political accountability of the Executive in situations that go well beyond the

6  present dispute.  When Congress "delegate[s] policymaking responsibilities" to an

7  agency, as it did with the TPP Program, it is understood that "the *incumbent*

8  administration's views of wise policy" will govern its decisions.  *Chevron U.S.A.,*

9  *Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 865 (1985) (emphasis added).

10 Because the President is "accountable to the people," agencies operating under him

11 are entitled to "resolv[e] the competing interests which Congress … intentionally

12 left to be resolved by the agency charged with the administration of the statute in

13 light of everyday realities."  *Id.* at 865-66.  But Plaintiffs' position requires

14 incumbent administrators to administer the TPP Program according to the priorities

15 of the *previous* administration, based on an agreement to issue non-competing

16 awards for multiple years that Congress never approved.  Plaintiffs express

17 concern that political appointees with different policy views from the Plaintiffs

18 were involved in the decision to recompete the TPP Program.  Pls.' Resp. Br. 3-4,

19 ECF No. 29.  But the ability of politically accountable administrators to exercise

20 discretion when Congress delegates authority is a feature of administrative law, not

21 a flaw.  Accordingly, their APA and due process claims must be rejected.

22     **A. The ADA and *Leiter* Preclude Agreements Purporting to Obligate**

23          **The Government For More Than One Fiscal Year**

24     Plaintiffs assert that the ADA is "irrelevant" to this case, claiming that "there

25 are no … improper contracts at issue here."  Pls.' Resp Br. 18.  That is because, in

26 Plaintiffs' view, "an agency may enter into multi-year agreements where, at the

27 time of the award, the United States incurs no financial obligation beyond current

28 appropriation."  *Id.*  But the essence of Plaintiffs' argument is at odds with the

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 3

1    plain meaning of the ADA.  Plaintiffs' theory requires a finding that when

2    Defendants initially awarded the TPP Program grants, they incurred a legal *duty* to

3    renew Plaintiffs' funding for four more years without competing the funds, subject

4    only to appropriations and the "termination" provisions of 45 C.F.R. § 75.372(a).

5    Plaintiffs' case relies on that duty. Yet, in opposing the government's ADA

6    argument, Plaintiffs claim there is no financial obligation beyond current

7    appropriations here.  Plaintiffs cannot have it both ways.  If, in July 2017, the

8    government had incurred no obligation to fund Plaintiffs' programs, the

9    government was entitled to announce it would not issue continuation awards, and

10   is entitled to compete those funds now.  But if the government's announcement

11   violated a promise to give those future funds to Plaintiffs, the promise was void *ab*

12   *initio* as incurring financial obligations beyond a lawful appropriation.

13       The ADA prohibits financial "obligations" beyond a lawful appropriation,

14   which includes grants.  31 U.S.C. § 1341(a)(1)(A) ("[a]n officer or employee of the

15   United States Government ... may not ... make or authorize an expenditure or

16   obligation exceeding an amount available in an appropriation or fund for the

17   expenditure or obligation."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S.

18   414, 430 (1990) ("It is a federal crime, punishable by fine and imprisonment, for

19   any Government officer or employee to knowingly spend money in excess of that

20   appropriated by Congress."); Gov't Accounting Office, Principles of Federal

21   Appropriations Law,[3] 3rd ed., vol. 2, ch. 10, at 10-43, GAO-06-382SP [hereinafter

22

23   _____

24       [3] The Congressional Budget and Impoundment Control Act of 1974, Pub. L.

25   No. 93–344, § 801(a), 88 Stat. 297, 327 (1974), gives the Government
     Accountability Office ("GAO") specific oversight duties on budgetary matters. *See*

26   *generally* 31 U.S.C. § 1112(c).  GAO publishes the *GAO Red Book* to advise the

27   public of its views on appropriations law. "Although GAO decisions are not
     binding, [courts] 'give special weight to [GAO's] opinions' due to its 'accumulated

28   experience and expertise in the field of government appropriations.'" *Nevada v.*

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 4

"*GAO Red Book*"] (3rd ed. 2015), https://www.gao.gov/assets/210/202819.pdf
("Of course, grant obligations and expenditures are subject to the [ADA]."); *cf. E. Band of Cherokee Indians v. United States*, 16 Cl. Ct. 75, 78-79 (1988) (Anti-Deficiency Act prohibited Interior Department from reallocating funds to satisfy Indian entitlement program); *Md. Dep't of Human Res. v. HHS*, 854 F.2d 40, 42 (4th Cir. 1988) ("The Secretary of HHS, while under a statutory duty to schedule the transfer of grant money , is also obliged to comply with the applicable provisions of the Antideficiency Act, 31 U.S.C. § 1512(a)."). Thus, if the grants at issue here actually had the five-year obligation Plaintiffs' contend, the grants would be void under the ADA. Such an agreement would be analogous to "contract[s] covering the needs or requirements of more than one fiscal year." *GAO Red Book*, 3rd ed., vol. 2, ch. 6, at 6-51.

*Leiter v. United States*, 271 U.S. 204 (1926), is controlling here. Congress has not exempted the TPP Program from the ADA, or otherwise permitted HHS to make multi-year obligations while implementing the program. A right to terminate a grant based on the grantee's failure to comply with the terms and conditions of the grant is not sufficient under *Leiter* because it does not require the government to "affirmatively continue" the agreement. *Leiter*, 271 U.S. at 207; *see also GAO Red Book*, vol. 2, ch. 6, at 6-54 ("The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations."); *Comptroller General Warren To The Postmaster General*, 28 Comp. Gen. 553, April 1, 1949 (concluding thirty-day notice and one-day "for-cause" termination provisions did not cure an ADA violation). And *Leiter* specifically rejected the idea that conditioning future funding on appropriations was sufficient to avoid the ADA. *Leiter*, 271 U.S. 204, 206-07; *see also GAO Red* Book,

_____

*Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting *United Auto., Aerospace & Agric. Implement Workers v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)).

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 5

1  vol. 2, ch. 6, at 6-55.  HHS has not yet taken an "affirmative action" under the

2  authority of the FY 2018 appropriation necessary to require payment by the

3  government; instead, it will obligate the funds after a new competition.

4      The authority Plaintiffs cite for their alternate theory as to how the ADA

5  works are easily distinguishable.  First, Plaintiffs reference a section of the *GAO*

6  *Red Book* that addresses "contracts with no financial obligations."  *GAO Red Book*,

7  vol. 1, ch. 5, at 5-43.  The example the *GAO Red Book* gives of such a contract is

8  three-year agreement "for an agency with a requirement for a scheduled item to

9  order it from the contractor if the contractor has offered the lowest price," with no

10  minimum purchase requirement and the "free[dom] to procure the item from [a

11  lower-cost] source without violating the contract."  *Id.*  Such contracts place no

12  restrictions on the government's future conduct and create *no* financial obligation.

13  Plaintiffs, by contrast, insist that the grants actually do financially commit the

14  government to spending in future years, absent conditions outside the

15  government's control.

16      Second, Plaintiffs cite a Comptroller General decision in which the Interior

17  Department was permitted to make a contract contingent on appropriations.  *To the*

18  *Secretary of the Interior*, 39 Comp. Gen. 340, B-140850, Oct. 29, 1959.  But in

19  that unusual case, Congress passed a statute that conditioned the release of funding

20  on the Secretary of the Interior submitting the principal construction contract to

21  Congress "for a period of 45 calendar days prior to its execution" in order for

22  Congress to consider the agreement.  *Id.*  Because the statute "entail[ed] the

23  soliciting of bids and awarding of a proposed contract to be conditioned upon the

24  approval or disapproval" of Congress "and also contingent upon the future

25  authorization by the Congress of sufficient funds with which to make payment

26  under the terms of the contract[,]" the making of a contract contingent on the

27  condition of a *specific* appropriation for that agreement was acceptable.  *Id.*  No

28  similar statutory authority exists here.

The arrangement Plaintiffs believe they have is closely analogous to "a contract covering the needs or requirements of more than one fiscal year." *GAO Red Book*, vol. II, ch. 6, at 6-51 through 6-59. Plaintiffs point to no source of law that would exempt this arrangement from the ADA's strictures. The Court should, therefore, reject Plaintiffs' misconception of their grant instruments and instead interpret them only in terms of what HHS had lawful authority to commit to under appropriations law. That authority did not and could not vest Plaintiffs with a vested right to five years of funding.

### B. Defendants Did Not Violate the APA or the Due Process Clause Because No Grant Award Was "Terminated"

Absent a right to more than one year of funding, Plaintiffs' claimed "termination" theory fails. "Termination" refers to the withholding of grant funding before "the planned end of period of performance." 45 C.F.R. § 75.2. A "period of performance" is "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." *Id.* The only "time" period in these grant documents consistent with these definitions is the "budget period." Work is "authorized under the Federal award" on a "budget period" basis, and the "time during which the non-Federal entity may incur new obligations to carry out" that "work" is that same one-year "budget period." *Id.* (defining "federal award," as relevant here, as "the instrument setting forth the terms and conditions" of the grant, such as the "cooperative agreement"). Future "budget periods" within a "project period" are not "authorized under the federal award" Plaintiffs receive annually, and will not be so authorized until an appropriation is in place and HHS obligates those funds through a new Notice of Award ("NoA") entered under the authority of that appropriation. Thus, "[f]unds available to pay allowable costs during the period of performance include both Federal funds awarded and carryover balances" expressly approved by the agency

from previous budget periods.[4]  45 C.F.R. § 75.309(a).  Here, Defendants did not end Plaintiffs' funding in the middle of a "budget period," so no "termination" has occurred that would trigger the requirements of 45 C.F.R. § 75.372-73.

Plaintiffs' only response on the regulatory text is to point to the cross-reference in 45 C.F.R. § 75.2 between the terms "project period" and "period of performance," but this correspondence is only for the "definitions for terms used in this part."  Had HHS wanted to rely on the term "project period" *as used in the grant instruments*, it could have done so (as it has done in the past). *See, e.g.*, *S. Mut. Help Ass'n v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977) (discussing former HEW grant regulations that differently defined "termination" as "the termination of the grantee's authority to charge allowable costs to a grant prior to the grant expiration date *in the grant award document*." (emphasis added)). Plaintiffs' argument, if accepted, would mean that a grantee could "incur new obligations to carry out the work authorized under the federal award" for the entire

------

[4] Although permission to carryover unobligated balances from one "budget period" to another can be granted by HHS, this is a narrow exception.  Carryover is only permitted when it is expressly approved by a grants management officer, after receipt of a timely request by the grantee.  Grants Policy Statement, Gerardi Decl., Ex. B, at II-56, II-57.  A grantee that spends carryover funds without permission can be sanctioned by HHS.  *Id.* at II-56.  "Carryover of funds from one year to multiple years beyond the immediate budget period is not allowable."  OAH Grantee Guidance, OAH 2012-12: Requesting Carryover Funds (Dec. 10, 2012), at 2, https://www.hhs.gov/ash/oah/ sites/default/files/oah-grantee-guidance-requesting-carryover-funds-2012.pdf (last visited Apr. 13, 2018).  Rather, when a carryover request is approved, the carryover is integrated into the "notice of award," either by "revis[ing] the NoA authorizing the grantee to spend the unobligated funds for additional approved purposes as requested" or "us[ing] the balance to reduce or offset funding for a future budget period."  *Id.*; *see also* Notice of Award, Grubb Decl., Ex. D, at 1, remarks (noting offset to federal award for "unobligated balance from prior budget periods").  Carryover funds are closely tied to the "federal award" for the current "budget period" and support the position that the "period of performance" is the "budget period."

1   five-year "project period" even though work is "authorized under the federal

2   award" only for a one-year "budget period." 45 C.F.R. § 75.2. This simply makes

3   no sense. Finally, Plaintiffs' reading of "termination" would result in automatic

4   renewal of the grant for the duration of the "project period" absent defunding by

5   Congress. Such an arrangement is indistinguishable from the multi-year lease the

6   Supreme Court voided in *Leiter* and similar multi-year commitments prohibited by

7   the ADA. Plaintiffs' effort to discover five years of guaranteed funding in a cross-

8   reference is tantamount to finding an "elephant[] in a mousehole" and must be

9   rejected. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

10      Plaintiffs also rely upon excerpts from HHS websites and the Funding

11  Opportunity Announcements ("FOAs") to support their view of the grant terms,

12  but their reliance is misplaced. *See* Pls.' Resp. Br. 7-8. None of these statements

13  guarantee five-year funding absent termination under the regulations or a lapse in

14  appropriations. For instance, the FOAs and materials available on HHS's website

15  note that funding is only provided on a "budget period" basis, even though grants

16  are "programmatically approved" for a longer period. Moreover, even if these

17  statements could bind the government (they cannot), they must be read in harmony

18  with the limits imposed by the ADA and other guidance provided by the agency.

19  For example, the Grants Policy Statement ("GPS") referenced in the FOAs and

20  incorporated into the NoAs states that the "projections of future funding levels"

21  during a "project period" "are not guarantees that the project or program will be

22  funded or will be funded at those levels" and "create no legal obligation to provide

23  funding beyond the ending date of the current budget period as shown in the NoA."

24  Gerardi Decl., Ex. B, at I-34. Nor is it relevant that the "project period" structure

25  contemplates different stages of the project being completed in different years,

26  leading to reliance interests. *See* Pls.' Resp. Br. 8-9. Such interests exist in any

27  multi-year agreement where the government chooses not to exercise its annual

28  option. Congress has lifted those restriction in a few specifically identified

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 9

1   instances where the lack of multi-year contracting made it prohibitively difficult
2   for agencies to carry out their mission.  But Plaintiffs do not dispute that Congress
3   has not conferred such authority to Defendants with respect to the TPP Program.
4        Although Plaintiffs rely upon HHS websites and the funding opportunity
5   announcements when it suits them, they argue Defendants cannot rely on the GPS
6   because it was not properly incorporated into the grant documents.  Pls.' Resp. Br.
7   12.  Not so.  By regulation, HHS "must include wording [in the Notice of Award]
8   to incorporate, by reference, the applicable set of general terms and conditions[.]
9   The reference must be to the Web site at which the HHS awarding agency
10  maintains the general terms and conditions."  45 C.F.R. § 75.210(b).  The Notices
11  of Award do exactly that.  *See, e.g.*, PPH FY 2015 Notice of Award, Grubb Decl.,
12  Ex. A, at 1, 4 ("You must comply with all terms and conditions outlined in the
13  grant award, including grant policy terms and conditions contained in [the]
14  applicable [HHS GPS] ….").  Thus, observing this regulation, Defendants did not
15  merely "cite" the document, but "placed [it] on the recipient through explicit
16  coverage in the NoA" terms and conditions, which Plaintiffs accepted by drawing
17  down their funds.  Gerardi Decl. Ex. B, at ii.  The error in Plaintiffs' argument
18  becomes plain when considering that, if correct, it would require all 217 pages of
19  the GPS to be appended to the Notice of Award every year in order for Defendants
20  to rely upon their general terms and conditions for grants.  That is inconsistent with
21  both HHS's regulations and common sense.
22       Defendants are not arguing that the GPS should be followed at the expense
23  of HHS's regulations, as Plaintiffs suggest.  Pls.' Resp. Br. 12 n.21 & 13.  Rather,
24  the GPS simply explains what is evident as a consequence of HHS's regulations
25  and the ADA: that grantees have no legal right to funding in future "project
26  period" years.  That is why, consistent with the regulatory text, the GPS
27  distinguishes between a decision not to issue further continuation awards and grant
28  termination, only offering a right to appeal the former when that decision is based

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 10

on a specific grantee's "fail[ure] to comply with the terms and conditions of a previous award[.]" Gerardi Decl., Ex. B, at II-89.  *In re Am. Indian Ctr. of Omaha, Inc.*, DAB 1141 (1990), 1990 WL 600170 (Mar. 26, 1990), is not to the contrary. The grantee in that case lost continuation funding because "the lack of an audit constituted a material failure to comply with the terms and conditions of the 1988-89 grant[,]" and the government's "best interests" finding was tied to that violation.  1990 WL 600170, at *5, *7.  The Departmental Appeals Board's jurisdiction was therefore proper.  Plaintiffs accepted these terms for appeals when they drew down TPP Program funding and cannot repudiate them now.

Plaintiffs place extensive reliance in their reply brief on *Califano*, a case they did not even cite, let alone discuss, in their opening papers.  But *Califano* does not bind this Court and is not applicable here.  In that case, HHS's predecessor agency (the Department of Health, Education, and Welfare, or "HEW") denied the plaintiff's application for continuing funding on the basis of an allegation that the plaintiff had engaged in serious misconduct.  574 F.2d at 520-21.  The Court reviewed HEW's regulations at the time[5] "in the light most favorable to the grantee" (a level of deference the Plaintiffs have understandably not asked for here, as no principle of law would so require), the Court agreed that HEW had "terminated" the plaintiff's grant by "termination of the grantee's authority to charge allowable costs to a grant prior to the grant expiration date in the grant award document."  *Id.* at 526-27 (quoting 45 C.F.R. § 16.3(i) (1976)).  It ordered a hearing to afford the plaintiff an opportunity to rebut the allegations and have them

---

[5] Plaintiffs rely upon the "similarity" between today's definition of "termination" and a "secondary definition" of "termination" that the *Califano* court relied on to reach its conclusion.  *Califano*, 574 F.2d at 528 (discussing 45 C.F.R. § 74.110 (1976)).  But that definition was not directly at issue in *Califano*.  Even so, the present definition is materially different.  It incorporates the terms "federal award" and "period of performance," which do not appear in the former HEW definition.

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 11

"stricken from the record, in whole or in part[,]" if appropriate, in order to redress the reputational harm Plaintiff alleged due to its loss of eligibility.  *Id.* at 528.

This case does not involve any alleged termination of Plaintiffs' "authority to charge allowable costs" to the existing grant, which was the operative standard for "termination" in *Califano*.  *Id.* at 526.  Nor does it involve the due process concerns that arise when a grantee's reputation is damaged by allegations of misconduct in their performance under a grant award.  Moreover, *Califano* never considered whether the regulations at issue created a constitutional obligation to renew funding.  In fact, the law of the D.C. Circuit holds to the contrary: "grants on a year-to-year basis, and grants made on this basis, even over a period of years, cannot create more than a 'unilateral expectation' of continued funding which is not entitled to constitutional protection."  *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822, 828 & n.6 (D.C. Cir. 1977) (citations omitted); *Mil-Ka-Ko Research & Dev. Corp. v. Office Of Econ. Opportunity*, 352 F. Supp. 169, 173 (D.D.C. 1972) (same), *aff'd*, 497 F.2d 684 (D.C. Cir. 1974).  And at least one court has considered and rejected an argument similar to the one presented in *Califano* as a basis for extracting further funding on the grounds that a grantee had no legal entitlement to funds for future years within a "project period."  *See Missouri Health & Med. Org., Inc. v. United States*, 641 F.2d 870, 873-74 (Ct. Cl. 1981).

HEW "clarified its regulations" after the D.C. Circuit decided *Califano* "to specifically distinguish a termination of previously awarded funds from a denial of further funding" and "exclude[] refusal to extend a grant or award new funds" from the scope of the regulatory "termination" clause, "citing, as an example, the refusal to make a non-competing continuation award."  *In re Nw. Rural Opportunities, Inc.*, DAB 324 (1982), 1982 WL 189564, at *1 & n.1 (June 30, 1982).  Although

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 12

the regulations have undergone more changes since then,[6] the current HHS regulations maintain a distinction between decisions to "terminate" a grant (which are always appealable within HHS) and the "denial of a noncompeting continuation award under the project period system" (which is only appealable "where the denial is for failure to comply with the terms of a previous award"). 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3) (stating jurisdiction of HHS's departmental appeals board); 42 C.F.R. § 50.404(a)(1), (4) (same).[7]  The GPS supports this view,

_____

[6] The operative regulations in *Northwest Rural Opportunities* were revised in 1994 (to implement OMB Circular A-110) and 2014 (which repealed and replaced Circular A-110 with a standard set of rules for the management of federal grant programs that individual agencies implement).  But in neither revision did HHS suggest they were adopting *Califano*'s interpretation of the regulations or otherwise justify their modifications to OMB's guidance.  *See* Executive Office of the President, Federal Awarding Agency Regulatory Implementation of OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871, 75,873 (Dec. 19, 2014); HHS, Uniform Administrative Requirements for Awards and Subawards to Institutions of Higher Education, Hospitals, Other Non-Profit Organizations, and Commercial Organizations; and Certain Grants and Agreements with States, Local Governments, and Indian Tribal Governments, 59 Fed. Reg. 43,754-01 (Aug. 25, 1994).  Nonetheless, in both its regulations and its informal guidance, HHS has maintained the distinction between not issuing a continuation award and termination for decades.  It would be passing strange for HHS to adopt *Califano* through implementation of Circular 110-A while remaining ignorant of that fact for decades.  *Cf. Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("In a case where the [proposed] construction of legislative language … makes so sweeping and so relatively unorthodox a change … judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.").

[7] 45 C.F.R. § 75.374(b)(1) (invoking these appeal rules in HHS's general grant administration principles); 45 C.F.R. § 75.2 (defining "Departmental Appeals Board" with respect to part 16 of title 45); Letter from Drew A. Harker to Evelyn M. Kappeler, dated Aug. 1, 2017, Grubb Decl., Ex. E (invoking appeal procedures of § 50.406, which comes from the same subpart as § 50.404, to challenge decision not to issue further continuing support).

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 13

as well.  Gerardi Decl., Ex. B, at I-33, I-34, II-89, II-90.  Plaintiffs reliance on this outmoded case underscores the weakness of Plaintiffs' regulatory argument and provides no grounds for the relief they seek here.

### C. Because No Grant Was "Terminated," Plaintiffs' APA and Due Process Claims Fail

Plaintiffs' claims under the APA (Counts I and II) are easily dispensed with. Because there is no "termination" in this case, HHS did not violate any regulation by refusing to issue another continuation award to Plaintiffs.  With no statute or regulation governing the decision to recompete Plaintiffs' TPP Program grants, the decision is committed to agency discretion by law under 5 U.S.C. § 701(a)(2), as Defendants showed in their opening brief.  Defs.' Op. Br. 18-21, ECF No. 27. Plaintiffs do not dispute the legal principle, but argue it only arises in the absence of a statutory or regulatory violation and claim such discretion cannot lie here because Plaintiffs HHS's decision has violated its regulations.  Pls.' Resp. Br. 14-16.[8]  But as shown, no such violation exists.  Accordingly, the Court lacks

_____

[8] Plaintiffs also erroneously rely on federal procurement concepts in an attempt to buttress their analysis of the grants, Pls.' Resp. Br. 3 n.6, 16, including *Schlesinger v. United States*, 390 F.2d 702 (Ct. Cl. 1968), but a grant is not a procurement. *See, e.g., Hymas v. United States,* 810 F.3d 1312, 1319 (Fed. Cir. 2016) (award of cooperative agreement not subject to bid protest rules).  More specifically, in *Schlesinger*, a contracting officer terminated a procurement contract for default for failing to deliver a product by a designated date, but did so principally due to pressure from a Senate Subcommittee investigating the contractor for procurement irregularities. *Id.* at 702-06.  The Court of Claims held that the default termination was illegal because the "technical default served only as a useful pretext for the taking of action felt to be necessary on other grounds unrelated to the [contractor's] performance." *Id.* at 709.  *Schlesinger* merely precludes default termination, *in the procurement context*, where "there is no considered *nexus* between the default termination and the contractor's performance under the contract." *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (discussing *Schlesinger*).  Here, by contrast, HHS has not

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 14

jurisdiction under the APA to review the dispute over Defendants' decision to recompete the grants.[9]

Plaintiffs' due process claim (Count IV), Pls.' Resp. Br. 20-21, also fail. Courts consistently reject the argument that grantees have a right to continued grant funding that could anchor a procedural due process claim. *See Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1544 (S.D.N.Y. 1984) ("Undoubtedly the continued annual re-funding of [plaintiff's grant project] created an expectation of continued funding, but such expectations cannot automatically be converted to 'legitimate claims'" entitled to due process protection), *aff'd*, 805 F.2d 1088 (2nd Cir. 1986); *Mil-Ka-Ko*, 352 F. Supp. at 173; *see also Guttmacher*, 597 F. Supp. at 1544 n.6 (collecting cases).[10]  Here, the ADA, the regulations, and the terms and conditions of Plaintiffs' grants establish that Plaintiffs' expectation of further funding could be no more than a unilateral expectation of future funds, and Plaintiffs cannot distinguish cases like *Gallegos* on the grounds that a mutual understanding existed between Defendants and

---

terminated Plaintiffs' grants at all (an assumption that underlines Plaintiffs' analysis), much less used any failure to perform under the Notices of Award as a pretext for termination. *Schlesinger* does not preclude agency officials, political or otherwise, from ensuring that administrative resources are channeled in the best interests of the federal government.

[9] Alternatively, Defendants request entry of summary judgment on the administrative record because it was not "arbitrary and capricious" to choose to recompete TPP Program funds under the terms and conditions of the grant award that Plaintiffs' accepted by drawing down their TPP Program funds. *See* Defs.' Op. Br. 21-22.

[10] The only language Plaintiffs identify in support of their theory is a statement by the court in *Citizens Health Corp. v. Sebelius*, 725 F.3d 687 (7th Cir. 2013) that recognized an "arguable" right to due process for a grantee, but the grantee was not a party to that case and the comment is therefore dicta.

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 15

Plaintiffs in this case that was not present there.  For these reasons, the due process claim must be dismissed.

## II. The Establishment Clause Claim Must Be Dismissed

### A. Any Standing For Plaintiffs' Claim Only Relates To Defendants' Decision to Recompete TPP Program Funds

Plaintiffs deem Defendants' arguments on the ripeness of their Establishment Clause claim to be meritless, Pls.' Resp. Br. 25, but this misses the point.  Defendants contend that "[t]o the extent Plaintiffs have any Establishment Clause claim at all … it must be based solely on HHS's actual decision not to continue awarding them funds[,]" because that is all Defendants have done to date. Defs.' Op. Br. 29.  That is, Defendants will hold a new competition to award grants, which Plaintiffs will be able to compete in; this case concerns only Plaintiffs' claim that they have a legal entitlement to further continuation awards. Plaintiffs' complaint suggests they are challenging what Defendants *might* do with the TPP Program in the future, which by definition depends upon future events not yet ripe for the Court's review.  As Defendants' opening brief explained, and as further discussed below, simply recompeting a grant program is insufficient, as a matter of law, to make out an Establishment Clause claim.

### B. Plaintiffs Do Not Plausibly Allege That Defendants' Actions Were Motivated By Religious Purpose

Plaintiffs' Establishment Clause claim fails as a matter of law.  The claim relies almost entirely on a study asserting that two of thirty-one curricula in Ohio's federally funded abstinence-only education program in 2005 had religious messages, and that Valerie Huber, who would become the Chief of Staff of the Office of the Assistant Secretary of Health over a decade later (and now serves as Senior Policy Advisor), was responsible for administering that abstinence-only education program.  Compl. ¶¶ 70-71; Defs.' Op. Br. 32.  Plaintiffs try to broaden their allegations by citing to Ms. Huber's work for "a lobbying arm of the

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 16

abstinence education movement," an op-ed arguing for greater funding for "sexual risk education," and a news piece in which she claimed a study linking dropping birth rates to increased contraceptive access was "biased." Compl. ¶¶ 72-74. None so much as mentions religious beliefs.

Plaintiffs also rely on articles from the Internet and documents obtained through FOIA requests (Pls.' Resp. Br. 26-27, 29) that are not a part of their complaint. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) ("Generally a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."). At most, they show that Ms. Huber holds religious beliefs and that HHS has met with faith-based groups about the possibility of awarding them TPP Program funding, both of which are perfectly legal. *See McDaniel v. Paty*, 435 U.S. 618, 641 (1978) (Brennan, J., concurring) ("[The Establishment Clause] may not be used as a sword to justify repression of religion or its adherents from any aspect of public life."); 45 C.F.R. § 75.218; § 87.3 ("Faith-based or religious organizations are eligible, on the same basis as any other organization, to participate in any HHS awarding agency program for which they are otherwise eligible.").

Even if the Court accepted all of Plaintiffs' allegations (including those asserted only in their briefs), the claim must be dismissed because *Lemon* evaluates the religious purpose of the *policy* at issue, not the *policymakers* responsible for its enforcement or enactment. *See Bd. Of Educ. of Westside Cmty. Sch. v. Mergens*, 496 U.S. 226, 249 (1990) ("[W]hat is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law."). The "eyes" of the objective observer look not to personal religious convictions or prior conduct, as Plaintiffs suggest, but to the "traditional external signs that show up in the text, legislative history, and implementation of the statute or comparable official act." *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 862-63 (2005) (citations omitted). If the law were otherwise, policies that would pass muster

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 17

under the Establishment Clause could fail solely on the religious beliefs of those advocating for them.[11]  Likewise, policies raising serious Establishment Clause concerns could escape review if the legislator did not intend to promote religion. *See Stone v. Graham*, 449 U.S. 39, 41 (1980) (striking down statute requiring the Ten Commandments to be posted in schools despite "avowed" secular motivation of instructing students about origins of western civilization and the common law).

Plaintiffs' complaint dwells on the personal religious beliefs of an HHS officer and adduces no objective evidence that the policy purpose of recompeting the TPP Program grants was to advance the religious beliefs of Ms. Huber or anyone else.  The NoAs Plaintiffs received cite no religious belief as a reason not to continue the Plaintiffs' future grants.  Nor do any of the statements HHS made after the change became public invoke sectarian aims.  Compl. ¶¶ 82-86.  On their face the statements are secular: they are about the statistics of the effectiveness, or lack thereof, of programs in actually reducing teen pregnancy. These are differences of opinion on a matter of *policy*, not religion. Even if one assumes that these policy differences will animate the recompetition of the TPP Program, the Supreme Court has already held that these differing views constitute a plausible secular purpose under the Establishment Clause.  *Bowen v. Kendrick*, 487 U.S. 589, 605 (1988).  Plaintiffs suggest that Defendants' departures from typical procedures and their "shifting and implausible" explanations for discontinuing further support give rise to an inference of improper purpose.  But the Establishment Clause does not entitle Plaintiffs to a presumption that if

---

[11] For instance, some religious adherents believe their faith compels them to oppose abstinence-only policies.  *See* "Reproductive Health," Religious Coalition for Reproductive Choice, http://rcrc.org/reproductive-health/ (last visited Apr. 12, 2018).  It would not offend the Establishment Clause if an official holding such beliefs pursued policies consistent with those beliefs and consulted with others who shared such beliefs in forming policy, so long as the objective legislative intent of the eventual policy was secular in nature.

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 18

government officials disagree with them on policy questions, they must be violating the Establishment Clause.  Even assuming Plaintiffs are right on both scores, Defendants allege no objective evidence of intent that would suggest that the purpose of the action is the advancement of religious belief.

A brief review of the primary authorities Defendants rely upon shows how far short their allegations fall from stating a claim under the Establishment Clause. In *Wallace v. Jaffree*, the statute at issue authorized a period of silence "for meditation *or voluntary prayer*."  472 U.S. 38, 40-41 (1985) (emphasis added). The religious intent of the statute was therefore manifest on its face, since prayer, unlike a mere moment of silence, is "associated with a religious exercise."  *Id.* at 72 (O'Connor, J., concurring).  In fact, Alabama already had a statute on the books that required a moment of silence for "meditation," leading to the inference that the "voluntary prayer" provision was "intended to characterize prayer as a favored practice."  *Id.* at 58-60.  In addition, the bill's primary sponsor "inserted into the legislative record—apparently without dissent—a statement indicating that the legislation was an 'effort to return voluntary prayer' to the public schools."  *Id.* at 56-57.  Thus, the record in *Wallace*—unlike Plaintiffs' allegations—clearly established objective sources of legislative intent to conclude that the statute in *Wallace* violated the Establishment Clause.  No such evidence exists here, where the award announcement does not mention religion, and HHS's later statements are wholly about the effectiveness and secular goals of the program.

Plaintiffs also cite *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993), to argue that "facial neutrality is not determinative" under the Establishment Clause.  Pls.' Resp. Br. 28.  But nothing in this Free Exercise Clause decision stands for the proposition that an Establishment Clause claim can be allowed to proceed on no objective evidence of a purpose to advance religion.  The ordinance in *Lukumi* used the terms "sacrifice" and "ritual" to describe the types of practices it prohibited, and although the Court concluded this

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 19

was not sufficient to compel a finding of improper targeting purely from the face of the statute itself, the Court did find that "the choice of these words is support for our conclusion." *Id.* at 534-35.  Moreover, the resolutions the city passed in conjunction with the ordinance expressed "concern that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety" and "reiterate[d] the city's commitment to prohibit any and all such acts of any and all religious groups." *Id.* at 535.  Finally, Court's concluded that, as applied, "almost the only conduct subject to [the ordinances] is the religious exercise of Santeria church members," *id.* at 535, particularly since it "exempt[ed] kosher slaughter," as well, *id.* at 538.  No analogous evidence nor even an allegation of such evidence exists here.

Plaintiffs fail to state an Establishment Clause claim because they have not pled "enough factual matter (taken as true) to suggest" there are "plausible grounds" for such a claim.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007).  Despite the large amount of information available relevant to understanding the objective purpose of HHS in recompeting the TPP Program, Tutt Decl. at ¶ 4, Plaintiffs' complaint and briefing fail to plausibly allege that the purpose of recompeting the TPP Program was to advance sectarian aims.  Discovery on the personal motivations of HHS officers is irrelevant and would do nothing to advance this claim.  Even in the Establishment Clause context, the plaintiff must allege sufficient factual matter to raise her entitlement to relief above the speculative level.  *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 318-19 (6th Cir. 2017) (dismissing establishment clause claim at the motion-to-dismiss stage); *Serpentfoot v. Rome City Comm'n*, 426 F. App'x 884, 886 (11th Cir. 2011) (same) (citation omitted).   Plaintiffs have not done so here.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion and dismiss this case, or enter summary judgment on Defendants behalf.

DATED: April 13, 2018.                    Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          JOSEPH H. HARRINGTON
                                          United States Attorney

                                          RUTH A. HARVEY
                                          Director, Commercial Litigation Branch
                                          JOEL McELVAIN
                                          Assistant Director, Federal Programs Branch
                                          MICHAEL J. QUINN
                                          Senior Litigation Counsel
                                          Commercial Litigation Branch

                                          /s/ *Michael J. Gerardi*
                                          MICHAEL J. GERARDI
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Ave. NW, Room 7223
                                          Washington, D.C. 20530
                                          Tel: (202) 616-0680
                                          Fax: (202) 616-8460
                                          E-mail: michael.j.gerardi@usdoj.gov

                                          /s/ *Jonathan E. Jacobson*
                                          ALICIA M. HUNT
                                          Trial Attorneys
                                          United States Department of Justice
                                          Civil Division
                                          Commercial Litigation Branch
                                          1100 L St. NW, 10th floor
                                          Washington, D.C. 20005

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 21

Tel: (202) 353-7971
Fax: (202) 514-9163
E-mail: jonathan.e.jacobson@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION - 22

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on April 13, 2018, I electronically filed the foregoing

4  with the Clerk of the Court using the CM/ECF system, which will send notification

5  of such filing to all counsel of record.

6

7                                                        <u>/s/ *Michael J. Gerardi*</u>

8                                                        MICHAEL J. GEARDI

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28